THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WATERFORD TOWNSHIP GENERAL EMPLOYEES RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>MONOLITHIC POWER SYSTEMS, INC., MICHAEL HSING, and BERNIE BLEGEN,<br><br>　　　　　　　Defendants. | No. 2:25-cv-00220-JLR<br><br>CLASS ACTION<br><br>FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

**TABLE OF CONTENTS**

NATURE AND SUMMARY OF THE ACTION............................................................... 1

JURISDICTION AND VENUE....................................................................................... 5

PARTIES........................................................................................................................ 5

BACKGROUND............................................................................................................ 7

A. The Company and its Operations. ....................................................................... 7

B. Nvidia Was the Most Important User of Monolithic's PMICs. ....................... 11

DEFENDANTS' MATERIALLY FALSE AND  MISLEADING STATEMENTS AND
OMISSIONS................................................................................................................ 12

ADDITIONAL SCIENTER ALLEGATIONS ............................................................. 22

A. Defendant Hsing Was Personally Motivated to Maintain an Inflated Price
for Monolithic Stock to Maximize Returns on His Stock Sales...................... 22

B. Defendant Blegen Was Personally Motivated to Maintain an Inflated Price for
Monolithic Stock to Maximize Returns on His Stock Sales. ........................... 25

C. Defendants' Statements Themselves Directly Acknowledged Their Awareness
of Quality Issues. ............................................................................................. 28

D. The Core Operations Doctrine Supports an Inference of Scienter. .................. 29

E. The Temporal Proximity of the False and Misleading Statements to the Corrective
Disclosures Supports an Inference of Scienter. ............................................... 29

LOSS CAUSATION/ECONOMIC LOSS ..................................................................... 30

APPLICABILITY OF PRESUMPTION OF RELIANCE: ....................................... 31

NO SAFE HARBOR ................................................................................................... 32

CLASS ACTION ALLEGATIONS............................................................................. 33

COUNT I..................................................................................................................... 34

COUNT II.................................................................................................................... 35

PRAYER FOR RELIEF .............................................................................................. 36

DEMAND FOR JURY TRIAL ................................................................................... 36

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                    ii

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Lead Plaintiff Mirko Dardi ("Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon personal knowledge as to himself, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of documents filed by Defendants Monolithic Power Systems, Inc. ("Monolithic" or the "Company"), Michael Hsing ("Hsing"), and Bernie Blegen ("Blegen") with the U.S. Securities and Exchange Commission ("SEC"), research reports issued by securities and financial analysts, press releases issued by Defendants, media and news reports, and other publicly available information about Defendants. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE AND SUMMARY OF THE ACTION

1.      This is a securities fraud class action on behalf of all those who purchased, or otherwise acquired, Monolithic common stock during the period from February 8, 2024 and November 11, 2024, inclusive (the "Class Period"), who were damaged thereby (the "Class"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      Monolithic is a fabless global semiconductor company that designs high-performance, power electronics solutions aimed at improving energy efficiency and sustainability. Monolithic is headquartered in Kirkland, Washington and was founded in 1997. Monolithic's common stock has traded publicly on the NASDAQ since 2004.

3.      Monolithic's most important end market is its Enterprise Data segment, which supplies power solutions for data-center infrastructure and AI computing hardware. For fiscal year 2024, revenue from the Enterprise Data market comprised over one-third of Monolithic's total revenue.

First Amended Complaint for Violation
of the Federal Securities Laws
Case No. 2:25-cv-00220-JLR          1

Tousley Brain Stephens PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

4.    Monolithic's Enterprise Data segment includes the development and sales of power management integrated circuits (PMICs), specialized chips that manage voltage regulation, current control, and thermal protection in power modules that, among other things, are used in Nvidia's GPU platforms.

5.    Nvidia, the leading supplier of graphic processing units ("GPUs"), was the most significant user of Monolithic's Enterprise Data products. In 2024, indirect sales of power management solutions for Nvidia's GPU platforms accounted for approximately 17% of Monolithic's total revenue. Monolithic supplied 100% of the PMICs used in Nvidia's Hopper architecture, which was launched in 2022 and widely regarded to be the most powerful of its kind. Nvidia was replacing the Hopper server in 2024 with a new and more powerful server, the Blackwell, which was announced in March 2024 and ramped throughout the second half of 2024.

6.    Starting in late 2023, however, Nvidia began to experience serious failures in its Hopper server boards—failures that were ultimately traced back to Monolithic's PMICs.

7.    On a February 7, 2024, earnings call, Monolithic's CEO, Michael Hsing, reassured investors that "all these issues are resolved." On a May 1, 2024 conference call, Monolithic's CFO Bernie Blegen, in responding to a question about Monolithic's relationship with Nvidia–and its prospects for supplying PMICs for the new Blackwell server system–represented that Monolithic was "at the front of the design cycle, we're consulted, we're integrated, in fact, with the development of the next generation of products" and claimed that the Company was strategically positioned to continue to be a "leader" in the market for such products.

8.    In truth, Nvidia's frustrations with Monolithic persisted and it had begun cultivating relationships with alternative PMIC suppliers, jeapordizing Monolithic's postion as the dominant supplier for the new Nvidia server.

9.    While concealing that the quality issues with the PMICs had not been resolved, Hsing and Blegen engaged in unusual sales of Monolithic stock in open market transactions—

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR          2

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

reducing their overall holdings in the Company significantly by selling tranches of thousands of personally-held shares in a manner distinct from their previous stock selling patterns. Hsing sold over $44 million of his Monolithic common stock while Blegen sold almost $22 million in stock.

10. On October 30, 2024, Monolithic shocked investors by reporting a slowdown in Enterprise Data revenue, which missed consensus estimates by nearly 13%. Blegen attributed the decline to "customer ordering patterns" but stock market analysts immediately linked the weakness to Nvidia sourcing PMICs from other competitors for the Blackwell servers. Hsing admitted on an October 30, 2024 call that new and additional competitors had entered the market as of Monolithic's first and second 2024 quarters, i.e., beginning in January 2024 and continuing throughout 2024.

11. Following this disclosure, Monolithic's stock price fell 17% in a single day, from $919.81 to $759.30 per share. Yet the stock remained artificially inflated as Defendants continued to downplay the severity of the problems with Nvidia.

12. During a conference call on October 30, 2024, Hsing misrepresented Monolithic's power solutions as the "best solution to fulfill" customers' needs, claiming this was why Monolithic "occupied a pretty large share" of the market.

13. On November 11, 2024, Edgewater Research, an investment management firm, issued a report revealing that Nvidia had cancelled half of its outstanding orders with Monolithic and was shifting most of its Blackwell production to competitors due to persistent "performance issues." The report stated that Nvidia engineers had "lost confidence" in Monolithic's PMICs and had issued "rush orders" to rival suppliers.

14. This revelation caused Monolithic's share price to fall another 15%, from $761.30 to $647.31, on heavy trading volume. Over the next week, the stock continued to decline, reaching $560 per share as investors absorbed corroborating reports from KeyBank, Needham, and Truist Securities confirming that Nvidia was sourcing PMICs from Monolithic's competitors.

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR          3

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

15. Analysts highlighted the increasingly favorable outlook for Infineon, Monolithic's main competitor in supplying PMICs to Nvidia. Brian Collello at Morningstar wrote on November 12, 2024, that "Infineon disclosed that AI revenue rose over 50% sequentially as it has more content within Nvidia's slate of Blackwell AI GPU servers. Management forecasts this AI business doubling in fiscal 2025 to EUR 500 million and reaching EUR 100 billion in two years, implying that this design win won't be a one-hit wonder." Similarly, Janardan Menon at Jeffries observed on November 13, 2024 that "[r]evenues and the growth outlook in AI power supply seems to have exceeded previous expectations just in the last few months. We believe this is due to the securing of a new major platform win at Nvidia for Blackwell, with strong orders coming through from this customer. We expect Infineon to continue to have a high market share in subsequent Nvidia platforms like Rubin as well, even though component supply for such high volume platforms is likely to be multi-sourced."

16. Another major competitor, Renasas, similarly reported strength in its Nvidia-related business. During its 4Q24 results briefing, Renasas's management noted it expected to maintain its share of PMICs at Nvidia and to more than double PMIC sales to the company, further underscoring Monolithic's loss of its previously near-exclusive position as Nvidia's PMIC supplier.

17. Confirming the loss of Nvidia business, on May 5, 2025, Monolithic filed its 10-Q for the first quarter of fiscal year 2025. The 10-Q noted that "[r]evenue from the enterprise data market decreased $16.8 million, or 11.2%, from the same period in 2024. This decrease was primarily due to lower sales of our power management solutions for AI applications . . . ."

18. Defendant Hsing's statements reassuring investors that all quality and performance issues plaguing Nvidia had been "resolved" and Defendant Blegen's statement claiming that Monolithic was "consulted" and "integrated" with "the development of the next generation of products" were false and misleading when made.

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR          4

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

19.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Lead Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

20.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1367, and pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa.

21.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

23.     In connection with the acts, omissions, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

24.     As set forth in the certification previously filed with the Court (Dkt. 26-2), the Dart Trust purchased shares of Monolithic common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. As this Court previously found, Mirko Dardi has standing to pursue claims on behalf of the Dart Trust. Dkt. 35.

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR          5

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

25.     Defendant Monolithic is a provider of power management components used in electronic systems. The Company is headquartered in Kirkland, Washington. Monolithic common stock is listed on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "MPWR."

26.     Defendant Michael Hsing founded Monolithic in 1997 and has served as the Company's Chief Executive Officer ("CEO") and Chairman of Monolithic's Board of Directors ("Board") since that time.

27.     Defendant Bernie Blegen has served as Monolithic's Chief Financial Officer ("CFO") since July 2016. Before this role, Blegen served as Monolithic's Corporate Controller.

28.     Defendants Hsing and Blegen, because of their position at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, i.e., the market. Defendants Hsing and Blegen authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their position with the Company and access to material non-public information available to them but not to the public, Defendants Hsing and Blegen knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. Defendants Hsing and Blegen are liable for the false statements pleaded herein.

29.     Monolithic, Defendant Hsing and Defendant Blegen are collectively referred to herein as "Defendants."

First Amended Complaint for Violation
of the Federal Securities Laws
Case No. 2:25-cv-00220-JLR          6

Tousley Brain Stephens PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
Tel. 206.682.5600 • Fax 206.682.2992

# BACKGROUND

## A.  The Company and its Operations.

30.     Monolithic was founded in 1997 by its current Chief Executive Officer, Defendant Hsing. It is based in Kirkland, Washington, with over 4,000 employees worldwide and various locations in Asia, Europe, and the U.S.

31.     Monolithic provides high-performance, semiconductor-based power electronics solutions. The Company designs and manufactures integrated circuits that control, convert, and manage electrical power within electronic systems. These chips are essential for ensuring that devices, from data center servers to consumer electronics, operate efficiently, safely, and with minimal energy loss.

32.     Monolithic is a "fabless" company: it does not own or operate its own manufacturing facilities ("fabs"). Instead, Monolithic outsources the production of its chips to specialized third-party manufacturers known as "foundries." To sell its products, Monolithic claims it relies on a staff of technical sales and applications engineers who assist prospective customers with the design and use of the Company's products and in the development of the customers' own products. According to Monolithic, this process enables the Company to meet customers' exacting specifications for quality and performance and promotes future product sales.

33.     Monolithic reports its financial and operational results under a single operating segment. However, the Company also reports revenue generated by sales into various end markets. Chief among these end markets is Enterprise Data, which includes sales of power management modules to technology companies engaged in supplying graphic processing units ("GPUs") that are used to run and operate artificial intelligence ("AI") data servers. Nvidia Corporation ("Nvidia")–the world's leading supplier of GPUs–is Monolithic's largest customer.

34.     Due to intense demand for AI applications, global technology companies have poured hundreds of billions of dollars into the construction of data centers necessary for the

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                    7

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

development of AI technologies. Amid this influx of AI-related capital, Nvidia launched the "Hopper" GPU in late 2022, which was used to construct the next wave of AI data centers.

35.     As the sole supplier of certain power modules used in Nvidia's Hopper GPUs, Monolithic benefitted from the downstream effects of the growing demand for AI infrastructure. For example, following the launch of Nvidia's Hopper GPUs, Monolithic's Enterprise Data business quickly became the Company's largest and fastest growing unit, jumping from 11% of total sales in the second fiscal quarter of 2023 to roughly 27% of sales the following quarter. By the end of the fourth quarter of 2023, Enterprise Data had become Monolithic's largest business segment, representing approximately 28% of the Company's overall sales.

36.     During the Class Period, Monolithic executives represented to investors that the widespread adoption and use of the Company's products within the AI industry was due to the purportedly superior performance of Monolithic products. For example, during a February 2024 conference call, Defendant Hsing represented that Monolithic's customers were "very receptive" to the Company's products and claimed that client demand was increasing because Monolithic was able to "solve" issues within their systems. During a subsequent call with investors, Defendant Blegen similarly stated that Monolithic's products had gained a majority market share due to the Company's innovative solutions and claimed that Monolithic could maintain its market-leading position because the Company was working with clients, including Nvidia, on the development of their next-generation products.

37.     Monolithic's filings with the SEC also emphasized the Company's purported specialization in semiconductor technologies and highlighted the supposed reliability and performance of Monolithic's products. For example, in quarterly reports filed throughout the Class Period, Monolithic represented that it possessed "innovative proprietary" technology and an "expertise" in semiconductor design and claimed that these advantages allowed the Company to deliver "reliable, compact, and monolithic solutions."

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                    8

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

38.    As a result of the demand for its purportedly superior products, Monolithic reported favorable revenue growth during the Class Period. For example, for the second fiscal quarter of 2024, Monolithic reported "record" quarterly revenue of $507 million. Monolithic attributed this unprecedented revenue growth in substantial part to increased customer demand for its AI power solutions, which had caused Enterprise Data revenue to increase 290% year-over-year to $187 million, from $48 million in the prior year quarter.

39.    In the wake of these disclosures, analysts applauded Monolithic's financial results. For example, a Deutsche Bank analyst report stated that Monolithic was a "[b]eacon on a hill" compared to peers who, in contrast, had reported "relatively muted" financial results. Similarly, an Oppenheimer analyst report stated that Monolithic had reported "standout" results, making the Company a "Rose Among Thorns" given recent "peer malaise."

40.    Unbeknownst to investors, however, Monolithic's power management solutions were suffering from significant performance and quality control issues, which, in turn, negatively impacted the GPUs they powered like those supplied by Nvidia. Contrary to Defendants' Class Period representations that Monolithic had resolved quality issues with the components the Company supplied to Nvidia, these issues were in fact ongoing. As a result of these shortcomings, Monolithic's relationship with Nvidia (its largest customer) had been damaged, thereby exposing Monolithic to material undisclosed risks of significant business, financial, and reputational harm and causing Monolithic to lose significant market share in supplying PMICs to Nvidia's new, cutting edge Blackwell server.

41.    Monolithic differentiates itself from competitors with its "monolithic" design philosophy, which involves integrating an entire power system onto a single silicon chip. Silicon, a semiconductor whose electrical conductivity can be adjusted to fall between that of a conductor (like copper) and an insulator (like rubber), enables this integration. The Company's "monolithic" approach allows it to produce smaller, more efficient, single-chip power management integrated circuits (ICs).

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                9

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

42.    ICs are circuits in which a number of transistors and other elements are electrically interconnected to form a more complicated electronic circuit.

43.    Monolithic focuses on the market for high performance analog and mixed-signal ICs:

    a.    **Analog ICs** respond to real world signals such as temperature, pressure, light, sound, or speed and perform power management functions, such as regulating or converting voltages, for electronic devices.

    b.    **Mixed-signal ICs** combine digital and analog functions onto a single chip and play an important role in bridging real world applications to digital systems.

44.    Monolithic's key product families include Direct Current ("DC") to DC, Alternating Current ("AC") to DC, driver metal-oxide-semiconductor field-effect transistor, power management IC, current limit switch and lighting control products.

45.    A **power management integrated circuit** (PMIC) is a specialized chip that controls how electrical power is delivered and regulated within an electronic device. It handles key functions such as voltage regulation, current control, power sequencing (turning different parts of the device on and off), efficiency optimization, and protection against overheating, overvoltage, and short circuits.

46.    PMICs are generally considered analog integrated circuits because these core functions involve continuous real-world electrical signals, however, Monolithic's PMICs incorporate digital logic that enables programmability and advanced system control and are therefore classified as mixed-signal ICs.

47.    Monolithic's key end markets, in descending order of revenue contribution, are enterprise data (32.5%); storage and computing (22.7%); automotive (18.8%); communications (10.2%); consumer applications (9.1%); and industrial (6.7%).

48.    The Enterprise Data end market encompasses, most importantly, data-center and cloud infrastructure markets, in particular, power solutions for servers, storage, networking, and

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR          10

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

AI computing hardware. Selling PMICs for Nvidia's GPU chips (used in data center infrastructure) was the singular most important part of MPS's Enterprise Data market.

**B. Nvidia Was the Most Important User of Monolithic's PMICs.**

49.     Nvidia is a leading designer of graphics processing units ("GPUs"), which are specialized electronic circuits built for parallel processing—performing many mathematical operations simultaneously. Nvidia's GPUs are central to AI acceleration, deep learning, and high-performance computing.

50.     Nvidia's Hopper architecture, launched in 2022, was specifically engineered for large-scale computing applications and excelled in transformer-based AI models, large language models (LLMs), and scientific workloads. The H100 is the Hopper architecture GPU, which was widely deployed in AI servers through 2024.

51.     Within each GPU, PMICs are essential components that enable high power delivery for demanding AI tasks while maintaining thermal efficiency and stable performance. GPUs like Nvidia's H100 require numerous power "rails"—distinct voltage levels and current requirements—each controlled by a dedicated PMIC. These rails power different subsystems on the GPU, including processing cores, memory, high-speed I/O, and auxiliary circuits.

52.     PMICs are also essential components within the larger HGX baseboards that house multiple GPUs. HGX boards are Nvidia's reference server platforms, each of which contain multiple GPUs and are used by hyperscalers such as Google and Microsoft as the foundation for AI servers.

53.     Nvidia was Monolithic's most important indirect customer. Truist analyst William Stein noted in a December 16, 2024 report that by the end of 2024, Nvidia's purchases represented approximately 50% of Monolithic's Enterprise Data end market and 20% of its total sales. Chris Caso at Wolfe Research wrote on January 16, 2025 that Monolithic supplied 100% of the PMIC chips used in Nvidia's Hopper GPUs.

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR    11

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

54.     Monolithic does not typically sell directly to Nvidia. Instead, the Company relies on third-party distributors and value-added resellers, or sells directly to contract manufacturers or board assemblers in Asia that integrate Monolithic's PMICs into Nvidia GPUs and HGX boards.

55.     Nvidia's Blackwell architecture, released in 2024 and expected to be widely available by the end of 2025, is the successor to the Hopper GPU platform. Blackwell is designed for the most demanding computational workloads, including training large AI models, running complex simulations, and accelerating generative AI applications.

56.     Blackwell delivers a 2.5× performance increase over Hopper while being 25× more energy efficient and six times faster than Hopper for large datasets. As Nvidia CEO Jensen Huang remarked in January 2025, "I said before that when Blackwell starts shipping in volume, you couldn't give Hoppers away . . . There are circumstances where Hopper is fine, that's the best thing I could say about Hopper . . . ."

57.     As it became clear that the Blackwell architecture would soon render the Hopper obsolete, investors began to pay close attention to whether Monolithic's PMICs would play as important a role in Blackwell as they did in the Hopper.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

58.     The Class Period begins on February 8, 2024. After close of market on February 7, 2024, Monolithic issued a release announcing the Company's financial results for its fourth fiscal quarter and year ending December 31, 2023 ("4Q23 Release"). The 4Q23 Release stated that Monolithic's quarterly revenues decreased to $454 million from $460 million in the prior year quarter. The 4Q23 Release added that quarterly revenues within the Company's Enterprise Data business increased to $129 million from $68 million in the prior year quarter.

59.     Also on February 8, 2024, Monolithic held a conference call with analysts to discuss the Company's financial and operational results for the fourth quarter of 2024, which was hosted by Defendants Hsing and Blegen ("4Q23 Earnings Call").

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR          12

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

60.    During the 4Q23 Earnings Call, Nathaniel Quinn Bolton of Needham & Company asked Defendants Hsing and Blegen about "new ramps with probably higher content," referring to the start of production of Nvidia's Blackwell and other next-generation systems with substantial power demands. Higher power consumption typically increases the number and complexity of power management components per unit. Bolton wanted to know how the potential "increase in competition" might impact "average dollar content per win" (revenue Monolithic earns per system design that incorporates its chips), which would otherwise "trend[] higher as power consumption goes up."

61.    In response, Defendant Hsing reassured Bolton "at this time, we want to solve all the problems and ***we believe we resolve all these issues during this fast ramp***. And also the cost at this time is not really the issue. ***It's all about the throughput and to meet the customer demand***."

62.    The italicized statements identified in ¶61 were materially false and misleading and omitted material facts. First, it was false and misleading for Hsing to say that "all these issues during this fast ramp" were resolved.[1] At the time that the statement was made, Nvidia's Hopper server boards had been experiencing failures during production testing, a problem that was traced back to Monolithic's PMICs and the issues had not been resolved. Second, Hsing misled investors by claiming "it's all about the throughput and to meet the customer demand." Hsing omitted from his statements and failed to reveal that the quality control issues Monolithic experienced negatively impacted its relationship as a supplier for Nvidia's servers which negatively impacted Monolithic's ability "to meet the customer demand." Thus, Hsing misleadingly sought to reassure Bolton and investors that Monolithic had resolved its quality control problems and they would not affect Nvidia's allocation of its orders for power solutions for its next-generation Blackwell. In fact, on November 11, 2024, Edgewater Research reported

---

[1] By "fast ramp," Defendant Hsing was referring to the rapid scale up in production of PMICs for Nvidia's Hopper as AI GPU demand surged.

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                13

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

that this slowdown was caused, at least in part, by Nvidia cancelling half of its outstanding Monolithic orders because of "[p]erformance issues" with the Company's products. The report also disclosed that Nvidia engineers "lost confidence" in Monolithic's products and decided to turn to the Company's competitors as Nvidia's "primary suppliers."

63.     Later on in the 4Q23 Earnings Call, Richard Ewing Schafer of Oppenheimer & Co. asked: "I was just curious to get your thoughts on if it gets harder or the competition going forward as guys like NVIDIA move from a 2-year cadence on new processor development to an annual cadence."

64.     Defendant Hsing responded that "[s]o far, in what we have, okay, and our customers can be very receptive to our solution. So far, we pretty much have a majority of the volumes. ***And they keep requesting it and keep requesting we solve all these issues,*** related to their system issues, ours and issues from our side . . . So we start to win a lot of -- a lot of shares. And the same is in the servers and have a very similar trend. And that's how we win the market. And we always want to do -- as we said in the past, we want to push in the technology. We want to make sure we're the best."

65.     The italicized statement identified in ¶64 was materially false and misleading and omitted material facts. At the time Hsing responded to an analyst's question about Monolithic's competition for supplying Nvidia's GPU architectures with PMICs by saying "they keep requesting it and keep requesting we solve all these issues," Monolithic's relationship with Nvidia had already begun to deteriorate because of significant performance and quality control issues with its PMICs. In late 2023, Nvidia's Hopper server boards began to experience failures during production testing, a problem that was traced back to Monolithic's power modules. At that point, Nvidia began searching for additional PMIC suppliers. This development led to the slowdown in Monolithic's Enterprise Data segment in 3Q24, because Nvidia was moving away from using Monolithic's PMICs. As discussed, on November 11, 2024, Edgewater Research reported that this slowdown was caused, at least in part, by Nvidia cancelling half of its

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                    14

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1    outstanding Monolithic orders because of "[p]erformance issues" with the Company's products.

2    The report also reported that Nvidia engineers "lost confidence" in Monolithic's products and

3    decided to turn to the Company's competitors as Nvidia's "primary suppliers."

4        66.    Later in the 4Q23 Earnings Call, Defendant Hsing acknowledged that Monolithic

5    had experienced "some issues" with its power management components, but again reassured

6    investors that "***all these issues are resolved***," which he claimed would enable Monolithic to

7    "significantly" increase the amount of products installed on customer projects, stating:

8        Yes, okay. We had some issues on the Stage 1. We had some design wins and very small
         volumes in different systems, actually. Now we don't have – ***all these issues are resolved***.
9        That will significantly gain the content. And in each AR systems.

10       67.    The italicized statement identified in ¶66 was materially false and misleading and

11   omitted material facts. At the time Hsing reassured investors that "all these issues are resolved,"

12   the quality control issues had not been resolved as evidenced by the fact that Monolithic's

13   Enterprise Data revenue declined significantly in its 2024 third quarter because it received fewer

14   orders for its PMICs for Nvidia's servers as Nvidia began to replace Monolithic with other

15   suppliers. As noted, on November 11, 2024, Edgewater Research reported that this slowdown

16   was caused, at least in part, by Nvidia cancelling half of its outstanding Monolithic orders

17   because of "[p]erformance issues" with the Company's products. The report also reported that

18   Nvidia engineers had "lost confidence" in Monolithic's products and decided to turn to the

19   Company's competitors as Nvidia's "primary suppliers."

20       68.    The market took note of Defendant Hsing's reassurances on the 4Q24 Earnings

21   Call. On February 7, 2024, William Stein of Truist Securities noted in a report that "[o]ver the

22   last few days one of our industry contacts (component buyers/sellers) highlighted a 'quality issue'

23   with MPWR [Monolithic] in NVDA's (Buy) products. Today, MPWR confirmed it did face a

24   quality concern with NVDA. The good news is that MPWR identified the problem, the failure

25   rate is low, the problem is fixed, and the relationship remains on solid footing."

26

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                    15

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

69.     On May 1, 2024, Monolithic issued a release announcing the Company's financial results for its first fiscal quarter ending March 31, 2024 ("1Q24 Release"). The 1Q24 Release stated that Monolithic's quarterly revenues increased to $458 million from $451 million in the prior year quarter. The 1Q24 Release further stated that quarterly revenues within the Company's Enterprise Data business increased to $150 million from $47 million in the prior year quarter.

70.     That same day, Monolithic hosted a conference call with analysts to discuss the Company's financial and operational results for the first quarter of 2024, which was hosted by Defendants Hsing and Blegen. In response to a question from an analyst regarding the Company's relationship with its "largest enterprise data customer" (i.e., Nvidia), Defendant Blegen represented that Monolithic was "***at the front of the design cycle, we're consulted, we're integrated, in fact, with the development of the next generation of products***" and claimed that the Company was strategically positioned to continue to be a "***leader***" in the market for such products.

71.     Blegen's response to the analyst's question in ¶79 was materially false and misleading when made. Nvidia was frustrated with Monolithic's quality control issues and its relationship with Nvidia was damaged as a result. Monolithic lost its position as a leading supplier of PMICs for the Blackwell server as evidenced by the substantial decline in Enterprise Data revenue for Monolithic's 2024 fiscal third quarter, Hsing's statement, on October 30, 2024, that additional competitors were supplying Nvidia which, he admitted "happened in the last couple of quarters" i.e., Monolithic's 2024 first and second quarters, and competitors' (Infineon and Renasas) increased sales attributed to Nvidia's Blackwell server.

72.     On August 1, 2024, Monolithic issued a release announcing the Company's financial results for its second fiscal quarter ending June 30, 2024 ("2Q24 Release"). The 2Q24 Release stated that Monolithic's quarterly revenues increased to $507 million from $441 million in the prior year quarter. The 2Q24 Release further stated that quarterly revenues within the

First Amended Complaint for Violation
of the Federal Securities Laws
Case No. 2:25-cv-00220-JLR                    16

Tousley Brain Stephens PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Company's Enterprise Data business increased to $187 million from $48 million in the prior year quarter.

73.     That same day, Monolithic held a conference call with analysts to discuss the Company's financial and operational results for the second quarter of 2024, which was hosted by Defendants Hsing and Blegen. During his prepared remarks, Defendant Blegen emphasized Monolithic's "record" revenue growth, which he attributed in substantial part to increased demand for the Company's AI power solutions, stating in pertinent part as follows:

> Let me open by saying MPS reported yet another record quarter, with Q2 2024 revenue of $507.4 million, exceeding the high end of our guidance. ***Our strong revenue growth was attributed to three factors: increased demand for AI power solutions, improving order trends in several of our end markets, and lastly, initial revenue ramps associated with design wins secured in past years***.

74.     The italicized portion of Blegen's statements in ¶73 were materially false and misleading when made and omitted to reveal material facts. While Blegen attributed strong revenue growth, in part, to "improving order trends" and "design wins" this was misleading as it omitted to reveal that Monolithic's quality control issues damaged its relationship with Nvidia causing it to seek out new and additional suppliers for PMICs for its new Blackwell server. In fact, Hsing subsequently acknowledged on October 30, 2024 that additional competitors were supplying Nvidia which he admitted "happened in the last couple of quarters" i.e., Monolithic's 2024 first and second quarters.

75.     In a report published nearly two months later, on October 24, 2024, Seymore noted that "[h]eading into 3Q24 earnings . . . we expect investor attention to focus upon . . . How will MPWR's Enterprise Data segment perform in the near/medium term given the product transition at its largest customer (NVDA) and debate of increased competition in Blackwell?"

### THE TRUTH EMERGES

76.     On October 30, 2024, Monolithic issued a press release announcing the Company's financial results for its third fiscal quarter ending September 30, 2024 ("3Q24 Release"). The 3Q24 Release revealed an unexpected slowdown in Monolithic's critical

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                    17

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Enterprise Data segment, with quarterly revenue declining sequentially to $184 million, down from $187 million in the prior quarter and missing consensus estimates of $211 million by nearly 13%.

77.     During Monolithic's third quarter earnings call on October 30, 2024, Defendant Hsing represented that Monolithic's provision of "best"-in-class power solutions had allowed the Company to maintain a dominant initial share of the burgeoning AI market, stating in pertinent part as follows:

> Yes. I mean you probably – everybody knows that if you look at the transcript from the last year, we talked about the market is big and that the market is growing or the AI requirements is growing. And so the customers initially will take the – ***always take the best solutions to fulfill their needs*** and the best solution and also the speed of the development service, as Bernie said earlier. ***And that's why we occupied a pretty large shares***, okay? And last year, we said, okay, this market is too big and MPS will be always have the best solutions in these applications. And we also talk about the market is bigger. There will be a second or third or fourth supplier to join this segment. ***And this – and when will that happen, and we don't know, okay? It happened in the last couple of quarters.*** And again, in next years, what we see – again, the market is growing very fast. [Emphasis added.]

78.     The statements identified in ¶77 in italics were materially false and misleading when made and omitted to reveal material facts. Hsing misled investors by claiming that Monolithic's products were the "best solutions" for customers which was why Monolithic "occupied a pretty large [market] share." In fact, Monolithic lost market share to competitors because its products were not the "best" due to quality control issues which is precisely why it lost business with Nvidia and new competitors took market share away from Monolithic.

79.     During the call, an analyst asked about Monolithic's "opportunity" within AI accelerators in the upcoming year. In response, Defendant Hsing stated that Monolithic's power solutions were the "***best***" and "***most power efficient***" in the industry, and represented to investors that the Company's Enterprise Data business "***will grow***."

80.     Hsing's response to the analysts' question was materially false and misleading when made and omitted to reveal material facts for the reasons as set forth in ¶78 above. Monolithic lost market share to competitors because its products were not the "best" due to

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                    18

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

quality control issues which is precisely why it lost business with Nvidia and new competitors took market share away from Monolithic.

81.     In the wake of these disclosures, analysts reported that Monolithic's lackluster sales within its Enterprise Data segment were due to a decrease in Nvidia orders.

82.     Hans Mosesmann of Rosenblatt stated "Enterprise Data (AI Nvidia-driven) took a pause for 4Q24, we think, on the delayed Blackwell ramp. The issue for investors to fix on is the rather precarious position of having most of the Nvidia Hopper and early Blackwell power module vertical/lateral share and then sharing the socket with two other players, likely Renesas and Infineon, in 2025."

83.     Joshua Buchalter of TD Cowen wrote "[w]e believe inventory build is likely to blame but admittedly are left scratching our heads as the AI- and server-levered Enterprise Data segment printed down -1% Q/Q, well below our expectations for +10% Q/Q and the Street's +13%. MPS had signaled a moderation to sequential growth during our meetings intra-quarter (here), but the magnitude was much greater than investors (and our own model) had contemplated."

84.     On this news, the price of Monolithic common stock fell more than $160 per share from $919.81 per share on October 30, 2024 to $759.30 per share on October 31, 2024, a decline of more than 17% on above-average trading volume of more than 3 million shares traded. But the price of Monolithic common stock remained artificially inflated as Defendants continued to make material misstatements and omissions and to conceal the full truth regarding the Company's business, operations, and financial results.

85.     On November 11, 2024, Edgewater Research analysts issued an explosive report revealing that Nvidia had cancelled half of its outstanding Monolithic orders and intended to eliminate Monolithic's allocation to most variants of its next-generation Blackwell chips due to "[p]erformance issues" with the Monolithic's products. The report also revealed that Nvidia engineers "lost confidence" in Monolithic's products and decided to turn to the Company's

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR          19

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

competitors as Nvidia's "primary suppliers." Corroborating these claims, the report noted that Monolithic's competitors had received "rush orders" in recent weeks for components related to Nvidia's most-advanced Blackwell models.

86.     On this news, the price of Monolithic common stock fell $114 per share from $761.30 per share on November 8, 2024 to $647.31 per share on November 11, 2024, a decline of 15% on above-average trading volume of more than 4 million shares traded.

87.     While Monolithic attempted to refute the disclosures contained in the Edgewater Research report, the market found the claims credible and concerning. As a result, in subsequent trading days the price of Monolithic stock continued to fall, reaching a low of $560 per share on November 20, 2024.

88.     Furthermore, later reporting confirmed that Monolithic's declining Enterprise Data revenue was connected with PMIC performance issues in Nvidia's products. On November 17, 2024, John Vinh of KeyBanc wrote "[w]e believe MPWR will lose significant market share on Blackwell with the ramp of GB200/B200, as Hopper PMIC overheating issues have persisted on Blackwell . . . we believe NVDA has been experiencing overheating issues with MPWR's PMIC in its testing and, as a result, will not have any share on GB200/B200. These overheating issues appear to be related to the PMIC issues we had flagged on Hopper and likely worsened as the power requirements increased on Hopper at 700W to 1,000W on Blackwell . . . given that these issues had persisted on Hopper at 700W and were never completely resolved, we believe significant uncertainty exists as to when MPWR will be able to reenter NVDA's supply chain."

89.     Nathaniel Quinn Bolton of Needham & Co. wrote on November 21, 2024 that "[r]ecent reports from a competing broker and the Asia supply chain have raised questions about the performance of MPWR's multi-phase solutions at higher power levels. The company has refuted these claims and believes there are no technical issues with its solutions. However, regardless of the reason, we believe NVIDIA recently made a decision to ramp initial Blackwell volumes using competing multi-phase solutions from Infineon and Renesas . . . We are also

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                    20

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

reducing our assumption for MPWR's share of NVIDIA's Hopper platform to 50% over the next couple quarters as we believe NVIDIA is ramping Renesas as a second source. Additionally, based on commentary from NVIDIA on its F3Q25 earnings call, we expect a rapid cutover to Blackwell volumes through 2025 driven strong demand for this higher-TCO platform. As a result, we see Hopper volumes declining meaningfully beyond 1Q25."

90.    On December 16, 2024, William Stein of Truist Securities lowered his price target for Monolithic, noting that "[w]e believe that MPWR's challenges with NVDA stem from a quality concern or debate arising from MPWR's supporting a meteoric rise in NVDA's demand during 2023 . . . [W]e have no confidence in MPWR's share in Blackwell. We suspect the answer lies more in the ability of new suppliers – likely Renesas and Infineon – to ramp production with good yields and high quality. As a result of our recognition that there is a clear imperfection in MPWR's relationship with NVDA, we are adjusting our model . . . ."

91.    Analysts also noted the increasingly favorable outlook for Monolithic's main competitor in supplying PMICs to Nvidia, Infineon. Brian Collello at Morningstar, wrote on November 12, 2024, that "Infineon disclosed that AI revenue rose over 50% sequentially as it has more content within Nvidia's slate of Blackwell AI GPU servers. Management forecasts this AI business doubling in fiscal 2025 to EUR 500 million and reaching EUR 100 billion in two years, implying that this design win won't be a one-hit wonder." Similarly, Janardan Menon at Jeffries, wrote on November 13, 2024, "Revenues and the growth outlook in AI power supply seems to have exceeded previous expectations just in the last few months. We believe this is due to the securing of a new major platform win at Nvidia for Blackwell, with strong orders coming through from this customer. We expect Infineon to continue to have a high market share in subsequent Nvidia platforms like Rubin as well, even though component supply for such high volume platforms is likely to be multi-sourced."

92.    Another major competitor, Renasas, similarly reported strength in its Nvidia-related business. During its 4Q24 results briefing, Renasas's management noted it expected to

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

maintain its share of PMICs at Nvidia and to more than double PMIC sales to the company, further underscoring Monolithic's loss of its previously near-exclusive position as Nvidia's PMIC supplier.

93.     On May 5, 2025, Monolithic filed its 10-Q for the first quarter of fiscal year 2025. The 10-Q noted that "[r]evenue from the enterprise data market decreased $16.8 million, or 11.2%, from the same period in 2024. This decrease was primarily due to lower sales of our power management solutions for AI applications . . . ." This decrease further indicated that Monolithic had lost significant AI-related business and that Defendants' earlier assurances regarding the Company's continuing position with Nvidia were materially misleading.

## ADDITIONAL SCIENTER ALLEGATIONS

94.     As alleged herein, Defendants acted with scienter because they knew or recklessly disregarded that their public statements were materially false and misleading; knew that their statements would be disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of their statements in actions intended to manipulate the market price of Monolithic's common stock as primary violations of the federal securities laws.

### A.  Defendant Hsing Was Personally Motivated to Maintain an Inflated Price for Monolithic Stock to Maximize Returns on His Stock Sales.

95.     Insider sales of the stock of public companies must be disclosed. Specifically, a corporate officer of a publicly traded company must file an SEC Form 4 within two business days of a transaction that results in a change in beneficial ownership of company securities. This includes buying or selling shares, making gifts, or exercising or converting derivative securities like stock options.

96.     Although motive and stock sales are not required to plead scienter, the information available from such public disclosures shows Defendants Hsing and Blegen engaged in suspicious insider stock sales during the Class Period, while Monolothic's stock was at all-time highs until October 30, 2024.

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                    22

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

97.    Defendant Hsing was motivated to maintain Monolithic's stock price to maximize returns on his stock sales during the Class Period and his sales of stock during the Class Period were unusual in several respects.

98.    All of Defendant Hsing's transactions in Monolithic stock during the Class Period were sales. None of Defendant Hsing's stock sales during the Class Period were made pursuant to a previously entered 10b5-1 Plan—each was an independent, volitional open market transaction.

99.    Defendant Hsing engaged in eleven transactions concerning Monolithic's stock during the approximately nine-month Class Period, selling a total of 59,765 shares for a total of $44,211,500.

100.    On February 8, 2024, Hsing sold 2790 shares of Monolithic stock in open market transactions for approximately $1,897,200.

101.    On March 1, 2024, Hsing sold 8,000 shares of Monolithic stock in open market transactions for approximately $5,808,620.

102.    On April 1, 2024, Hsing sold 8,000 shares of Monolithic stock in open market transactions for approximately $5,419,521.

103.    On May 1, 2024, Hsing sold 8,000 shares of Monolithic stock in open market transactions for approximately $5,294,840.

104.    On May 8, 2024, Hsing sold 2,824 shares of Monolithic stock in open market transactions for approximately $1,948.560.

105.    On June 3, 2024, Hsing sold 8,000 shares of Monolithic stock in open market transactions for approximately $5,848,606.

106.    On July 1, 2024, Hsing sold 2,672 shares of Monolithic stock in open market transactions for approximately $2,149,816.

107.    On July 22, 2024, Hsing sold 9,614 shares of Monolithic stock in open market transactions for approximately $7,994,810.

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                23

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

108.    On August 8, 2024, Hsing sold 2,790 shares of Monolithic stock in open market transactions for approximately $2,171,708.

109.    On August 9, 2024, Hsing sold 4,263 shares of Monolithic stock in open market transactions for approximately $3,526,277.

110.    On November 8, 2024, Hsing sold 2,812 shares of Monolithic stock in open market transactions for approximately $2,151,602.

111.    The nature, timing, and amount of Defendant Hsing's open market sales of stock during the Class Period were unusual.

112.    Every single sale of Monolithic stock Hsing made in 2023 was indicated on the associated Form 4 filed with the SEC as having been conducted to cover taxes on the vesting of restricted stock units acquired as part of the Company's equity incentive plan, whereas during the Class Period, a majority of the Form 4's accompanying Hsing's sale of shares included no similar notation. The Form 4s Hsing filed in connection with his sales of stock on March 1, April 1, May 1, June 3, July 1, and August 9, 2024 do not include any notation describing the sale as having been made in connection with a tax obligation incurred by the vesting of shares acquired as part of Monolithic's equity incentive plan.

113.    In 2022, all but one of Hsing's stock sales were noted on the associated Form 4 filed with the SEC as having been conducted to cover taxes on the vesting of restricted stock units acquired as part of the Company's equity incentive plan—and that transaction was a sale of just 3,807 shares. By comparison, during the Class Period Hsing sold more than ten times as many shares, 38,935, in open market transactions not described as having been made in connection with a tax obligation incurred by the vesting of shares acquired as part of the Company's equity incentive plan.

114.    The timing of Defendant Hsing's stock sales during the Class Period was also unusual. Hsing repeatedly made major stock sales on or shortly after making false and misleading

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                    24

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

statements, including on February 8, 2024, March 1, 2024, May 1, 2024 and on November 8, 2024, just days before the release of the Edgewater Research Report.

115.    Each of the four transactions involving exactly 8,000 shares (March 1, April 1, May 1, and June 3, 2024) that Hsing sold during the Class Period described above was made on the first trading day of the month and each netted in excess of $5 million. Additionally, each of the four transactions involving exactly 8,000 shares is included in the subset of transactions not indicated as having been made in connection with a tax obligation incurred by the vesting of shares as part of Monolithic's equity incentive plan.

116.    The amount of Defendant Hsing's stock sales during the Class Period was also unusual. During the approximately nine-month Class Period, Hsing's sale of shares generated a financial windfall of more than $44,211,500—representing nearly twice the amount of Hsing's annual salary as Monolithic's CEO.

117.    Additionally, Hsing substantially reduced the number of personally-held shares of Monolithic stock during the Class Period. At the beginning of the Class Period on February 8, 2024, Hsing personally held 917,983 shares of Monolithic. By the end of the Class Period, on November 11, 2024, Blegen held just 858,265 shares—a reduction of his personally-held shares of approximately 6%.

118.    Hsing's unusual transactions in Monolithic's stock during the Class Period support a strong inference of scienter.

**B. Defendant Blegen Was Personally Motivated to Maintain an Inflated Price for Monolithic Stock to Maximize Returns on His Stock Sales.**

119.    Defendant Blegen was personally motivated to maintain an inflated price for Monolithic stock to maximize returns on his stock sales.

120.    The information available from public disclosures shows Defendant Blegen was motivated to maintain Monolithic's stock price to maximize returns on his stock sales during the Class Period, and that his sales of stock during the Class Period were unusual in several respects.

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                25

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

121.   All of Defendant Blegen's transactions in Monolithic stock during the Class Period were sales. None of Defendant Blegen's stock sales during the Class Period were made pursuant to a previously entered 10b5-1 Plan—each was an independent, volitional open market transaction.

122.   Defendant Blegen engaged in fourteen transactions concerning Monolithic's stock during the approximately nine-month Class Period, selling a total of 28,007 shares for $21,878,412.

123.   On February 8, 2024, Blegen sold 728 shares of Monolithic stock in open market transactions for approximately $495,040.

124.   On March 1, 2024, Blegen sold 2,500 shares of Monolithic stock in open market transactions for approximately $1,814,388.

125.   On April 1, 2024, Blegen sold 2,500 shares of Monolithic stock in open market transactions for approximately $1,693,493.

126.   On May 1, 2024, Blegen sold 2,500 shares of Monolithic stock in open market transactions for approximately $1,658.215.

127.   On May 8, 2024, Blegen sold 737 shares of Monolithic stock in open market transactions for approximately $508,515.

128.   On June 3, 2024, Blegen sold 2,500 shares of Monolithic stock in open market transactions for approximately $1,829,437.

129.   On July 1, 2024, Blegen sold 2,500 shares of Monolithic stock in open market transactions for approximately $2,010,485.

130.   On July 22, 2024, Blegen sold 2,580 shares of Monolithic stock in open market transactions for approximately $2,145,476.

131.   On August 1, 2024, Blegen sold 2,500 shares of Monolithic stock in open market transactions for approximately $2,131,264.

Tousley Brain Stephens PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

132.    On August 8, 2024, Blegen sold 728 shares of Monolithic stock in open market transactions for approximately $566,668.

133.    On September 3, 2024, Blegen sold 2,500 shares of Monolithic stock in open market transactions for approximately $2,260,506.

134.    On October 1, 2024, Blegen sold 2,500 shares of Monolithic stock in open market transactions for approximately $2,270,900.

135.    On November 1, 2024, Blegen sold 2,500 shares of Monolithic stock in open market transactions for approximately $1,932,405.

136.    On November 8, 2024, Blegen sold 734 shares of Monolithic stock in open market transactions for approximately $561,620.

137.    The nature, timing, and amount of Defendant Blegens open market sales of stock during the Class Period were unusual.

138.    The nature of Defendant Blegen's stock sales during the Class Period was unusual. All but two sales of the seventeen transactions in Monolithic stock Blegen made in 2023 were indicated on the associated Form 4 filed with the SEC as having been conducted to cover taxes on the vesting of restricted stock units acquired as part of the Company's equity incentive plan, but a majority of the transactions Blegen made during the Class Period included no similar notation. The Form 4s Blegen filed in connection with his sales of stock on March 1, April 1, May 1, June 3, July 1, August 1, September 3, October 1, and November 1, 2024 do not include any notation describing the sale as having been made in connection with a tax obligation incurred by the vesting of shares acquired as part of Monolithic's equity incentive plan.

139.    In 2022, all of Blegen's stock sales were noted on the associated Form 4 filed with the SEC as having been conducted to cover taxes on the vesting of restricted stock units acquired as part of the Company's equity incentive plan or made pursuant to a 10b5-1 plan.

140.    The timing of Defendant Blegen's stock sales during the Class Period was also unusual. Blegen repeatedly made major stock sales on or shortly after Defendants' false and

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR          27

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

misleading statements, including on February 8, 2024, March 1, 2024, May 1, 2024 and on November 8, 2024, just days before the release of the Edgewater Research Report.

141.     Each of Blegen's nine transactions involving exactly 2,500 shares (March 1, April 1, May 1, June, July 1, August 1, September 3, October 1 and November 1, 2024) that Blegen sold during the Class Period described above was made on the first trading day of the month and each netted between $1.6 and $2.2 million. Additionally, each of the nine transactions involving exactly 2,500 shares is included in the subset of transactions not indicated as having been made in connection with a tax obligation incurred by the vesting of shares as part of Monolithic's equity incentive plan.

142.     The amount of Defendant Blegen's stock sales during the Class Period was also unusual. During the approximately nine-month Class Period, Blegen's sale of shares generated a financial windfall of more than $21,878,412—representing nearly seven times the amount of Blegen's annual salary and bonus compensation as Monolithic's CFO.

143.     Additionally, Blegen substantially reduced the number of personally-held shares of Monolithic stock during the Class Period. At the beginning of the Class Period on February 8, 2024, Blegen personally held 83,901 shares of Monolithic. By the end of the Class Period, on November 11, 2024, Blegen held just 55,944 shares—a reduction of his personally-held shares of approximately 33%.

144.     Blegen's unusual transactions in Monolithic's stock during the Class Period support a strong inference of scienter.

**C. Defendants' Statements Themselves Directly Acknowledged Their Awareness of Quality Issues.**

145.     As shown by the statements themselves, Defendants held themselves out as knowledgeable about Monolithic's products and directly acknowledged their awareness of the quality issues with Monolithic's PMICs in statements made to investors and securities analysts. These were the same quality issues later described in the Edgewater Report as having compromised Monolithic's relationship with Nvidia, its most important customer. Defendants'

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                28

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

admissions that they were aware of quality issues with Monolithic's products and claims to have addressed them eliminates the possibility that they were unaware of such issues during the Class Period and supports an inference of scienter.

### D. The Core Operations Doctrine Supports an Inference of Scienter.

146.    Monolithic's Enterprise Data segment and its indirect sales of PMICs to Nvidia was a "core operation" of the Company. As noted above, by 2024, Monolithic's Enterprise Data sales accounted for one-third of the Company's total revenues. Revenues generated by the Enterprise Data segment were specially broken out in SEC filings, including Monolithic's 10-Ks and 10-Qs throughout the Class Period, and specifically touted in press releases and public statements.

147.    Further, Monolithic's relationship with Nvidia, its most important Enterprise Data customer, was of particular importance to the operations of the Company throughout the relevant period because of the scale of the potential market for power solutions for data-center infrastructure and AI computing hardware.

148.    Indeed, Monolithic's relationship with Nvidia was the subject of repeated direct questions posed by analysts throughout the Class Period, and Defendants highlighted the significance of Monolithic's relationship with key industry partners and the Company's integration into future product developments—underscoring the significance of the relationship to the future of Monolithic's business.

149.    The central importance of Monolithic's Enterprise Data segment and the Company's relationship with Nvidia supports an inference of scienter.

### E. The Temporal Proximity of the False and Misleading Statements to the Corrective Disclosures Supports an Inference of Scienter.

150.    The short span of time—just over nine months—between Defendants' first false and misleading statement and the first corrective disclosure supports an inference of scienter. As described above, Defendants misleadingly assured investors that all of Monolithic's quality control problems were in the past in February 2024, but, within months, Edgewater Research

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR          29

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1  revealed that Nvidia had "lost confidence" in Monolithic's products because of those same

2  performance issues with Monolithic's products. The rapid turnabout diminishes the plausibility

3  of innocent explanations for Defendants' misleading statements touting the reliability of

4  Monolithic's products and implying the strength of their relationship with Nvidia.

5  **LOSS CAUSATION/ECONOMIC LOSS**

6  151.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

7  the economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the Class.

8  152.    On October 30, 2024, Monolithic issued a press release announcing the

9  Company's financial results for its third fiscal quarter ending September 30, 2024 ("3Q24

10  Release"). The 3Q24 Release revealed a sudden and surprising slowdown in Monolithic's critical

11  Enterprise Data segment. The 3Q24 Release reported that quarterly revenue within Monolithic's

12  Enterprise Data business declined sequentially to $184 million, down from $187 million in the

13  prior quarter, missing consensus estimates of $211 million by nearly 13%. During the

14  corresponding conference call held later that day, Defendant Blegen further revealed that

15  customer orders had fallen materially below recent historical trends, which had negatively

16  impacted Monolithic's Enterprise Data revenues and was set to limit segment revenue growth in

17  the upcoming quarter to low single digits.

18  153.    On this news, the price of Monolithic common stock fell more than $160 per share

19  from $919.81 per share on October 30, 2024 to $759.30 per share on October 31, 2024, a decline

20  of more than 17% on above-average trading volume of more than 3 million shares traded. Yet

21  the price of Monolithic common stock remained artificially inflated as Defendants continued to

22  make material misstatements and omissions and to conceal the full truth regarding the

23  Company's business, operations, and financial results.

24  154.    Then, on November 11, 2024, Edgewater Research analysts published an

25  explosive report revealing that Nvidia had cancelled half of its outstanding Monolithic orders

26  and intended to eliminate Monolithic's allocation to most variants of its next-generation

Blackwell chips due to "[p]erformance issues" with the Company's products. The report also disclosed that Nvidia engineers had "lost confidence" in Monolithic's products and decided to turn to the Company's competitors as Nvidia's "primary suppliers." Corroborating these claims, the report noted that Monolithic's competitors had received "rush orders" in recent weeks for components related to Nvidia's most-advanced Blackwell models. On this news, the price of Monolithic common stock fell $114 per share from $761.30 per share on November 8, 2024 to $647.31 per share on November 11, 2024, a decline of 15% on above-average trading volume of more than 4 million shares traded.

155.    The declines in Monolithic's stock price are directly attributable to the announcements about Nvidia's cancelled orders due to performance issues with Monolithic's products.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

156.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.      The omissions and misrepresentations were material;

c.      The Company's common stock traded in efficient markets;

d.      The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.      Lead Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

157.    At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC;

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                              31

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL 206.682.5600 • FAX 206.682.2992

1   and (ii) the Company regularly communicated with public investors via established market

2   communication mechanisms, including through regular disseminations of press releases on the

3   major news wire services and through other wide-ranging public disclosures such as

4   communications with the financial press, securities analysts, and other similar reporting services.

5   Lead Plaintiff and the Class relied on the price of the Company's common stock, which reflected

6   all information in the market, including the misstatements by Defendants.

7                                   **NO SAFE HARBOR**

8         158.   The statutory safe harbor provided for forward-looking statements under certain

9   conditions does not apply to any of the allegedly false statements pleaded in this Complaint. First,

10   the statutory safe harbor does not apply to any statements alleged to be false and misleading

11   which relate to historical facts or existing conditions. Second, to the extent any of the allegedly

12   false and misleading statements may be characterized as forward-looking, they were not

13   adequately identified as "forward-looking" statements when made. Third, any purported

14   forward-looking statements were not accompanied by meaningful cautionary language because

15   the risks that Defendants warned of had already come to pass.

16         159.   To the extent any statements alleged to be false and misleading may be construed

17   to discuss future intent, they are mixed statements of present or historical facts and future intent

18   and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the

19   statement that refers to the present.

20         160.   In addition, the PSLRA imposes an additional burden on oral forward-looking

21   statements, requiring Defendants to include a cautionary statement that the particular oral

22   statement is a forward-looking statement, and that "actual results might differ materially from

23   those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants

24   failed to both identify certain oral statements as forward-looking and include the cautionary

25   language required by the PSLRA.

26

First Amended Complaint for Violation
of the Federal Securities Laws
Case No. 2:25-cv-00220-JLR     32

Tousley Brain Stephens PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

161.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected.  To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested.

162.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer who knew that the statement was false when made. As detailed herein, Defendants were not only aware of factors undermining their forward-looking projections but were planning a strategic shift which would render them false.

## CLASS ACTION ALLEGATIONS

163.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Monolithic common stock between February 8, 2024 and November 11, 2024, inclusive. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

164.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                33

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

165.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.    Whether Defendants violated the Exchange Act;

b.    Whether Defendants omitted and/or misrepresented material facts;

c.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.    Whether Defendants deployed schemes, devices, or artifices to defraud;

f.    Whether the price of the Company's stock was artificially inflated; and

g.    The extent of damage sustained by Class members and the appropriate measure of damages.

166.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

167.    Lead Plaintiff will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Lead Plaintiff have no interests that conflict with those of the Class.

168.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**For Violations of §10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder**
**(Against All Defendants)**

169.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                    34                    TOUSLEY BRAIN STEPHENS PLLC
                                                                    1200 Fifth Avenue, Suite 1700
                                                                    Seattle, Washington 98101
                                                                    TEL. 206.682.5600 • FAX 206.682.2992

170.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

171.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b) in that they made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading.

172.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Lead Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II
### For Violation of §20(a) of the Exchange Act
### (Against Defendants Hsing and Blegen)

173.    Lead Plaintiff repeats and re-alleges the allegations contained above in ¶¶1-180 as if fully set forth herein.

174.    Defendants Hsing and Blegen acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level position at the Company, Hsing and Blegen had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. Hsing and Blegen were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Lead Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading. By reason of their senior management positions, Hsing and Blegen had the power to direct the actions of, and exercised the same to cause, Monolithic to engage in the unlawful acts and conduct complained of herein.

First Amended Complaint for Violation
of the Federal Securities Laws
Case No. 2:25-cv-00220-JLR                    35

Tousley Brain Stephens PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

1   Because of their positions of control and authority as senior officers, Hsing and Blegen were able

2   to, and did, control the contents of the various reports, press releases, public filings, and other

3   public statements which Monolithic disseminated. Hsing and Blegen exercised control over the

4   general operations of Monolithic and possessed the power to control the specific activities,

5   including statements made over telephone and through SEC filings, which comprise the primary

6   violations about which Lead Plaintiff and the other members of the Class complain. By reason

7   of such conduct, Hsing and Blegen are liable pursuant to §20(a) of the Exchange Act.

8                              **PRAYER FOR RELIEF**

9        WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

10       A.      Determining that this action is a proper class action pursuant to Rule 23(a) and

11   23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a

12   certification of Lead Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of

13   Civil Procedure and appointment of Lead Plaintiff's counsel as Lead Counsel;

14       B.      Awarding compensatory and punitive damages in favor of Lead Plaintiff and the

15   other class members against all Defendants, jointly and severally, for all damages sustained as a

16   result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and

17   post-judgment interest thereon.

18       C.      Awarding Lead Plaintiff and other members of the Class their reasonable costs

19   and expenses in this litigation, including attorneys' fees, experts' fees and other reasonable costs

20   and disbursements; and

21       D.      Awarding Lead Plaintiff and the other Class members such other relief as this

22   Court may deem just and proper.

23                            **DEMAND FOR JURY TRIAL**

24       Lead Plaintiff hereby demands a trial by jury.

25

26

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR                    36

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

DATED this 12th day of November, 2025

**TOUSLEY BRAIN STEPHENS PLLC**

By: *s/ Kim D. Stephens, P.S.*
    Kim D. Stephens, P.S., WSBA #11984
    Rebecca L. Solomon, WSBA #51520
    1200 Fifth Avenue, Suite 1700
    Seattle, Washington  98101
    Telephone:  206.682.5600
    Facsimile: 206.682.2992
    kstephens@tousley.com
    rsolomon@tousley.com

**BLOCK & LEVITON LLP**

By: *s/ Jeffrey C. Block*
    Jeffrey C. Block (pro hac vice forthcoming)
    Jacob A. Walker (pro hac vice forthcoming)
    Brendan T. Jarboe (pro hac vice forthcoming)
    Zoe van Vlaanderen (pro hac vice forthcoming)
    260 Franklin Street, Suite 1860
    Boston, Massachusetts 02110
    Telephone: (617) 398-5600
    jeff@blockleviton.com
    jake@blockleviton.com
    brendan@blockleviton.com
    zoe@blockleviton.com

*Attorneys for Mirko Dardi and*
*Lead Counsel for the Class*

FIRST AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS
CASE NO. 2:25-CV-00220-JLR    37

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992