The Honorable James L. Robart

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| WATERFORD TOWNSHIP GENERAL EMPLOYEES RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MONOLITHIC POWER SYSTEMS, INC., MICHAEL HSING, and BERNIE BLEGEN,<br><br>Defendants. | Case No. 2:25-cv-00220-JLR<br><br>DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT<br><br>NOTE ON MOTION CALENDAR: March 3, 2026[1] |

---

[1] See ECF-37

DEFS.' MOTION TO DISMISS
FIRST AMENDED COMPLAINT
(2:25-cv-00220-JLR)

FENNEMORE CRAIG P.C.
999 Third Avenue, Suite 600
Seattle, WA 98104 | 206.749.0500

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ......................................................................................................................... 1

FACTUAL ALLEGATIONS ....................................................................................................... 2

    A.   Parties and nature of the action........................................................................................ 2

    B.   The alleged "quality" issues and theories about competitor entry. .............................. 3

    C.   The allegedly false or misleading statements. .............................................................. 3

        1.   February 7, 2024 statements regarding "issues." .................................................... 3

        2.   May 1, 2024 remarks regarding integration and positioning with "largest enterprise data customer." ..................................................................................... 4

        3.   August 1, 2024 statements regarding drivers of "record" revenue and order trends. .................................................................................................................... 5

        4.   October 30, 2024 statements touting "best" solutions and market share. .............. 5

    D.   The alleged corrective disclosures and stock price declines. ........................................ 5

    E.   Plaintiff's scienter allegations. ...................................................................................... 6

LEGAL STANDARD ................................................................................................................... 6

ARGUMENT ................................................................................................................................ 8

I.     THE COMPLAINT FAILS TO PLEAD FALSITY WITH PARTICULARITY. ............... 8

        1.   February 7, 2024 statements regarding "issues." .................................................... 9

        2.   May 1, 2024 remarks regarding integration and positioning with "largest enterprise data customer." ................................................................................... 12

        3.   August 1, 2024 statements regarding drivers of "record" revenue and order trends. .................................................................................................................. 13

        4.   October 30, 2024 statements touting "best" solutions and market share. ............ 15

II.    THE COMPLAINT FAILS TO ALLEGE PARTICULARIZED FACTS GIVING RISE TO A STRONG, COGENT, AND COMPELLING INFERENCE OF SCIENTER. ..................................................................................................................... 15

DEFS.' MOTION TO DISMISS        -i-        FENNEMORE CRAIG P.C.
FIRST AMENDED COMPLAINT                  999 Third Avenue, Suite 600
(2:25-cv-00220-JLR)                          Seattle, WA 98104 | 206.749.0500

**TABLE OF CONTENTS**
(continued)

Page

A. The Individual Defendants' stock sales do not support a strong inference of scienter. ...................................................................................................... 16

   1. Defendants' trading history is inconsistent with an inference of scienter. ........... 16

   2. The amounts and percentages sold undermine an inference of scienter. ............. 18

   3. The timing of Defendants' stock sales is not suspicious. .................................... 19

B. Defendants' statements do not support a strong inference of scienter. ....................... 20

C. Plaintiff's reliance on the core operations doctrine is misplaced. ............................... 21

D. The supposed temporal proximity between positive statements and the alleged corrective disclosures does not support an inference of scienter. ................................ 23

E. Plaintiff's scattershot theories do not coalesce into a cogent and compelling inference of scienter. ................................................................................................... 23

III. PLAINTIFF'S SECTION 20(A) CLAIM MUST BE DISMISSED. ................................ 25

CONCLUSION ............................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Benson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ....................................................................................22

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092, 1109 (E.D. Wash. 2013),
*aff'd*, 691 F. App'x 393 (9th Cir. 2017).................................................8, 10, 11, 12

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ...........................................................12, 17

*Fialkov v. Microsoft Corp.*,
692 F. App'x 491 (9th Cir. 2017) ...............................................................................8

*Fialkov v. Microsoft Corp.*,
72 F. Supp. 3d 1220 (W.D. Wash. 2014).................................................14, 20, 23

*Gompper v. VISX, Inc.*,
298 F.3d 893 (9th Cir. 2002) ......................................................................................7

*Gonzalez v. Planned Parenthood of Los Angeles*,
759 F.3d 1112 (9th Cir. 2014) ..................................................................................18

*In re Adobe Inc. Sec. Litig.*,
2025 WL 3124312 (S.D.N.Y. Nov. 7, 2025).........................................................18

*In re Finjan Holdings, Inc.*,
58 F.4th 1048 (9th Cir. 2023) .....................................................................................9

*In re GlenFed, Inc. Sec. Litig.*,
42 F.3d 1541 (9th Cir. 1994) ..............................................................................7, 11

*In re Metawave Commc'ns Corp. Sec. Litig.*,
298 F. Supp. 2d 1056 (W.D. Wash. 2003).............................................................23

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ..................................................................................21

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ..............................................................10, 16, 17, 19

*In re Silicon Storage Tech., Inc.*,
    2006 WL 648683 (N.D. Cal. Mar. 10, 2006)..............................................................8

*In re Watchguard Sec. Litig.*,
    2006 WL 2038656 (W.D. Wash. Apr. 21, 2006) (Robart, J.)..............................7, 21

*Joyce v. Amazon.com, Inc.*,
    2025 WL 835054 (W.D. Wash. Mar. 17, 2025) ....................................................23

*Lilien v. Olaplex Holdings, Inc.*,
    765 F. Supp. 3d 993 (C.D. Cal. 2025) ..................................................................13

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ........................................................................11, 20

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*,
    39 F.4th 1092 (9th Cir. 2022) ...........................................................................9, 13

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..............................................................................................14

*McDonald v. Kinder-Morgan, Inc.*,
    287 F.3d 992 (10th Cir. 2002) ............................................................................14

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ..........................................................16, 19, 20, 21

*Mogensen v. Body Cent. Corp.*,
    15 F. Supp. 3d 1191 (M.D. Fla. 2014)..................................................................18

*Mulligan v. Impax Lab'ys, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ...................................................................20

*N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp.*,
    2009 WL 3112574 (C.D. Cal. Sept. 25, 2009) .....................................................12

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Nursing Home Pension Fund v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ............................................................................... 11

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ................................................................................ 9, 10, 15

*Plevy v. Haggerty*,
38 F. Supp. 2d 816 (C.D. Cal. 1998) ..................................................................... 20

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ............................................................................... 21

*Rodriguez v. Gigamon Inc.*,
325 F. Supp. 3d 1041 (N.D. Cal. 2018) ................................................................. 18

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .......................................................................... *passim*

*Rubke v. Capitol Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009) ............................................................................... 10

*Semegen v. Weidner*,
780 F.2d 727 (9th Cir. 1985) ................................................................................... 7

*South Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ................................................................................. 21

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
552 U.S. 148 (2008) ................................................................................................. 7

*Studen v. Funko, Inc.*,
2024 WL 2209686 (W.D. Wash. May 16, 2024) (Robart, J.) ......................... *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ....................................................................................... 7, 8, 23

*ThermoLife Int'l, L.L.C. v. NeoGenis Labs, Inc.*,
411 F. Supp. 3d 486 (D. Ariz. 2019) ..................................................................... 15

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Wenger v. Lumisys, Inc.*,
  2 F. Supp. 2d 1231 (N.D. Cal. 1998) ...................................................................11, 13, 14

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
  29 F.4th 611 (9th Cir. 2022) ...........................................................................................8, 14

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) ..........................................................................................8, 9

*Woolgar v. Kingstone Cos., Inc.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020)..................................................................................18

*Wozniak v. Align Techs., Inc.*,
  2011 WL 2269418 (N.D. Cal. June 8, 2011) ......................................................................19

*Yourish v. Cal. Amplifier*,
  191 F.3d 983 (9th Cir. 1999) ..............................................................................................11

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ....................................................................................7, 8, 25

STATUTES

15 U.S.C. § 78u-4 ...............................................................................................................7

RULES

Federal Rule of Civil Procedure 9(b)................................................................................1, 7

**INTRODUCTION**

This securities action should be dismissed with prejudice under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA") because the First Amended Complaint ("FAC") pleads neither falsity nor scienter with the particularity the law demands.  The FAC attempts to retrofit ordinary competitive dynamics and a fast-evolving platform transition into fraud by leaning on post-hoc analyst commentary and a speculative third-party research note, not contemporaneous facts contradicting anything Defendants actually said or knew at the time.[2]

On falsity, the claims fail for three independent reasons.  First, Plaintiff attacks a February 7, 2024 statement by MPS's CEO that the Company "resolve[d] all these issues during this fast ramp," but offers no particularized allegation that the statement was false when made or disbelieved by the speaker, especially given that the FAC identifies no contemporaneous data showing unresolved issues at the time of those February remarks.  Second, the remaining alleged misstatements are classic nonactionable opinion, corporate optimism, or accurate descriptions of historical results.  Third, Plaintiff's theory rests on an impermissible fraud-by-hindsight narrative:  it stitches together later conjecture by analysts to insinuate earlier falsity.  But the PSLRA requires contemporaneous, particularized facts, not such post-hoc speculation.

Scienter fares no better.  Plaintiff's central theory—that the Individual Defendants' stock sales during the proposed class period evidence fraudulent intent—is demonstrably false.  The judicially noticeable public filings for the challenged sales show, on their face, that those sales were pursuant to Rule 10b5-1 trading plans adopted long before the class period began or were for routine tax withholdings.  This conclusively ***negates*** any inference of fraudulent intent, let alone the ***strong, cogent,*** and ***compelling*** inference the PSLRA demands.  Invocation of the "core operations" doctrine cannot fill the void given the absence of any specific facts about contemporaneous access to contradictory information.  Nor does the nine-month span between

---

[2] The "Defendants" are Monolithic Power Systems, Inc. ("MPS" or the "Company") and its Chief Executive Officer Michael Hsing and Chief Financial Officer T. Bernie Blegen (who, together, are the "Individual Defendants").

DEFS.' MOTION TO DISMISS                         - 1 -                    FENNEMORE CRAIG P.C.
FIRST AMENDED COMPLAINT                                                   999 Third Avenue, Suite 600
(2:25-cv-00220-JLR)                                                       Seattle, WA 98104 | 206.749.0500

early-2024 optimism and the November 2024 Edgewater note about customer sourcing strategies come close to establishing that any Defendant knew that any alleged misstatement was false when made.

Because the FAC fails to plead falsity or scienter with the required particularity, the Section 10(b) claim fails as a matter of law. The derivative Section 20(a) claim necessarily falls with it. The Court should dismiss the FAC in its entirety, with prejudice.

## FACTUAL ALLEGATIONS

### A.   Parties and nature of the action

Plaintiff brings this putative securities class action on behalf of purchasers of MPS common stock from February 8, 2024 through November 11, 2024 (the "Class Period"). ¶1.[3] The FAC asserts claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5, alleging that MPS, CEO Michael Hsing, and CFO Bernie Blegen made false or misleading statements about product quality, MPS's relationship with NVIDIA Corporation, and competitive dynamics in MPS's enterprise data end market. ¶¶36, 58-67, 70-75, 77-80.

The FAC alleges MPS is a semiconductor company headquartered in Kirkland, Washington. ¶2. As a fabless company, MPS outsources production of components for end products and systems to third-party manufacturers. ¶32. MPS designs and sells power management solutions used in multiple end markets, including automotive, storage and computing, communications, consumer, industrial, and enterprise data. ¶¶30-35. By late 2023, Plaintiff contends, enterprise data had become MPS's largest end market, driven by sales of power management integrated circuits ("PMICs") used in data-center infrastructure and AI computing. ¶¶3-5, 33-36. Plaintiff alleges that NVIDIA was MPS's most significant indirect customer in this segment, and that MPS supplied PMICs used in NVIDIA's Hopper-generation

---

[3] Paragraph references ("¶__") are to the FAC, Dkt. 39. For purposes of this Motion only, well-pled factual allegations are treated as if they were true. All internal citations and quotations are omitted and all emphases are added unless otherwise noted. Concurrently with and in support of this Motion, Defendants are filing their Request for Judicial Notice and Notice of Incorporation by Reference; documents cited as "Ex. ___" refer to exhibits to the Declaration of Marjorie P. Duffy in support of this Motion.

DEFS.' MOTION TO DISMISS                          - 2 -                    FENNEMORE CRAIG P.C.
FIRST AMENDED COMPLAINT                                                     999 Third Avenue, Suite 600
(2:25-cv-00220-JLR)                                                         Seattle, WA 98104 | 206.749.0500

graphic processing units ("GPUs").  ¶¶4-5, 49-57.  According to the FAC, NVIDIA-related revenue represented roughly 17–20% of MPS's total revenue and approximately half of its enterprise data revenue in 2024.  ¶¶5, 53.  Notably, the FAC does not allege that MPS had any direct contractual relationship with NVIDIA; rather, Plaintiff acknowledges that MPS sells to distributors, contract manufacturers, and board assemblers, which, in turn, integrate MPS components into products that NVIDIA eventually sells.  ¶¶54-55.

**B.   The alleged "quality" issues and theories about competitor entry.**

The FAC alleges that beginning in late 2023, certain NVIDIA "Hopper server boards" experienced failures "traced back" to MPS's PMICs.  ¶¶6, 65.  It asserts that purported "performance" or "quality control" issues "persisted" into 2024 and that NVIDIA, "frustrated" by these issues, began "cultivating relationships" with other PMIC suppliers and reallocating "share" for NVIDIA's next-generation Blackwell platforms.  ¶¶8, 71, 75, 85-93.  As the FAC acknowledges, Hopper and Blackwell are distinct NVIDIA GPU architectures and server platforms:  Hopper (*e.g.*, H100) launched in 2022 and was widely deployed through 2024, whereas Blackwell (*e.g.*, B200/GB200) was announced in 2024 as the next-generation successor expected to ramp up thereafter.  ¶¶5, 50, 55-56.

Plaintiff does not describe the supposed issues in Hopper with any specificity, allege any particular failure to satisfy NVIDIA specifications, or identify any contemporaneous reports or data showing that any identified problem was unresolved at the time of any challenged statement.  Instead, Plaintiff leans heavily on later analyst conjecture that "overheating" at higher wattage "appears" linked to MPS's PMICs, and on the claim that NVIDIA "lost confidence" in MPS—an assertion drawn from a third-party research note, not from NVIDIA or MPS.  ¶¶85-89, 90-93.

**C.   The allegedly false or misleading statements.**

**1.   February 7, 2024 statements regarding "issues."**

Plaintiff alleges Mr. Hsing misled investors during a Q4 2023 earnings call on February

7, 2024 by making three statements.  First, in response to a question about "lower cost cards," Mr. Hsing stated that on "[t]he cost side … we want to solve all the problems and we believe we resolve all these issues and during this fast ramp."  ¶¶60-61; Ex. 1 at 7-8 (Q4 2023 Earnings Tr.). Mr. Hsing then immediately said, "also the cost at this time is not really the issue.  It's all about the throughput and to meet customer demand."  ¶61.  Second, Mr. Hsing was subsequently asked about "competition going forward," and responded that "our customers can be very receptive to our solution …. [T]hey keep requesting it and keep requesting we solve all these issues, related to their system issues, ours and issues from our side."  ¶64; Ex. 1 at 9-10 (Q4 2023 Earnings Tr.). Third, Mr. Hsing stated, "We had some issues on the Stage 1s and we had some design wins and very small volumes in different systems, actually. And now we don't have -- all these issues are resolved."  ¶66; Ex. 1 at 10 (Q4 2023 Earnings Tr.).

Plaintiff asserts these remarks were false because NVIDIA's Hopper server boards were experiencing failures allegedly tied to MPS's PMICs and because NVIDIA was qualifying additional suppliers.  ¶¶62-67.  But the FAC identifies no contemporaneous facts contradicting Mr. Hsing's statements as of February 7.

### 2. May 1, 2024 remarks regarding integration and positioning with "largest enterprise data customer."

Plaintiff next challenges Mr. Blegen's response on the Q1 2024 earnings call on May 1, 2024 describing MPS as "at the front of the design cycle," "consulted," and "integrated" in the development of next-generation products, and as a "leader" in the market.  ¶70; Ex. 2 at 5 (Q1 2024 Earnings Tr.).  Plaintiff characterizes this statement as misleading because NVIDIA was allegedly dissatisfied with MPS and reallocating share for Blackwell.  ¶71.  The FAC, however, pleads no contemporaneous facts showing that, as of May 1, 2024, NVIDIA was not consulting with MPS or that NVIDIA either had made any definitive allocation decision for Blackwell or had communicated it to MPS.

DEFS.' MOTION TO DISMISS                        - 4 -                  FENNEMORE CRAIG P.C.
FIRST AMENDED COMPLAINT                                               999 Third Avenue, Suite 600
(2:25-cv-00220-JLR)                                                   Seattle, WA 98104 | 206.749.0500

### 3. August 1, 2024 statements regarding drivers of "record" revenue and order trends.

In prepared remarks introducing Q2 2024 results, Mr. Blegen stated that "record" MPS revenue was "attributed to three factors: increased demand for AI power solutions, improving order trends in several of our end markets, and lastly, initial revenue ramps associated with design wins secured in past years." ¶73; Ex. 3 at 2 (Q2 2024 Earnings Tr.). The FAC does not allege Mr. Blegen's statement about historical results was inaccurate. Rather, Plaintiff contends the statement was misleading because it did not also say that MPS's relationship with NVIDIA had been "damaged" by alleged ongoing quality issues, which in turn purportedly caused NVIDIA to seek additional PMIC suppliers for Blackwell. ¶¶74-75, 77, 91-92. But the FAC pleads no particularized facts that those things were true on August 1 or that Mr. Blegen knew or believed them.

### 4. October 30, 2024 statements touting "best" solutions and market share.

Finally, Plaintiff challenges Mr. Hsing's comments during an October 30, 2024 call regarding Q3 2024 results that, in a rapidly growing AI market, "customers initially will take … the best solution," "that's why we occupied a pretty large shares," and that additional suppliers had joined the market "in the last couple of quarters." ¶77. He later stated that "we believe, our products, our solution is the best and the most power efficient," and that MPS's enterprise data revenues "will grow." ¶79; Ex. 4 at 7 (Q3 2024 Earnings Tr.). The FAC alleges that these statements were misleading because MPS's products were purportedly not the "best" and MPS had begun to lose share at NVIDIA. ¶¶77-80. Once again, the FAC offers no particularized facts about what Mr. Hsing knew or believed as of October 30.

### D. The alleged corrective disclosures and stock price declines.

Plaintiff alleges two "corrective" disclosures. First, on October 30, 2024, MPS disclosed that enterprise data revenue declined by 1% (approximately $3 million as compared to the prior quarter) and missed the consensus estimate for that segment, and the stock price fell 17% the

DEFS.' MOTION TO DISMISS
FIRST AMENDED COMPLAINT
(2:25-cv-00220-JLR)

- 5 -

FENNEMORE CRAIG P.C.
999 Third Avenue, Suite 600
Seattle, WA 98104 | 206.749.0500

next day. ¶¶76, 152-154. Plaintiff asserts this decline reflected the market learning that NVIDIA orders had "decreased." ¶81.

Second, on November 11, 2024, Edgewater published a note stating that NVIDIA had placed "rush orders" with other PMIC suppliers for certain Blackwell platforms, that the root cause of an MPS PMIC issue may be related to Hopper and seems evident at higher wattage, and that NVIDIA had cancelled "half" of MPS's unconfirmed backlog. ¶¶85-86; Ex. 5 (11/11/24 Edgewater Rpt.). The stock fell 15% that day. ¶86.

### E.    Plaintiff's scienter allegations.

Plaintiff's scienter theory rests on four unsteady legs. First, Plaintiff alleges that the Individual Defendants engaged in unusual and suspicious stock sales during the Class Period, which purportedly shows a motive to defraud. ¶¶98-144. Second, Plaintiff alleges that Defendants' statements on earnings calls about product quality and performance issues affecting MPS's PMICs, including a statement that "all these issues are resolved," demonstrate their contemporaneous knowledge of the issues later cited by analysts as reasons for purported customer decisions and order cancellations. ¶¶61-67, 145. Third, Plaintiff invokes the "core operations" doctrine, alleging that the enterprise data segment and MPS's relationship with NVIDIA were central to MPS's business and financial results, and were repeatedly discussed in SEC filings and analyst engagements. ¶¶146-149. Fourth, Plaintiff alleges the temporal proximity between the challenged statements and later "corrective" disclosures supports scienter. ¶150. In particular, Plaintiff points to the nine-month period between reassurances in February 2024 and the November 2024 Edgewater report suggesting NVIDIA had lost confidence in MPS's products. ¶¶76-93, 85-90, 150.

### LEGAL STANDARD

Section 10(b) of the Exchange Act prohibits fraud or deceit in connection with the purchase or sale of any security. To state a violation of Section 10(b), a plaintiff must plead: (1) a material misrepresentation made by the defendant; (2) scienter (*i.e.*, intent); (3) a

DEFS.' MOTION TO DISMISS                         - 6 -                    FENNEMORE CRAIG P.C.
FIRST AMENDED COMPLAINT                                                   999 Third Avenue, Suite 600
(2:25-cv-00220-JLR)                                                       Seattle, WA 98104 | 206.749.0500

connection between the misstatement and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

Such a claim "does not receive the traditional deference a court affords a complaint in resolving a motion to dismiss" under Rule 12(b)(6).  *In re Watchguard Sec. Litig.*, 2006 WL 2038656, at *3 (W.D. Wash. Apr. 21, 2006) (Robart, J.).  A complaint asserting violations of Section 10(b) must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).  Rule 9(b) requires particularized allegations that are "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged."  *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).  When a fraudulent statement is alleged, the "plaintiff must set forth what is false or misleading about [the] statement, and why it is false."  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994)).  In other words, the plaintiff must "set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*."  *Id.* at 1549.

Securities fraud complaints also are subject to the heightened pleading requirements of the PSLRA.  *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002).  The PSLRA requires that a complaint "'plead with particularity both falsity and scienter.'"  *Id.* (quoting *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)).

To plead scienter, a securities complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  The required state of mind under the PSLRA is a "mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  Thus, "the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made."  *Ronconi*, 253 F.3d at 432.  Further, a

DEFS.' MOTION TO DISMISS
FIRST AMENDED COMPLAINT
(2:25-cv-00220-JLR)

- 7 -

FENNEMORE CRAIG P.C.
999 Third Avenue, Suite 600
Seattle, WA 98104 | 206.749.0500

complaint must "plead facts showing scienter as to each defendant individually." *In re Silicon Storage Tech., Inc.*, 2006 WL 648683, at *21-22 (N.D. Cal. Mar. 10, 2006) (group pleading is impermissible).

The "strong inference" of scienter required by the PSLRA "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324. "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners*, 552 F.3d at 991; *see also Tellabs*, 551 U.S. at 324 (same).

For these reasons, "[i]n few other areas are motions to dismiss for failure to state a claim … so powerful." *Fialkov v. Microsoft Corp.*, 692 F. App'x 491, 492 (9th Cir. 2017).

ARGUMENT

## I.     THE COMPLAINT FAILS TO PLEAD FALSITY WITH PARTICULARITY.

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege that the defendant made a statement that was false or misleading as to a material fact. *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022). A statement is false or misleading if it directly contradicts what the defendant knew at the time or omits material information. *Id*. The plaintiff must "set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*." *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1109 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017). The fact that a statement is *later* discovered to be untrue does not show that the earlier statement was untrue at the time it was made. *Id*.

"Certain types of statements are not actionable for securities fraud." *Studen v. Funko, Inc.*, 2024 WL 2209686, at *7 (W.D. Wash. May 16, 2024) (Robart, J.). For example, statements of opinion are "generally not actionable." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021). There are only three narrow circumstances in which an opinion may be

actionable: where (1) the speaker did not actually hold the stated belief, (2) the opinion contains an embedded statement of untrue fact, or (3) a reasonable investor would "understand an opinion statement to convey facts ... about the speaker's basis for holding that view," but those facts are untrue. *Id.* at 1189 (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015)). Pleading an actionable opinion statement is thus "no small task." *Omnicare*, 575 U.S. at 194.

Vague or puffing statements likewise are not actionable. *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098 (9th Cir. 2022). "Corporate 'puffing' involves 'expressing an opinion' that is not 'capable of objective verification.'" *Id.* at 1098-99. "These 'vague statements of optimism like "good," "well-regarded," or other feel good monikers, are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.'" *Id.* at 1099.

The FAC fails these well-established standards because it lacks particularized facts showing that any challenged statement was false when made and, in addition, many of the challenged statements were non-actionable opinions and puffery.

### 1. February 7, 2024 statements regarding "issues."

Plaintiff's claims premised on Mr. Hsing's remarks during the February 7, 2024 Q4 2023 earnings call fail as a matter of law. *See* ¶¶61, 64, 66.

First, in response to a question about costs, Mr. Hsing stated that on "[t]he cost side … we want to solve all the problems and we believe we resolve all these issues and during this fast ramp." ¶¶60-61; Ex. 1 at 7-8 (Q4 2023 Earnings Tr.). Mr. Hsing's expressed wants and beliefs are quintessential, nonactionable opinions. *Omnicare*, 575 U.S. at 183. The FAC alleges no particularized facts demonstrating that Mr. Hsing did not actually want to solve cost "problems" or did not sincerely believe MPS had solved these issues, as required to demonstrate falsity of an opinion. *Id.*; *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1056 (9th Cir. 2023). Nor does the FAC allege any untrue fact embedded within these opinions or specific contrary facts known to

DEFS.' MOTION TO DISMISS
FIRST AMENDED COMPLAINT
(2:25-cv-00220-JLR)

- 9 -

FENNEMORE CRAIG P.C.
999 Third Avenue, Suite 600
Seattle, WA 98104 | 206.749.0500

Mr. Hsing that undermined his opinions. *See Omnicare*, 575 U.S. at 188-90.

Nor does Plaintiff sufficiently allege that Mr. Hsing made an actionable misstatement when he said, "It's all about the throughput and to meet customer demand." ¶61. According to Plaintiff, Mr. Hsing failed to reveal that quality control issues "impacted [MPS's] relationship as a supplier for Nvidia" and thus impacted its ability to meet customer demand. ¶62. But, to state a viable omission-based claim, Plaintiff first "must demonstrate that the omitted information existed at the time" of Mr. Hsing's statement and, second, that Mr. Hsing knew as much. *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1164 (9th Cir. 2009). Plaintiff alleges neither. Instead, the FAC alleges that the November 2024 Edgewater report—released nine months *after* Mr. Hsing's statement—reported rumors of NVIDIA cancelling orders because of performance issues. ¶62. But Plaintiff alleges no particularized facts demonstrating that quality control issues were affecting MPS's relationship with NVIDIA in *February 2024*, when the challenged statement was made. This is classic, impermissible "fraud by hindsight" and so must be rejected. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999).

The same is true of Mr. Hsing's second alleged misstatement, that MPS customers "keep requesting we solve all these issues, related to their system issues, ours and issues from our side." ¶64. According to Plaintiff, this statement was misleading because Mr. Hsing did not also disclose that, by February 2024, MPS's relationship with NVIDIA "had already begun to deteriorate." ¶65. But the only allegation purportedly supporting Plaintiff's theory is, again, the vague, unsourced Edgewater report, dated nine months *after* Mr. Hsing's statement. The FAC contains no particularized facts showing that MPS knew its relationship with NVIDIA was purportedly deteriorating back in February 2024. "No confidential witness (CW) has come forward to say that Defendants knew [of any purported issue in the NVIDIA relationship], or that they were deliberately indifferent to the [NVIDIA relationship]. No internal document or communication is offered to corroborate Plaintiff's theory." *City of Roseville Emp.s' Ret. Sys.*, 963 F. Supp. 2d at 1119. The FAC thus fails to "set forth, as part of the circumstances

constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*." *Id.* (citing *GlenFed*, 42 F.3d at 1549).

Third, Plaintiff alleges that Mr. Hsing's statement—in reference to "Stage 1," that "all these issues are resolved"—was false because "quality control issues had not been resolved," as later evidenced by "fewer orders" from NVIDIA in the third quarter (between July–September 2024), and by the November 2024 Edgewater report claiming that NVIDIA cancelled half its outstanding orders because of performance issues. ¶¶66-67. Yet once more, the FAC alleges no *contemporaneous*, particularized facts showing the February 7 statement was false when made. *See Ronconi*, 253 F.3d at 432.

To establish contemporaneous falsity, Plaintiff must allege that the "true facts" "arose *before* the allegedly misleading statements were made." *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1250 (N.D. Cal. 1998). The most direct way to show that a statement was false when made "is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).[4] Here, the FAC alleges no specific facts showing that the specific "Stage 1" issues that Mr. Hsing stated had been resolved were, in actuality, unresolved as of February 7, 2024: no internal test reports, communications, root-cause records, qualification failures, engineering change orders, procurement notices, or anything else. The FAC also does not identify any communications with or about NVIDIA that pre-dated February 7 and were inconsistent with Mr. Hsing's statements.

A later statement may demonstrate contemporaneous falsity of an earlier statement only if the former directly contradicts or is inconsistent with latter. *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996-97 (9th Cir. 1999). But the November 2024 Edgewater report does not directly

---

[4] In *Oracle*, the Ninth Circuit distinguished the specificity of the allegations in that complaint from those in another, *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 (9th Cir. 2002) (affirming dismissal with prejudice), where the plaintiffs alleged that the company knew that demand was flat while stating it was enjoying very strong sales growth. But "they had no hard numbers or other specific information." 380 F.3d at 1231. In contrast, the complaint in *Oracle* plead "hard numbers" and had "specific" allegations regarding "sales data." *Id.* (describing particularized allegations in the complaint with details from former employees).

contradict Mr. Hsing's February 7, 2024 statement that certain issues had been resolved. At most it offered unsourced, anonymous suggestions that, at higher wattages and in later product generations (*e.g.*, Blackwell B200/GB200), NVIDIA was considering using a second supply source. Ex. 5 (11/11/24 Edgewater Rpt.). That later purported development does not show that ramp-phase issues with Hopper were not resolved by February 2024 or that Mr. Hsing believed them to be unresolved, and NVIDIA's consideration of a second source is consistent with well-established business practices and competitive entry into the market, rather than being necessarily indicative of unresolved issues with MPS's products. *See N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp.*, 2009 WL 3112574, at \*10 (C.D. Cal. Sept. 25, 2009) ("[T]he fact that subsequent disclosures revealed that the remedial measures were not sufficient does not render false the individual Defendants' contemporaneous statements about those measures."); *City of Roseville Emps.' Ret. Sys.*, 963 F. Supp. 2d at 1109 ("Without evidence of contemporaneous falsity, an allegation of a misleading representation, which rests entirely on later contradictory statements, constitutes an impermissible attempt to plead fraud by hindsight.").

### 2. May 1, 2024 remarks regarding integration and positioning with "largest enterprise data customer."

Plaintiff's challenge to Mr. Blegen's May 1, 2024 statements on the Q1 2024 earnings call fails because the FAC does not plead with particularity that these statements were false when made. ¶70-71. An analyst asked management to respond to "competitors making noise about perhaps gaining share at your largest enterprise data customer," and to address "your latest thoughts on competitive landscape." Ex. 2 at 4 (Q1 2024 Earnings Tr.). Mr. Blegen responded that MPS sells "an enabling technology, meaning that, at the front of the design cycle, we're consulted, we're integrated, in fact, with the development of the next generation of products." *Id.* at 5. "So," Mr. Blegen continued, "we believe that strategically, that yes, there will be competitive influences [in] the market, but we want to continue to position ourselves as the

DEFS.' MOTION TO DISMISS
FIRST AMENDED COMPLAINT
(2:25-cv-00220-JLR)

- 12 -

FENNEMORE CRAIG P.C.
999 Third Avenue, Suite 600
Seattle, WA 98104 | 206.749.0500

leader." *Id.*

Off the bat, Plaintiff's complaint about Mr. Blegen's aspiration to position MPS as a leader fails as a matter of law. ¶70; *see Lilien v. Olaplex Holdings, Inc.*, 765 F. Supp. 3d 993, 1017 (C.D. Cal. 2025) ("It is not misleading to make such aspirational statements without disclosing any and every event that might undermine that aspirational goal."). His expressed desire for MPS to "position ourselves as the leader" is classic puffery, such as "industry-leading," and thus not actionable. *Studen*, 2024 WL 2209686, at *14; *see also Macomb Cnty. Emps. Ret. Sys.*, 39 F.4th at 1099 (dismissing as puffery vague, positive statements such as "it's a huge market opportunity for us" and "the economics work well for us"); *Wenger,* 2 F. Supp. 2d at 1245 (dismissing as puffery statements such as "we're the leader in a rapidly growing market" and "we dominate these markets").

With respect to the remainder of Mr. Blegen's statement, Plaintiff does not allege it was false when made. Plaintiff asserts that "NVIDIA was frustrated with Monolithic's quality control issues" and the relationship purportedly was "damaged." ¶71. But the FAC identifies no contemporaneous reports, data, or other specific facts showing that, as of May 1, 2024, NVIDIA was "frustrated," had curtailed MPS's role in next-gen designs, or that its relationship with MPS was "damaged"—far less that MPS knew so. The PSLRA requires "specific contemporaneous statements or conditions" contradicting the challenged statement; Plaintiff pleads none. *Ronconi*, 253 F.3d at 432.

> **3.  August 1, 2024 statements regarding drivers of "record" revenue and order trends.**

On August 1, 2024, MPS announced "yet another record quarter" with revenue of $507.4 million. Ex. 3 at 2 (Q2 2024 Earnings Tr.). During his prepared remarks, Mr. Blegen stated the "record" revenue was "attributed to three factors: increased demand for AI power solutions, improving order trends in several of our end markets, and lastly, initial revenue ramps associated with design wins secured in past years." ¶¶73-74. Plaintiff contends that these statements were

misleading because they omitted that MPS's relationship with NVIDIA had been "damaged" by alleged quality issues.  ¶¶74-75, 77, 91-92.

To start, Plaintiff's theory fails because "federal securities laws 'do not create an affirmative duty to disclose any and all material information.'" *Fialkov v. Microsoft Corp.*, 72 F. Supp. 3d 1220, 1229 (W.D. Wash. 2014), *aff'd*, 692 Fed. App'x 491 (9th Cir. 2017).  Rather, the duty to disclose is triggered only "when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  Mr. Blegen's August 1, 2024 remarks did not speak to customer-specific share or future allocations; they described the ***past*** quarter's revenue and the factors that drove those historical results, and Plaintiff does not allege that those statements were false.  "It is well-established that the accurate reporting of ***historic*** successes does not give rise to a duty to further disclose contingencies that might alter the revenue picture in the future." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (citing cases); *see also Wenger*, 2 F. Supp. 2d at 1245 ("Disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.").  Because Mr. Blegen's remarks were accurate recitations of historical facts, they could not trigger a duty to disclose any purported "damage" to the NVIDIA relationship that might impact future success.

Moreover, Plaintiff does not allege any specific facts demonstrating that, as of August 1, 2024, the relationship with NVIDIA had been "damaged," as Plaintiff alleges.  The PSLRA requires contemporaneous particularized facts showing that, as of August 1, 2024, MPS's stated Q2 revenue drivers were untrue or that its relationship was then "damaged" in a manner that rendered the attribution misleading.  *Twitter*, 29 F.4th at 619 (for a statement to be false or misleading, it must "directly contradict what the defendant knew at that time").  The FAC alleges none; post-hoc analyst conjecture months after the fact cannot establish falsity "at that time." *Id.*.

DEFS.' MOTION TO DISMISS
FIRST AMENDED COMPLAINT
(2:25-cv-00220-JLR)

- 14 -

FENNEMORE CRAIG P.C.
999 Third Avenue, Suite 600
Seattle, WA 98104 | 206.749.0500

**4.    October 30, 2024 statements touting "best" solutions and market share.**

Finally, Plaintiff's challenge to the remarks made on October 30, 2024 during the Q3 2024 earnings call fails because the statements are classic, non-actionable opinions and corporate optimism.  Plaintiff points to two kinds of statements by Mr. Hsing on October 30: (i) characterizations that customers "initially will take the best solutions," that MPS "occupied a pretty large share" because it had the "best" solution and development speed, and that additional suppliers had "joined" the segment in the last couple of quarters; and (ii) a later response that "we believe, our products, our solution is the best and the most power efficient" and that enterprise data "will grow."  ¶¶77, 79; Ex. 4 at 7 (Q3 2024 Earnings Tr.).

As a matter of law, generalized statements about MPS products being the "best" or "most power efficient" are paradigmatic corporate puffery and opinion.  *See, e.g.*, *ThermoLife Int'l, L.L.C. v. NeoGenis Labs, Inc.*, 411 F. Supp. 3d 486, 501 (D. Ariz. 2019).  Likewise, Mr. Hsing's stated *belief* that MPS products are the best and most power efficient "reflect pure opinion." *Studen*, 2024 WL 2209686, at *15.  Even if his stated belief later proved untrue, under *Omnicare*, "an investor cannot state a claim by alleging only that an opinion was wrong."  *Id.* And, critically, Plaintiff does not allege that Mr. Hsing did not actually hold the stated belief, that the opinion statement contained an embedded statement of untrue fact, or that the stated opinion did not fairly align with the information in Mr. Hsing's possession at the time.  *Id.*

## II.    THE COMPLAINT FAILS TO ALLEGE PARTICULARIZED FACTS GIVING RISE TO A STRONG, COGENT, AND COMPELLING INFERENCE OF SCIENTER.

Plaintiff's securities fraud claim also must be dismissed because the FAC does not adequately plead scienter.  Even if the FAC sufficiently alleged a statement that was false-when-made—and it does not—it also must allege particularized facts giving rise to a strong inference that Defendants acted with an intent to defraud or with deliberate recklessness.  *Studen*, 2024 WL 2209686, at *16.  It does not do this either.  Plaintiff attempts to satisfy the PSLRA's demanding pleading requirement with tactics both routine (*e.g.*, invoking the so-called "core

operations doctrine") and highly irregular (*e.g.*, misrepresenting judicially noticeable facts about the Individual Defendants' stock sales). But ultimately, none of Plaintiff's allegations—whether viewed individually or holistically—supports a cogent and compelling inference of scienter that is at least as strong as any opposing nonculpable inference.

### A.    The Individual Defendants' stock sales do not support a strong inference of scienter.

Plaintiff principally attempts to plead scienter by alleging that Messrs. Hsing and Blegen "engaged in suspicious insider stock sales during the Class Period." ¶96; *see also* ¶¶97-118. But those sales were not suspicious at all, and Plaintiff resorts to misstating judicially noticeable facts to allege otherwise. ***Every one*** of the Individual Defendants' stock sales was executed pursuant to Rule 10b5-1 trading plans or for routine tax withholdings.

In the Ninth Circuit, trading by insiders is suspicious only when it is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986. To assess scienter, courts examine: (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008). All three considerations undercut, rather than support, Plaintiff's scienter theory.

### 1.    Defendants' trading history is inconsistent with an inference of scienter.

Start with the Individual Defendants' trading history as compared to the Class Period sales. Plaintiff alleges that Mr. Hsing made an unidentified number of stock sales in 2022 and 2023, all but one of which were conducted to cover taxes resulting from the vesting of restricted stock units. ¶¶112-113. Plaintiff alleges that Mr. Hsing made eleven stock sales during the Class Period, but concedes that five of them were made in connection with tax obligations incurred by the vesting of shares acquired as part of MPS's equity incentive plan (¶112), and so are unremarkable. What's "unusual," Plaintiff alleges, is that during the Class Period, Mr. Hsing also made six other trades that were neither connected to a tax obligation nor "made pursuant to

DEFS.' MOTION TO DISMISS
FIRST AMENDED COMPLAINT
(2:25-cv-00220-JLR)

- 16 -

FENNEMORE CRAIG P.C.
999 Third Avenue, Suite 600
Seattle, WA 98104 | 206.749.0500

a previously entered 10b5-1 Plan." ¶98; *see also* ¶¶101-103, 105-106, 109. But the truly "unusual" circumstance here is that the FAC flatly misrepresents Mr. Hsing's judicially-noticeable SEC Form 4s.[5] As is apparent from the face of Mr. Hsing's Forms 4, ***all*** of the challenged stock sales—March 1, April 1, May 1, June 3, July 1, and August 9, 2024 (¶112)—were made pursuant to a previously entered 10b5-1 plan:

SEC Form 4

FORM 4

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

☒ Check this box to indicate that a transaction was made pursuant to a contract, instruction or written plan for the purchase or sale of equity securities of the issuer that is intended to satisfy the affirmative defense conditions of Rule 10b5-1(c). See Instruction 10.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL
OMB Number: 3235-0287
Estimated average burden hours per response: 0.5

Exs. 6-11 (highlighting added).

The same is true of Mr. Blegen's stock sales. Plaintiff alleges that Mr. Blegen made seventeen stock sales in 2023 (all but two of which were to cover taxes on the vesting of restricted stock units) and an unspecified number of stock sales in 2022 (all of which were to cover taxes on the vesting of restricted stock units). ¶¶138-139. Plaintiff alleges Mr. Blegen made fourteen stock sales in 2024, and concedes that five of them were in connection with tax obligations resulting from the vesting of shares under MPS's equity incentive plan. ¶138. Once more, Plaintiff relies on the fact that the other nine stock sales were not described as having been made in connection with a tax withholding obligation (¶138), and pairs that with the allegation

---

[5] Officers of publicly traded companies must file an SEC Form 4 within two business days of a transaction that results in a change in beneficial ownership of company securities. ¶ 95. As further demonstrated in their Request for Judicial Notice and Notice of Incorporation by Reference, Defendants' Form 4s are incorporated into the FAC because the FAC specifically references them (*e.g.*, ¶¶ 112–113, 138) and they are related to Plaintiff's allegations concerning stock sales by the Individual Defendants. *See Silicon Graphics*, 183 F.3d at 986 (treating Forms 4 as incorporated by reference where plaintiff "clearly gleaned from the SEC Form 3 and 4 filings many of the facts regarding the officers' stock sales"). "Moreover, courts may take judicial notice of SEC Forms 4, … to prove that stock sales were made pursuant to a Rule 10b5-1 trading plan." *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1059 (N.D. Cal. 2012).

DEFS.' MOTION TO DISMISS
FIRST AMENDED COMPLAINT
(2:25-cv-00220-JLR)
- 17 -
FENNEMORE CRAIG P.C.
999 Third Avenue, Suite 600
Seattle, WA 98104 | 206.749.0500

that "[n]one of Defendant Blegen's stock sales during the Class Period were made pursuant to a previously entered 10b5-1 Plan" ( ¶121). But again, Plaintiff's allegation is demonstrably wrong. As is apparent from the face of Mr. Blegen's Forms 4, *all* of the nine challenged stock sales—March 1, April 1, May 1, June 3, July 1, August 1, September 3, October 1, and November 1, 2024 (¶138)—were made pursuant to a previously entered Rule 10b5-1 plan. Exs. 12-20.

Indeed, MPS disclosed in its Form 10-Q for the third quarter of 2023 that Messrs. Hsing and Blegen both entered into Rule 10b5-1 plans in August 2023—some six months before the start of the purported Class Period—and that those plans ran through the end of 2024. *See* Ex. 21 at 55 (excerpt of Q3 2023 Form 10-Q).

Because the FAC's allegations are facially contradicted by the Forms 4 incorporated into the FAC, the Court should not accept those allegations as true. *Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112, 1115 (9th Cir. 2014). And when the false allegations about the stock sales are stripped away, the case for scienter falls apart.

Automatic sales "made pursuant to Rule 10b5-1 plans do not support a strong inference of scienter." *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1056 (N.D. Cal. 2018). If anything, such sales "negat[e] any inference of scienter." *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1222 (M.D. Fla. 2014); *see also Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 236 (S.D.N.Y. 2020) (stock sales made pursuant to a Rule 10b5-1 trading plan "undermine[] an inference of fraudulent intent"). Likewise, stock sales made to satisfy tax obligations "do not demonstrate a defendant's motive to defraud." *In re Adobe Inc. Sec. Litig.*, 2025 WL 3124312, at *14 (S.D.N.Y. Nov. 7, 2025). Where, as here, the only sales were pre-scheduled plan trades or routine tax withholdings, Plaintiff's allegation of "suspicious trading" collapses and does not give rise to a strong inference of scienter.

### 2.    The amounts and percentages sold undermine an inference of scienter.

The amounts and percentages of stock sold by the Individual Defendants also undercut

any inference of scienter. "The Ninth Circuit has held that typically 'larger sales amounts' than 37% of a defendant's holdings are necessary to support scienter." *Wozniak v. Align Techs., Inc.*, 2011 WL 2269418, at *14 (N.D. Cal. June 8, 2011) (citing *Metzler*, 540 F.3d at 1067 (finding allegation that defendant sold 37% of total stock holdings insufficient)). Here, Plaintiff concedes that Mr. Hsing reduced his shares of MPS by just 6% during the Class Period. ¶117. On its face, that undercuts an inference of scienter. *See Silicon Graphics*, 183 F.3d at 987 (sales of 6.9% to 7.7% of holdings constituted "relatively small portions" that were "not unusual or suspicious"). While Mr. Blegen reduced his shareholdings by 33%—still below the Ninth Circuit threshold— all sales were effected as part of a pre-scheduled plan or for tax withholding purposes. ¶143.

### 3.    The timing of Defendants' stock sales is not suspicious.

Finally, there is nothing unusual or suspicious about the timing of the Individual Defendants' stock sales. Their 10b5-1 plans were adopted some six months before the purported Class Period, at a time when the FAC does not allege that either of them knew any adverse information. The sales to cover tax withholdings were consistent with their pre-Class Period sales. The sales under the 10b5-1 plans were spread across a long period, frequently on the first trading day of a month, rather than immediately before the alleged "corrective" events. The consistent cadence—*e.g.*, transactions on March 1, April 1, May 1, June 3, and July 1, 2024— strongly suggests an orderly approach to following a predetermined plan rather than some nefarious attempt to avoid future losses or deceive shareholders.

Plaintiff's allegation that the Individual Defendants also made stock sales "on or shortly after Defendants' false and misleading statements" is not evidence of scienter. ¶140; *see also* ¶114. The alleged false statements were made in earnings calls, meaning the Individual Defendants sometimes sold stock after earnings were released. This is not suspicious; it is what corporate officers are supposed to do. Insiders may not trade on material, non-public information; evidence that the Individual Defendants "suspended their trading until after the earnings information had been disseminated to the investing public is simply evidence of

DEFS.' MOTION TO DISMISS                       - 19 -                   FENNEMORE CRAIG P.C.
FIRST AMENDED COMPLAINT                                                 999 Third Avenue, Suite 600
(2:25-cv-00220-JLR)                                                     Seattle, WA 98104 | 206.749.0500

Defendants' compliance with federal securities laws." *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 835 (C.D. Cal. 1998); *see also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) ("Officers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings," and such sales are not indicative of scienter.).

\*    \*    \*

Where, as here, "there are no allegations of stock sales by corporate insiders or other suspicious activities manifesting Defendants' intent to deceive the market," "the inference of motive is particularly weak." *Microsoft*, 72 F. Supp. 3d at 1233.

**B.    Defendants' statements do not support a strong inference of scienter.**

Plaintiff fails to allege scienter based on Defendants' statements about certain issues being "resolved" because the FAC contains no specific, contemporaneous facts showing that Defendants knew or were deliberately reckless in not knowing that any of the resolved quality issues were, in fact, unresolved when they made the challenged statements.

Plaintiff's theory is that because Defendants "acknowledged their awareness" of certain quality issues while stating those issues had been resolved, it can be inferred they knew this statement was false. ¶145. This theory relies on a third-party report issued nine months later that, according to Plaintiff, identified "the same quality issues" as having compromised MPS's relationship with NVIDIA. *Id.*

But this theory is impermissible fraud by hindsight. The FAC "do[es] not specifically allege direct evidence showing the key officer[] making the statements at issue"—Mr. Hsing— "had knowledge of the falsity of the statements." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 969 (N.D. Cal. 2014). To establish a strong scienter inference, Plaintiff is required to identify "specific contemporaneous statements or conditions that demonstrate the intentional or deliberately reckless false or misleading nature of the statements when made." *Metzler*, 540 F.3d at 1066. Plaintiff asks the Court to infer that when Mr. Hsing made his statement, he knew (or was deliberately reckless in not knowing) that specific quality issues had not been resolved. But

DEFS.' MOTION TO DISMISS
FIRST AMENDED COMPLAINT
(2:25-cv-00220-JLR)

\- 20 -

FENNEMORE CRAIG P.C.
999 Third Avenue, Suite 600
Seattle, WA 98104 | 206.749.0500

"Plaintiffs have pleaded no facts that would permit the court to make this inference." *Watchguard*, 2006 WL 2038656, at *11.

The FAC identifies no contemporaneous facts suggesting that, in February 2024, Mr. Hsing did *not* actually believe that specific quality issues that he said had been resolved were actually unresolved. The FAC cites no internal MPS report, email, meeting note, root-cause analysis, customer communication, or qualification failure notice showing that Mr. Hsing knew those resolved issues were in fact unresolved. *See Metzler*, 540 F.3d at 1068 (to plead scienter, there must be "at least" "some additional allegation of specific information conveyed to management and related to the fraud"). Instead, Plaintiff strings together post-hoc analyst conjecture and a third-party research note to theorize what Defendants "must have known." But Plaintiff's reliance on later third-party commentary does not bear on what Mr. Hsing knew or believed nine months earlier. *See Ronconi*, 253 F.3d at 430 n.12 ("Fraud by hindsight is not actionable."); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1060 (9th Cir. 2014) (third-party articles "written in hindsight" "do not contribute to an inference of scienter").

**C.   Plaintiff's reliance on the core operations doctrine is misplaced.**

Plaintiff also seeks to establish scienter under the core operations doctrine, which is "not easy." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). The doctrine supports a strong inference of scienter in only two limited circumstances: (1) where particularized allegations suggest the defendants had actual access to the disputed information (*i.e.*, mere assertions of "must have" are not enough) and (2) in even rarer circumstances, where the nature of the relevant fact is of such prominence that it would be literally "absurd" to suggest that management lacked knowledge of the matter. *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). Plaintiff appears to invoke but does not sufficiently plead the second prong, alleging that indirect sales of PMICs used in NVIDIA platforms accounted for 17% of MPS revenue in 2024, so Defendants must have been lying when they made reassuring statements about the enterprise data market. ¶¶5, 146-49.

This variant of the core operations doctrine is reserved for facts so company-defining that ignorance would be absurd (*e.g.*, stop-work orders freezing major revenue). *Benson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987-89 (9th Cir. 2008). This case is nothing like that. Plaintiff concedes MPS sold indirectly through distributors and manufacturers in a complex, multi-sourced ecosystem. ¶54. Allocation decisions by customers are iterative, confidential, and not necessarily communicated promptly to indirect suppliers. The Edgewater report Plaintiff cites—which does not purport to be based on information from either MPS or NVIDIA, but rather on what "we hear" from unidentified third parties—references "rush orders" and evolving "feedback," reflecting fluid, late-stage dynamics, not an earlier definitive decision regarding share allocation known to Defendants. Ex. 5 (11/11/24 Edgewater Rpt.). And the October 30 disclosure showed only a small comparative decline in one segment of MPS's business and acknowledged competitor entry "in the last couple of quarters," consistent with an evolving market share landscape, not concealed knowledge of a dramatic shift. ¶71.

Plaintiff's own pleading further undercuts any "absurdity" inference. It alleges NVIDIA-related revenue comprised roughly 17–20% of the Company's total revenue in 2024, embedded within a single end market among several, and that the purported order cancellations were generation- and platform-specific during the Blackwell transition. ¶5. That is a far cry from the kind of business-stopping event that courts have found "absurd" for management to have missed. The absence of any confidential witness, contemporaneous internal source, customer communication, or anything else attesting that Defendants were told of a definitive share reallocation by NVIDIA at the relevant times confirms that Plaintiff's theory depends on speculation, not particularized facts. Accordingly, "this is not the 'exceedingly rare' and 'unusual' case where the court can impute knowledge to the Executive Defendants solely through their executive roles." *Studen*, 2024 WL 2209686, at *18.

**D.    The supposed temporal proximity between positive statements and the alleged corrective disclosures does not support an inference of scienter.**

Finally, Plaintiff alleges that the "short span of time"— nine-plus months—"between Defendants' first false and misleading statement and the first corrective disclosure" supports an inference of scienter.  ¶150.  To begin, "the Ninth Circuit has consistently found that temporal proximity between allegedly false statements and a corrective disclosure, without more, cannot support a finding of scienter."  *Joyce v. Amazon.com, Inc.*, 2025 WL 835054, at \*14 (W.D. Wash. Mar. 17, 2025).  As relevant here, courts within the Ninth Circuit have consistently found periods *far shorter* than nine months to be insufficient evidence of scienter.  *See, e.g.*, *Ronconi*, 253 F.3d at 437 (rejecting five-week period between allegedly false statements and corrective disclosures); *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1081 (W.D. Wash. 2003) (same as to three-week period).  A nine-month interval between the earliest challenged statement and the first alleged corrective disclosure is not "short," particularly in a dynamic, fast-evolving market.

**E.    Plaintiff's scattershot theories do not coalesce into a cogent and compelling inference of scienter.**

Because Plaintiff has not alleged scienter based on any individual allegation, the Court must conduct a "holistic review," evaluating whether all the facts alleged, taken collectively, give rise to a cogent inference of scienter that is at least as compelling as any opposing innocent inference one might draw from the facts alleged.  *Tellabs*, 551 U.S. at 322-24; *see also* *Microsoft*, 72 F. Supp. 3d at 1228 (when assessing scienter, "the Court 'must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs'").  Here, when weighed holistically, the nonculpable inferences are plainly more compelling.

The most cogent inference is that Defendants spoke and acted in good faith and traded pursuant to ordinary, long-established plans, rather than with an intent to deceive.  The trading

records reflect transactions pursuant to 10b-5 plans implemented well before the Class Period and routine tax withholdings executed on a steady cadence consistent with compliance practices, which aligns with benign explanations rather than an effort to defraud shareholders. The percentages sold—approximately six percent for Mr. Hsing and roughly one-third for Mr. Blegen—are consistent with non-suspicious trading, particularly given that the sales were pursuant to Rule 10b5-1 plans adopted months before the Class Period. Taken together, these facts support the compelling inference that the trades were routine and structured, not timed to exploit undisclosed adversity and avoid future losses.

The same nonculpable inference coherently explains the challenged statements. The FAC contains no contemporaneous internal reports, communications or data indicating that Defendants knew unresolved PMIC issues persisted when they addressed the ramp or that NVIDIA had definitively reallocated share at those times. Given NVIDIA's scale, it is logical that it would seek to qualify additional suppliers for its new platform, and Defendants consistently disclosed this competitive reality to shareholders. *E.g.*, Ex. 1 at 7-8, 10 (Q4 2023 Earnings Tr.). The subsequent analyst note months later—couched in tentative terms from unnamed sources regarding "rush orders" during a later platform transition—fits comfortably within a narrative of evolving engineering specifications and competitive entry, not an earlier, concealed reality known to Defendants when they spoke. The conclusion that Defendants' statements reflected their then-current understanding and good-faith assessments is a cogent and far more compelling inference than one of deliberate concealment.

Temporal sequence likewise favors nonculpable inferences. The nine-month interval between the earliest challenged remarks and the first alleged corrective disclosure is consistent with ordinary product-cycle dynamics in a rapidly changing market, where platform qualifications, specification changes, and supply allocations unfold across multiple quarters. That timeline coheres with the benign narrative described above—pre-planned trading, aspirational or opinion statements aligned with information then available, accurate reporting of

historical results, and later market developments—without requiring any inference of intent to defraud.  Even crediting Plaintiff's theories at a high level, the alternative inferences grounded in the pleaded facts are cogent and at least as than any inference of an intent to defraud.  The FAC thus fails to plead the requisite strong, cogent inference of scienter

**III.  PLAINTIFF'S SECTION 20(A) CLAIM MUST BE DISMISSED.**

Because section 20(a) liability is premised on an underlying section 10(b) violation, section 20(a) claims must be dismissed where, as here, Plaintiff fails to adequately plead a primary violation of section 10(b).  *Zucco Partners*, 552 F.3d at 990; *Studen*, 2024 WL 2209686, at *20.

**CONCLUSION**

For these reasons, Defendants' Motion to Dismiss the First Amended Complaint should be granted with prejudice.

Dated:  January 13, 2026

Respectfully submitted,

FENNEMORE CRAIG P.C.


*s/ Stephen C. Willey*

Stephen C. Willey, WSBA #24499
999 Third Avenue, Suite 600
Seattle, Washington 98104
206.749.0500 (phone)
swilley@fennemorelaw.com

JONES DAY

Geoffrey J. Ritts (*pro hac vice*)
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
216.586.3939 (phone)
gjritts@jonesday.com

Marjorie P. Duffy (*pro hac vice*)
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio 43215
614.469.3939 (phone)
mpduffy@jonesday.com

*Attorneys for Defendants Monolithic Power Systems, Inc., Michael Hsing, and Bernie Blegen*

I certify that this memorandum contains 8,398 words, in compliance with the Local Civil Rules.

## CERTIFICATE OF SERVICE

I hereby declare under penalty of perjury under the laws of the United States of America that, on this date, the foregoing document was filed electronically with the Court and thus served simultaneously upon all counsel of record.

Executed on January 13, 2026.

s/ Marjorie P. Duffy
Marjorie P. Duffy (*pro hac vice*)

DEFS.' MOTION TO DISMISS
FIRST AMENDED COMPLAINT
(2:25-cv-00220-JLR)

- 27 -

FENNEMORE CRAIG P.C.
999 Third Avenue, Suite 600
Seattle, WA 98104 | 206.749.0500