THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| WATERFORD TOWNSHIP GENERAL EMPLOYEES RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MONOLITHIC POWER SYSTEMS, INC., MICHAEL HSING, and BERNIE BLEGEN,<br><br>Defendants. | No. 2:25-cv-00220-JLR<br><br>LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT<br><br>NOTE ON MOTION CALENDAR:<br>March 3, 2026 |

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

FACTUAL ALLEGATIONS ................................................................................................. 3

ARGUMENT ...................................................................................................................... 5

A.　Defendants' Statements Were False and Misleading ........................................ 5

　a.　Quality Control Issues With Monolithic's Power Modules Persisted
　　Throughout 2024 ......................................................................................... 6

　　i.　Defendant Hsing's Statements Were False When Made ............................ 7

　　ii.　Hsing's "We Believe" Statement is an Actionable Opinion ................................... 9

　b.　Defendants Misleadingly Omitted the Ongoing Risk That the Undisclosed Quality
　　Control Issues Could Hurt Monolithic's Relationship With Nvidia ......................... 10

B.　The Complaint Alleges Facts Supporting a Strong Inference of Scienter ................... 13

　a.　The Individual Defendants' Stock Sales Support an Inference of Scienter .............. 14

　b.　Asserting that Trades Were Made Under a 10b5-1 Trading Plan, Without More, Does
　　Not Displace an Inference of Scienter ................................................................ 18

　c.　The Misstatements Themselves Establish Defendants' Knowledge of Monolithic's
　　Quality Control Problems ................................................................................ 20

　d.　The Challenged Statements Concerned the Company's Core Operations ............... 21

　e.　The Speed With Which the Truth Came Out Supports an Inference of Scienter ...... 23

CONCLUSION ................................................................................................................. 25

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR
i

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

## TABLE OF AUTHORITIES

**Cases**

*Azar v. Yelp, Inc.*,
   2018 WL 6182756, at *19 (N.D. Cal. Nov. 27, 2018) ............................................................... 19

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009) ..................................................................................... 19

*Berson v. Applied Signal Tech.*,
   527 F.3d 982 (9th Cir. 2008) ..................................................................................................... 22

*Brody v. Transitional Hospitals Corp.*,
   280 F.3d 997 (9th Cir. 2002) ................................................................................................. 5, 12

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
   2022 WL 4491093 (S.D. Cal. Sept. 27, 2022) .......................................................................... 15

*City of Dearborn Heights v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ..................................................................................................... 22

*City of Roseville Emps.' Ret. Sys.*,
   963 F. Supp. 2d .......................................................................................................................... 8

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
   81 F.4th 918 (9th Cir. 2023) ......................................................................................... 17, 20, 21

*ESG Cap. Partners, LP v. Stratos*,
   828 F.3d 1023 (9th Cir. 2016) ................................................................................................... 13

*Evanston Police Pension Fund v. McKesson Corp.*,
   411 F. Supp. 3d 580 (N.D. Cal. 2019) ......................................................................... 19, 21, 22

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ..................................................................................................... 24

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) ................................................................................................ 10, 17

*Hatamian v. Adv. Micro Devices, Inc.*,
   87 F.Supp.3d 1149 (N.D. Cal. 2015) ......................................................................................... 11

*In re Apple Inc. Sec. Litig.*,
   2020 WL 2857397 (N.D. Cal. June 2, 2020) ...................................................................... 10, 19

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                    ii

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*In re Apple Inc. Sec. Litig.*,

   2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ................................................................ 23

*In re Countrywide Fin. Corp. Derivative Litig.*,

   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...................................................................... 19

*In re Daou Sys., Inc.*,

   411 F.3d 1006 (9th Cir. 2005) .................................................................................. 15

*In re Dermtech, Inc. Sec. Litig.*,

   2025 WL 1618193 (S.D. Cal. June 5, 2025) .............................................................. 17

*In re Gilead Scis. Sec. Litig.*,

   536 F.3d 1049, 1057 (9th Cir. 2008) .......................................................................... 6

*In re Juno Therapeutics, Inc.*,

    2017 WL 2574009 (W.D. Wash. June 14, 2017) ........................................................ 9

*In re Nuvelo, Inc. Sec. Litig.*,

   668 F. Supp. 2d 1217 (N.D. Cal. 2009) .................................................................... 12

*In re Quality Sys., Inc. Sec. Litig.*,

   865 F.3d 1130 (9th Cir. 2017) ........................................................................ 12, 13, 20

*In re Questcor Sec. Litig.*,

   2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ........................................................ 18, 25

*In re Semtech Corp.*,

    2025 WL 2884810 (C.D. Cal. Oct. 7, 2025) ............................................................ 8, 9

*In re Silicon Graphics Inc. Securities Litigation*,

   183 F.3d 970 (9th Cir. 1999), *as amended* (Aug. 4, 1999) ...................................... 15, 16, 17

*In re SolarCity Corp. Sec. Litig.*,

   274 F. Supp. 3d 972 (N.D. Cal. 2017) ........................................................................ 6

*In re SVB Fin. Grp. Sec. Litig.*,

   2025 WL 1676800 (N.D. Cal., June 13, 2025) .......................................................... 12

*In re Tracht Gut, LLC*,

    836 F.3d 1146 (9th Cir. 2016) .................................................................................... 8

*In re UTStarcom, Inc. Sec. Litig.*,

    617 F. Supp. 2d 964 (N.D. Cal. 2009) ...................................................................... 20

Lead Plaintiff's Opposition to
Defendants' Motion to Dismiss
2:25-cv-00220-JLR                                        iii

Tousley Brain Stephens PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*In re Vaxart, Inc. Sec. Litig.*,
 576 F. Supp. 3d 663 (N.D. Cal. 2021) ................................................................. 12

*In re VeriFone Holdings, Inc. Sec. Litig.*,
 704 F.3d 694 (9th Cir. 2012) ................................................................................. 5

*In re Volkswagen*,
 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ............................................................ 22

*In re Zillow Grp., Inc. Sec. Litig.*,
 2019 WL 1755293 (W.D. Wash. Apr. 19, 2019) ................................................. 21

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
 45 F.4th 1236 (10th Cir. 2022) ............................................................................ 14

*Institutional Invs. Grp. v. Avaya, Inc.*,
 564 F.3d 242 (3d Cir. 2009) ................................................................................. 17

*Johnson v. Aljian*,
 394 F. Supp. 2d 1184 (C.D. Cal. 2004) ............................................................... 15

*Joyce v. Amazon.com, Inc.*,
 2025 WL 835054 (W.D. Wash. Mar. 17, 2025 ................................................... 20

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
 540 F.3d 1049 (9th Cir. 2008) ............................................................................. 16

*Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*,
 523 F.3d 75 (1st Cir. 2008) .................................................................................. 18

*N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp.*,
 2009 WL 3112574 (C.D. Cal. Sept. 25, 2009) ...................................................... 8

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
 380 F.3d 1226 (9th Cir. 2004) ........................................................ 16, 17, 20, 21

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
 58 F.4th 195 (5th Cir. 2023) ................................................................................ 14

*Omnicare, Inc. v. Laborers Dist. Council*,
 575 U.S. 175 (2015) .................................................................... 5, 9, 10, 13

*Peters v. Twist Bioscience Corp.*,
 2025 WL 2532671 (N.D. Cal. Sept. 3, 2025) ........................................................ 9

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                                    iv

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,

   759 F.3d 1051 (9th Cir. 2014)........................................................................................ 22

*Reese v. Malone*,

   747 F.3d 557 (9th Cir. 2014)................................................................................... 22, 23

*Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*,

   790 F. Supp. 3d 763 (N.D. Cal. 2025) ......................................................................... 25

*Roberti v. OSI Sys., Inc.*,

   2015 WL 1985562, (C.D. Cal. Feb. 27, 2015)...................................................... 13, 24

*Rubke v. Capitol Bancorp Ltd*,

   551 F.3d 1156 (9th Cir. 2009).................................................................................... 12

*Schueneman v. Arena Pharms., Inc.*,

   840 F.3d 698 (9th Cir. 2016).................................................................................... 10

*Shenwick v. Twitter, Inc.*,

   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................... 24

*Shupe v. Rocket Companies, Inc.*,

   660 F. Supp. 3d 647 (E.D. Mich. 2023)................................................................... 15

*South Ferry LP No. 2 v. Killinger*,

   542 F.3d 776 (9th Cir. 2008)............................................................................... 17, 22

*Stocke v. Shuffle Master, Inc.*,

   615 F. Supp. 2d 1180 (D. Nev. 2009) ...................................................................... 20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,

   551 U.S. 308, 324 (2007) ...................................................................................... 13, 14

*U.S. v. Laurienti*,

   611 F.3d 530 (9th Cir.2010)..................................................................................... 10

*United Ass'n Nat'l Pension Fund v. Carvana Co.*,

   759 F. Supp. 3d 926 (D. Ariz. 2024)........................................................................ 20

*Warshaw v. Xoma Corp.*,

   74 F.3d 955 (9th Cir. 1996)....................................................................................... 12

*Yourish v. Cal. Amplifier*,

   191 F.3d 983 (9th Cir. 1999)........................................................................................ 9

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR         v

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

**Rules**

17 C.F.R. § 240.10b5-1(c)(1) ................................................................................. 19

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                                    vi

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

**INTRODUCTION**

This is a straightforward case of securities fraud. Defendants falsely reassured investors that technical shortcomings with their most important product had been "resolved"—while simultaneously rushing to sell tens of millions of dollars worth of stock before the truth caught up with them.

Beginning in late 2023, Nvidia experienced serious failures in its Hopper servers. Those problems were ultimately traced to Monolithic Power Systems, Inc.'s power management integrated circuits ("PMICs")—specialized chips that manage voltage regulation, current control, and thermal protection in power modules. Nvidia was Monolithic's most important customer. On February 8, 2024, Monolithic's CEO, Defendant Hsing, falsely reassured investors, that the problems with the Company's PMICs had been "resolved," and later, on May 1, 2024, the Company's CFO, Defendant Blegen, misleadingly claimed that Monolithic was fully integrated into Nvidia's next-gen Blackwell platform.

In truth, both Hsing and Blegen knew, or recklessly disregarded, that Monolithic had failed to remedy the design problem with its PMICs and the persistent technical failures were so significant that they put Monolithic's relationship with Nvidia at risk. The timing could not have been worse—the issue came to light just as competitors were entering the market and Nvidia's Blackwell was ramping for production. In the months after Defendants told investors the issues with Monolithic's PMICs had been "resolved," Hsing and Blegen offered a range of additional false reassurances to investors and analysts, while selling millions in stock as Nvidia began to cultivate alternatives.

Nvidia's move away from Monolithic became apparent when the Company released earnings on October 30, 2024, and Monolithic's stock price fell precipitously. Then, on November 11, 2024, Edgewater Research released a report that explained the shift—Nvidia's engineers had "lost confidence" in Monolithic because of the same persistent problems that Hsing and Blegen had told investors had already "resolved" months earlier. Monolithic's stock dropped

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                    1

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

15% in a single day on that news and its decline continued as confirmatory reports came out over the next several weeks.

Hsing and Blegen either knew their reassurances were misleading or acted with reckless disregard for the truth. Hsing and Blegen do not, because they cannot, deny that they were aware of the problem with Monolithic's PMICs—each made public statements specifically addressing the issue. As in other cases relating to a company's core operations, the product and relationships at issue were of central importance to the Company. In this case, the issue affected Monolithic's most significant product, its largest source of revenue and its greatest opportunity for growth. And in the nine months between Defendants' false reassurances and when the truth was revealed, Hsing and Blegen broke with their past trading patterns and sold tens of millions of dollars in Monolithic stock. Whereas in years past Hsing and Blegen had almost uniformly only sold shares to offset tax obligations, during the Class Period each sold regularly and substantially. Blegen sold especially aggressively, liquidating a third of his total holdings acquired over more than a decade of service to Monolithic in just nine months.

Defendants seek dismissal, but do not grapple with the Complaint's theory. As described below, Defendants thoroughly defend portions of their statements that are not challenged and misconstrue case law to suggest the existence of a "threshold" for insider trading unmoored from legal authority or common sense. Most notably, Defendants attempt to sanitize their insider trading solely by invoking their 10b5-1 trading plans without disclosing the terms or conditions of those plans. These arguments are, at best, non-sequiturs. None is relevant to the central question of whether the allegations in the Complaint, taken as true, plausibly allege that Defendants falsely reassured investors that the problems with the Company's product had been "resolved" when they were not. The motion should be denied.[1]

---

[1] Citations to "MTD" refer to ECF No. 46.

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                    2

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

## FACTUAL ALLEGATIONS

Monolithic designs high performance power electronics solutions. ¶31.[2] Monolithic's most significant end market—comprising over one-third of the Company's total revenue in 2024—is Enterprise Data, which supplies power solutions for data centers and artificial intelligence computing hardware. ¶3.

Nvidia, the world's dominant supplier of graphic processing units (GPUs), was Monolithic's most important customer for its Enterprise Data products. ¶35. GPUs are used to run and operate AI data servers, and Nvidia relied on Monolithic's PMICs in its GPU platforms. ¶¶34, 51. In 2024, indirect sales of power management solutions for Nvidia's GPU platforms accounted for approximately 17% of Monolithic's total revenue. ¶5. In 2023 Monolithic supplied 100% of the PMICs used in Nvidia's Hopper architecture. *Id*.

Nvidia's Hopper, launched in 2022, was designed for large-scale computing applications and widely deployed in AI servers though 2024. ¶50. At the time of its release, Hopper was the most powerful GPU architecture on the market. In 2024, however, Nvidia introduced its next-generation Blackwell, which delivered a 2.5 times performance increase over Hopper while being 25 times more energy efficient and six times faster. ¶56.

Despite these efficiency gains, Blackwell's power demands significantly outstripped Hopper's—raising serious concerns about Monolithic's ability to support Nvidia's future platforms. In early 2024, the market became aware that Monolithic's PMICs were suffering from significant performance and quality issues that negatively impacted Hopper-based GPUs. ¶40. Given Nvidia's outsized contribution to Monolithic's revenue, investors paid close attention to these problems, particularly because they were expected to worsen as power requirements increased in the Blackwell transition.

---

[2] Citations to "¶__" are to the numbered allegations in the Plaintiff's First Amended Complaint, ECF No. 39 (the "Complaint"). Defined terms have the same meaning as in the Complaint.

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                                    3

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

On February 8, 2024, during Monolithic's earnings call for its fourth fiscal quarter ending December 31, 2023 ("4Q23"), an analyst questioned the Company about its future with Nvidia's Blackwell. ¶60. In response, Defendant Hsing addressed the Hopper-related quality issues directly, stating, "*we believe we resolve all these issues*." ¶61. He later acknowledged that Monolithic had experienced "some issues" with its power management components, but reiterated that "*all these issues are resolved*." ¶66.

Shortly thereafter, Truist Securities analyst William Stein reported on these reassurances: "Today, MPWR confirmed it did face a quality concern with NVDA. The good news is that MPWR identified the problem, the failure rate is low, the problem is fixed, and the relationship remains on solid footing." ¶68.

Throughout the Class Period, Defendants Hsing and Blegen continued to tout Monolithic's relationship with Nvidia and increasing demand for its products. ¶¶70–79. At the same time, both Defendants engaged in significant and suspicious insider stock sales. Defendant Hsing executed eleven transactions involving Monolithic's stock during the approximately nine-month Class Period, selling a total of 59,765 shares for a total of $44,211,500—nearly twice his annual salary as Monolithic's CEO. ¶99. Defendant Blegen executed fourteen transactions during the same period, selling a total of 28,007 shares for $21,878,412—obtaining nearly seven times the amount of his annual salary as Monolithic's CFO by liquidating 33% of his Monolithic stock. ¶¶122, 142, 143.

The timing and circumstances of these sales were suspicious. The majority of these sales, contrary to Hsing and Blegen's normal practice in the years preceding the Class Period, were not identified as having been made to cover tax obligations. ¶¶112–113, 138–139. And most occurred on or shortly after Defendants' false and misleading statements, including on February 8, 2024, March 1, 2024, May 1, 2024 and on November 8, 2024. ¶¶115, 140.

The truth began to emerge on October 30, 2024, when Monolithic released financial results for its third fiscal quarter ending September 30, 2024 ("3Q24"). Nvidia had begun to shift

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                                4

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

marketshare to Monolithic's competitors, and revenue from the Enterprise Data segment had flatlined, missing consensus estimates by nearly 13%. ¶76. During the 3Q24 Earnings Call, Defendant Hsing acknowledged that over "the last couple of quarters," Nvidia had integrated additional PMIC suppliers, thereby reducing Monolithic's market share. ¶77. On this news, the price of Monolithic common stock fell more than $160 per share, a decline of more than 17%. ¶84. But the relationship between Monolithic's technical failures and this shift was not yet known.

On November 11, 2024, Edgewater Research reported that Nvidia had cancelled half of its outstanding Monolithic orders and intended to eliminate Monolithic's allocation to Blackwell. The report stated: "Over the last few weeks, there has been a major change in the PMIC that goes on Blackwell GPUs. [Nvidia] is finding serious limitations with [Monolithic's] PMIC for GPUs with power consumption above 700W … Apparently, there is an issue with their PMIC performance that goes back to the original issue [Monolithic] had with Hopper." ¶85; ECF No. 48-5. Hsing and Blegen's reassurances that these issues had been resolved months earlier were revealed to be false. Monolithic's stock price fell $114 per share, a decline of 15%. ¶86. The slide continued over several days. ¶87.

## ARGUMENT

### A. Defendants' Statements Were False and Misleading

Falsity is adequately pled where a complaint "'specif[ies] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (quoting 15 U.S.C. § 78u–4(b)(1)(B)). A statement is misleading if it "create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). "[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council*, 575 U.S. 175, 192 (2015). "[S]o long as the plaintiff alleges facts to

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                    5

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

Here, the Complaint alleges particularized facts showing Defendants misled investors to believe that Monolithic's quality control issues had been resolved and misleadingly omitted that those issues were significant enough to jeopardize demand for its PMICs from Nvidia, the Company's most important customer.

### a. Quality Control Issues With Monolithic's Power Modules Persisted Throughout 2024

In early 2024, buyers highlighted a quality issue with Monolithic's PMICs in Nvidia's products. ¶68. Hsing aimed to dispel those rumors on the February 8, 2024 4Q23 earnings call by reassuring investors that the quality control issues were "***resolved***." ¶66; *see also* ¶61 (Hsing stating "***we believe we resolve all these issues during this fast ramp***").[3]

These statements were false when made because as of February 2024, Monolithic had not resolved the quality control issues with its PMICs. Beginning in July 2024 (only six months after Hsing's assurances that the quality issue impacting Monolithic's products for Nvidia were entirely resolved), the Company's Enterprise Data revenue plunged: for 3Q24, revenue declined

---

[3] Lead Plaintiff opposes Defendants' Request for Judicial Notice and Incorporation by Reference (ECF No. 47) for Exhibits 1-4 (the earnings call transcripts) to the extent Defendants use those materials to dispute Plaintiff's well-pled allegations. Defendants cite to the 4Q23 Earnings Call to "explain[] the challenged statements." MTD 24 (citing Ex. 1). This is precisely the strategy that the Ninth Circuit rejected in *Khoja v. Orexigen Therapeutics, Inc.*, holding that "[t]o the extent that the district court judicially noticed the … investors' call transcript for the purpose for which [it] was offered, *i.e.*, to determine what the investors knew …, the district court abused its discretion." 899 F.3d 988, 1000 (9th Cir. 2018).

Furthermore, Defendants' self-serving statements cannot be presumed to be true. *See In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 988 (N.D. Cal. 2017) (courts cannot assume document's contents to be true on a motion to dismiss when plaintiff's complaint alleges that these documents contain false or misleading statements); *Khoja*, 899 F.3d at 1003 (it is "improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint").

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR

6

to $184 million, down from $187 million in the prior quarter and missing consensus estimates by nearly 13%. ¶76.

Following the Company's announcement of 3Q24 earnings, reporters quickly connected Monolithic's declining Enterprise Data revenue to PMIC performance issues. On November 11, 2024, an Edgewater Research report (the "Report") disclosed that Nvidia had cancelled half of its outstanding orders and planned to remove Monolithic from most variants of its next-generation Blackwell chips due to performance issues with the PMICs. ¶85. The Report explained that "[i]ndustry feedback" reflected "an issue with their PMIC performance that goes back to the original issue [Monolithic] had with Hopper." ECF No. 48-5.

Further reporting corroborated these claims: on November 17, 2024, John Vinh of KeyBanc wrote "Hopper PMIC overheating issues have persisted on Blackwell . . . as a result, [Monolithic] will not have any share on GB200/B200." ¶88. Vinh continued, stating "[t]hese overheating issues appear to be related to the PMIC issues we had flagged on Hopper and likely worsened as the power requirements increased on Hopper at 700W to 1,000W on Blackwell . . . these issues had persisted on Hopper at 700W and were never completely resolved[.]" *Id*. On December 16, 2024, William Stein of Truist Securities lowered his price target for the Company, noting that "[w]e believe that MPWR's challenges with NVDA stem from a quality concern or debate arising from MPWR supporting a meteoric rise in NVDA's demand during 2023 . . . [W]e have no confidence in MPWR's share in Blackwell." ¶90.

### i. Defendant Hsing's Statements Were False When Made

Defendants assert that Plaintiff failed to plead facts demonstrating contemporaneous falsity—but facts showing that problems with Monolithic's PMICs were never "resolved" demonstrate that Defendants' claims of "fraud-by-hindsight" are misplaced. *See In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 330 (D. Mass. 2002) ("fraud by hindsight" objections were

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                        7

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

"inapplicable" and falsity was adequately pled where proof that software product did not work at later point in time supported inference it did not work at earlier point in time).

Monolithic's Enterprise Data revenue began to decline in July 2024, only six months after Hsing's false claims that the quality control issues identified in 2023 were entirely "resolved" by February 2024. The most plausible inference is that this revenue decline—widely understood by the market to be caused by Nvidia cancelling orders for Monolithic's PMICs due to ongoing quality control issues—was caused by the Company's failure to remedy the PMIC problems. *Allaire*, 224 F. Supp. 2d at 330.

Furthermore, Defendants' claim that the Report "[a]t most [] offered unsourced, anonymous suggestions that, at higher wattages and in later product generations [], Nvidia was considering using a second supply source," MTD 12, is a blatant misconstrual of the Report and an improper attempt to create factual disputes at the motion to dismiss phase, where "the trial court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff." *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016). *See also In re Semtech Corp.*, 2025 WL 2884810, at *9 n.2 (C.D. Cal. Oct. 7, 2025) (defendants' arguments that plaintiff failed to plead falsity because allegations centered on an "unsourced" analyst report and lacked confidential witnesses and internal documents are "factual issues unsuitable for resolution on a motion to dismiss"). The Report explicitly links Nvidia's PMIC order cancellation to the same "[p]erformance issues" with Monolithic's products that Hsing claimed were "resolved," explaining that "there is an issue with their PMIC performance that goes back to the original issue [Monolithic] had with Hopper." ¶85; ECF No. 48-5.

Clearly distinct from Defendants' cited authority, the Report is not a "subsequent disclosure" from Defendants, *N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp.*, 2009 WL 3112574, at *10 (C.D. Cal. Sept. 25, 2009), that Plaintiff merely alleges "should have been made … earlier," *City of Roseville Emps.' Ret. Sys.*, 963 F. Supp. 2d 1092, 1109 (E.D. Wash. 2013), aff'd, 691 F. App'x 393 (9th Cir. 2017), nor "a later sobering revelation mak[ing] an earlier,

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

cheerier statement a falsehood." *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996-97 (9th Cir. 1999) (cleaned up). Instead, Hsing misled investors about the resolution of performance issues. But when Monolithic was forced to report notably reduced 3Q24 Enterprise Data revenue, analysts investigated and determined that the decline was caused by Nvidia's cancellation of orders because of the same quality control issues that Hsing had claimed were already resolved. These allegations are sufficient to establish the contemporaneous falsity of Hsing's statements. *See Semtech*, 2025 WL 2884810, at *9 (third party reporting supportive of falsity).

What is more, Defendants argument on this point is not plausible. The Complaint alleges a fundamental design and engineering probem with PMIC performance at higher wattages. ¶¶85, 88-89. Defendants' implausible explanation is that this fundamental, structural issue was resolved in February and then reappeared again a few months later. But their own exhibits describe the problem as a "design issue," ECF No. 48-5, and such a fundamental problem is unlike an inventory shortage that could be fixed and later reappear. It simply is not plausible that a structural problem with Monolithic's product was on again, off again, as Defendants ask the Court to believe.

### ii.   Hsing's "We Believe" Statement is an Actionable Opinion

Hsing's statement "***we believe we resolve all these issues during this fast ramp***," ¶61, is actionable because it contains an embedded, "objectively verifiable fact[]"—that Monolithic's quality control issues were resolved. *Peters v. Twist Bioscience Corp.*, 2025 WL 2532671, at *6 (N.D. Cal. Sept. 3, 2025). Opinion phrases such as "'we believe' or 'we think' ... can preface nearly any" statements which "remain perfectly capable of misleading investors." *Omnicare,* 575 U.S. at 193; *see also In re Juno Therapeutics, Inc.*, 2017 WL 2574009, at *5 (W.D. Wash. June 14, 2017) ("Purported statements of opinion that contain untrue embedded facts are not opinions shielded from liability under the securities laws.") (cleaned up). Whether Monolithic's quality issues were "resolve[d]" during the Blackwell "fast ramp" can be proven true or false—either they were fixed, or they persisted. Underscoring the factual nature of the statement, later in the

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                                    9

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

call, Hsing repeated that same misleading assertion—without any pretense of opinion—stating "*all these issues are resolved*." ¶66.

Even if Hsing's misrepresentation was construed to contain a subjective element, his statement "impl[ies] facts about the inquiry" or "the knowledge" Hsing had and "the real facts are otherwise, but not provided." *Omnicare*, 575 U.S. at 176. By assuring investors that "we resolve all these issues during this fast ramp," Hsing conveyed that he was informed about the status of the PMIC quality issues—knowledge that would have revealed that the issues were not, in fact, fully resolved. By "reassur[ing] investors" that the quality control issues had been resolved, Hsing "affirmatively create[d] an impression of a state of affairs" that did not "fairly align[ ] with the information in [his] possession…." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 771 (9th Cir. 2023) (cleaned up). *See also In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at \*16 (N.D. Cal. June 2, 2020) (opinion actionable where "statement did not align with the information [defendant] possessed at the time").

### b. Defendants Misleadingly Omitted the Ongoing Risk That the Undisclosed Quality Control Issues Could Hurt Monolithic's Relationship With Nvidia

Throughout the Class Period, Hsing and Blegen touted increased demand for Monolithic's power components and the strength of the Company's relationship with Nvidia, while omitting that unresolved quality control issues threatened that relationship and risked reducing demand for their products. Once Defendants chose to speak on these subjects, they were "bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016) (cleaned up). This is because Rule 10b–5(b) "prohibits the telling of material half-truths, where the speaker omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *U.S. v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010) (cleaned up).

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                    10

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

When Defendant Blegen announced that Monolithic was "*at the front of the design cycle, we're consulted, we're integrated, in fact, with the development of the next generation of products*," ¶70, Nvidia was, in fact, actively integrating Monolithic's competitors into the provision of PMICs—substantially reducing the Company's market share. Hsing admitted that Nvidia had started that process in the past "couple of quarters" prior to 3Q24—meaning it was underway at the time Blegen made his statement.. ¶77; *Hatamian v. Adv. Micro Devices, Inc.*, 87 F.Supp.3d 1149, 1160 (N.D. Cal. 2015) ("later admissions" "further reinforce[]" the plausibility of plaintiffs' falsity allegations). Blegen's statement is actionable because it omitted material facts necessary to make it not misleading.

Analysts quickly connected Nvidia's integration of additional suppliers to ongoing quality control issues with Monolithic's PMICs. *See* ¶85; ECF No. 48-5 (Edgewater Research Report noting that Monolithic's competitors reportedly received recent "rush orders" from Nvidia due to "an issue with their PMIC performance that goes back to the original issue [Monolithic] had with Hopper"); ¶¶91, 92 (analysts reporting increasingly favorable outlook for Monolithic's main competitors in supplying PMICs to Nvidia).

This statement, as well as similar statements from Hsing and Blegen touting demand for Monolithic's products, omitted that Nvidia was seeking to replace Monolithic with competing suppliers for inclusion in its next-generation Blackwell designs because of ongoing quality control issues. *See* ¶¶61, 64, 73 (Blegen announcing "*increased demand for AI power solutions*," "*improving order trends*," and "*design wins*,"[4] Hsing claiming "*they keep requesting it and keep requesting we solve all these issues*," and "*[i]t's all about the throughput and to meet customer demand*"). These statements are misleading because they "created an

---

[4] Although Blegen was referring to 2Q24 revenue, during 2Q24, Nvidia was already onboarding additional PMIC suppliers in part because of Monolithic's unresolved product design issues. Omitting this context rendered Blegen's descriptions misleading as they portrayed Monolithic's positioning with Nvidia and demand for its PMICs as far stronger than was reality. *See* ¶77; *Schueneman*, 840 F.3d 698.

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                    11

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

impression" of unaffected demand for Monolithic's PMICs "that differ[ed] in a material way from the one that actually exist[ed]": significantly decreased orders from Nvidia, the Company's most important customer. *Brody*, 280 F.3d at 1006 (9th Cir. 2002); *cf. Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1163 (9th Cir. 2009) (plaintiffs failed to plead actionable omission without indicating specific statements made misleading by the omitted information). And even if Nvidia had not yet begun onboarding Monolithic's competitors, Plaintiff "need not allege that defendants knew" that Nvidia was searching for other suppliers, he "need merely allege that defendants misled investors by omitting to disclose a material risk" that ongoing quality control issues could impact Monolithic's relationship with Nvidia. *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal. 2009).

Defendants attempt to brush away similar misrepresentations from Blegen and Hsing about customer demand for Monolithic's products as puffery. But "'even general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)). Blegen's claim that Monolithic continued to be a "*leader*," ¶70, in response to an analyst's question about Monolithic's "largest enterprise data customer," (Nvidia) is actionable because Monolithic's relationship with its most significant customer was important to a reasonable investor. *See In re SVB Fin. Grp. Sec. Litig.*, 2025 WL 1676800, at \*11 (N.D. Cal., June 13, 2025) (rejecting defendants' arguments of puffery because "the Court is skeptical that Defendants' statements … were unimportant to a reasonable investor"); *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670 (N.D. Cal. 2021) ("Statements are evaluated through a fisheye, not a telescope.").

Furthermore, Hsing's claims that Monolithic's power solutions were the "*best*" and "*most power efficient*" in the industry, and that the Company's Enterprise Data business "*will grow*," ¶79, are actionable as they "provide[d] specific details to investors about the status of specific

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

products," *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *9 (C.D. Cal. Feb. 27, 2015), which Hsing "[knew] to be performing poorly." *Quality Sys.*, 865 F.3d at 1143.5. Even if characterized as opinion statements, they are actionable under *Omnicare* because they did not fairly align with the information in Hsing's possession at the time. 575 U.S. at 189.

### B. The Complaint Alleges Facts Supporting a Strong Inference of Scienter

A plaintiff can establish scienter "by showing deliberate recklessness or 'some degree of intentional or conscious misconduct.'" *In re Sona Nanotech Inc. Sec. Litig.*, 2022 WL 22879627, at *4 (C.D. Cal. March 18, 2022) (quoting *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016)). Deliberate recklessness is "an extreme departure from the standards of ordinary care which presents a danger of misleading … that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id*. (cleaned up). "The inquiry … is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. Scienter is adequately pled where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Glazer*, 63 F.4th at 766 (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)).

A "strong" inference "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. "[I]f two possible inferences—one fraudulent and the other nonfraudulent—are equally compelling, a plaintiff has demonstrated a strong inference of scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016). Non-culpable inferences therefore must be more likely than the scienter

---

[5] For the same reasons, Hsing's misleading claims that Monolithic had "***occupied a pretty large [market] share***" because Monolithic products were the "***best solutions***" for customers ¶77, when in fact the Company had lost market share to competitors due to quality control issues, are not puffery—they are contextually responding to a question about Monolithic's share of PMIC sales in the Enterprise Data market, a specific product that was important to investors. *See Roberti*, 2015 WL 1985562, at *9; *In re Quality Sys.*, 865 F.3d at 1143.

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                    13

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

inference to support dismissal. *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 214 (5th Cir. 2023).

Defendants do not dispute that they sold millions in Monolithic stock after telling investors issues with their most essential product had been "resolved," but before the Edgewater Report revealed those issues were, in fact, unresolved. MTD 16-20. The Complaint alleges specific facts supporting the inference that those statements were made when Defendants knew or recklessly disregarded that the performance issues with Monolithic's PMICs not only persisted, they were serious enough to jeopardize the Company's relationship with Nvidia. In addition to their unusual stock sales, the substance of the challenged statements confirms that Hsing and Blegen were closely monitoring the problems with Monolithic's PMICs. Plus, the issues concerned the core operations of the Company, and the short time span between when Defendants' challenged statements and the revelation of the truth support an inference of scienter. *Tellabs*, 551 U.S. at 326 ("The court's job is not to scrutinize each allegation in isolation but to assess the allegations holistically.")

**a.   The Individual Defendants' Stock Sales Support an Inference of Scienter**

Hsing and Blegen's significant and unusual stock sales establish a financial motive to maintain the Company's artificially inflated stock price. *See Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1266 (10th Cir. 2022) (stock sales under 10b5-1 plan provided motive to misrepresent information and supported an inference of scienter). Defendants' own exhibits confirm the allegations in the Complaint that both Hsing and Blegen sold tens of millions of dollars' worth of Monolithic stock during the Class Period. *See* ECF Nos. 48-6 to 20. A defendant's "motive can be a relevant consideration, and personal financial gain may weigh *heavily* in favor of a scienter inference." *Tellabs*, 551 U.S. at 325 (emphasis added). "[T]rading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter" where it comes "in a context where defendants have incentives to withhold

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                     14

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

material, non-public information." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (internal quotation marks omitted). That is precisely what is alleged here.

In determining whether stock sales are suspicious, the Ninth Circuit has found that "[a]mong the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *In re Silicon Graphics Inc. Securities Litigation,* 183 F.3d 970, 986 (9th Cir. 1999), *as amended* (Aug. 4, 1999). Here, each of these factors supports a strong inference of scienter.

First, as to amounts and percentages, substantial sales can support scienter irrespective of the percentage sold. *See Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004); *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093, at *13 (S.D. Cal. Sept. 27, 2022) (holding that substantial sales supported scienter regardless of percentage); *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1199–1200 (C.D. Cal. 2004), aff'd in part, 490 F.3d 778 (9th Cir. 2007); *Shupe v. Rocket Companies, Inc.*, 660 F. Supp. 3d 647, 682 (E.D. Mich. 2023) (noting that "no legal authority" supports the "proposition that the Securities Exchange Act provides a more flexible footing for more significant owners"). Here, Hsing sold 6% of his Monolithic holdings during the Class Period, generating a windfall of more than $44 million. ¶¶99, 116-117. Blegen sold a whopping 33% of his Monolithic holdings during the Class Period for a sum of more than $21.8 million—representing nearly seven times the amount of his annual compensation. ¶¶122, 142-143. These sales are substantial enough, by any measure, to support an inference of financial motive.

Second, as to timing, Defendants admit that both Individual Defendants traded at a "steady cadence" while the stock price was allegedly artificially inflated by fraud. MTD 24. Both Hsing and Blegen made major stock sales on or shortly after making allegedly false and misleading statements, including on February 8, 2024, March 1, 2024, May 1, 2024 and on November 8, 2024, just days before the release of the Edgewater Research Report. ¶¶114, 140.

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Third, as to consistency, Defendants do not contest that most of Hsing and Blegen's trades during the Class Period were not made in connection with a tax obligation incurred by the vesting of other shares as part of Monolithic's equity incentive plan. *See* ECF No. 48-6 to 20; ¶¶112-113, 138-139. That pattern contrasts sharply with Hsing and Blegen's two prior years of trading preceding the Class Period, where they rarely, if ever, sold shares except to cover tax liabilities attendant to their acquisition of more stock. *Id.* Hsing and Blegen's Class Period stock sales thus lack "consistency with prior trading history." *Oracle*, 380 F.3d at 1232. Stock sales that are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information" are suspicious and support an inference of scienter. *Oracle*, 380 F.3d at 1232.

Defendants argue to the contrary by misconstruing cases applying the *Silicon Graphics* test as though they stand for brightline rules or "threshold[s]." MTD 26. Defendants claim, for example, that Blegen's liquidation of a third of his total holdings in Monolithic's stock does not support an inference of scienter because those sales fall below the "threshold" allegedly established by *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) where scienter was found to be inadequately alleged as to a defendant that sold 37% of his stock. This argument has multiple fatal defects.

To begin with, *Metzler* did not establish, nor claim to establish any such "threshold." *See Metzler*, 540 F.3d at 1067. *Metzler* is also readily distinguishable as it involved stock sales that took place well *before* the relevant period in a manner *consistent* with the defendants' prior patterns of selling shares immediately as they vested. *Id.* Here the trades at issue are Hsing and Blegen's sales made *during* the Class Period and in a manner *distinct* from the pattern established by two previous years' worth of trading—where Hsing and Blegen almost uniformly only sold stock to cover tax obligations incurred as the result of acquiring more stock. See ¶¶ 112, 113, 138, 139.

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                    16

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Second, the Ninth Circuit has specifically rejected the brightline approach endorsed by Defendants. *See E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 942 (9th Cir. 2023) (declining to adopt "categorical[]" rule that "would place an onerous and undue pre-discovery burden on plaintiffs in securities fraud cases" and "turn 'the PSLRA's formidable pleading requirement into an impossible one.'") (quoting *Glazer*, 63 F.4th at 769). The Ninth Circuit has repeatedly explained that the Silicon Graphics factors are to be considered in totality, not separately evaluated as "rules of thumb" because "federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *South Ferry LP No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008); *accord Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 268 (3d Cir. 2009) ("[T]otality-of-the circumstances tests … will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter."). In *Oracle*, the Ninth Circuit reversed a dismissal based on precisely the kind of rote application of the *Silicon Graphics* factors as though they were brightline rules that Defendants urge here, finding instead that stock sales supported scienter even though the defendants sold small percentages of their holdings (2.1% and 7%) and one Defendant had no trading history to use as a comparison. 380 F.3d at 1232.

Thus, while each of these factors weighs in favor an inference of scienter, it would be error to apply the *Silicon Graphics* factors as though they were "bright-line rule[s]" or thresholds as Defendants urge. *See In re Dermtech, Inc. Sec. Litig.*, 2025 WL 1618193, at *9 (S.D. Cal. June 5, 2025). Neither law nor logic supports the view that a defendant's liquidation of tens of millions worth of stock during the Class Period in a manner distinct from two previous years' worth of trading should weigh against an inference of scienter.

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                    17

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

**b. Asserting that Trades Were Made Under a 10b5-1 Trading Plan, Without More, Does Not Displace an Inference of Scienter**

Defendants rely heavily, indeed almost exclusively, on the claim that because some of their stock sales were purportedly pursuant to a 10b5-1 trading plans, inferences derived from their significant and unusual trading can be safely ignored. But standing alone, the existence of a 10b5-1 plan is inadequate to "negate" an inference of scienter. *Pluralsight,* 45 F.4th at 1266 ("Rule 10b5-1 plans do not per se rebut an inference of scienter" because once Defendants know when their trades were scheduled to occur, "they have every incentive to make false and misleading statements, and conceal material adverse information, to artificially boost the Company's share price."). Courts in this Circuit recognize that "the fact of [a] 10b5-1 trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales." *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013).

Indeed, Rule 10b5-1 "itself says nothing of whether such a plan can rebut an inference that an insider acted with scienter in making material misrepresentations in connection with the sale or purchase of securities." *Pluralsight*, 45 F.4th at 1266. Rather, Rule 10b5-1 creates an affirmative defense to claims of insider trading where a defendant meets their burden to prove that their trading plan complies with the regulation. *See* 17 C.F.R. §240.10b5-1(c). Merely pointing to a check-box is insufficient for that purpose, let alone negating allegations of scienter at the pleading stage of a fraud action.

Defendants "do not offer any persuasive contrary arguments" and instead simply cite "decisions recognizing that 10b5-1 plans *can* rebut an inference of scienter" in limited circumstances. *Pluralsight,* 45 F.4th at 1266 (emphasis in original). But Defendants do not, because they cannot, argue that such circumstances are present here—because Hsing and Blegen's 10b5-1 plans are notably absent from the dozens of extraneous exhibits submitted. *See Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 92 (1st Cir. 2008) (stock sales supported scienter where there was "no evidence … [defendants'] trading plans removed entirely from defendants' discretion the question of when sales would occur, or that they were

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

unable to amend these trading plans" and "[i]t fits with plaintiff's theory that defendants would have sold stock at this time, knowing that the price would drop when the" company "announced" manufacturing defect). Because Defendants did not disclose their trading plan's terms—i.e. the sales formula or whether Hsing and Blegen could alter or cancel their plans—it is impossible to evaluate whether those plans facially qualify for the affirmative defense against a charge of insider trading, much less whether they would weigh against an inference of scienter. *See* 17 C.F.R. § 240.10b5-1(c)(1) (requiring plans specify the amount of securities to be sold, dates and prices of sales, or a formula for controlling sales, and further mandating plans be "entered into in good faith"); *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *19 (N.D. Cal. Nov. 27, 2018) ("Without reviewing [defendant's] actual trading plan, the Court cannot determine whether these requirements were met, and cannot conclude that the plan negates any inference of scienter.").

Aditionally, while Defendants assert Hsing and Blegen "adopted" new 10b5-1 plans shortly before the Class Period, MTD 18-19, the sparsity of substance surrounding the disclosures of Hsing and Blegen's purported 10b5-1 plans makes it impossible to determine whether they actually complied with those plans or whether those plans were modified or amended during the Class Period. *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1068-69 (C.D. Cal. 2008) (insider's suspiciously-timed amendments to trading plan "appear[ed] to defeat the very purpose of 10b5-1 plans"); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1185 (S.D. Cal. 2009) (defendants amendment to 10b5-1 plans supported inference of scienter).

Defendants' assertion that trades were made under a 10b5-1 plan, without more, runs into a phalanx of authority holding such assertions are inadequate to negate an inference of scienter. *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605 n.3 (N.D. Cal. 2019) ("not every 10b5-1 plan is sufficient to negate the inference …"); *Apple*, 2020 WL 2857397, at *22 n.13 ("[U]se of the 10b5-1 plan is an affirmative defense that does not rebut well-pled allegations of scienter at the pleading stage."); *Joyce v. Amazon.com, Inc.*, 2025 WL 835054, at *7 (W.D. Wash. Mar. 17, 2025) (same); *In re UTStarcom, Inc. Sec. Litig.*, 617 F.

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                                    19

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) ("[A]lthough [10b5-1 plans] … may ultimately provide the basis of an affirmative defense at a later stage … it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales."); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) (10b5-1 plan affirmative defense requires "factual finding of good faith…. this Court [can]not make such factual findings when considering a motion to dismiss"). In short, without the substance of Hsing and Blegen's 10b5-1 plans, the mere existence of the plans does nothing to shift the uncontradicted allegations concerning Hsing and Blegen's unusual and frequent sales of tens of millions of dollars' worth of Monolithic stock during the Class Period.

### c. The Misstatements Themselves Establish Defendants' Knowledge of Monolithic's Quality Control Problems

The challenged statements themselves include claims by the Individual Defendants that they had particular knowledge of the technical problems with Monolithic's PMICs. A defendant's "specific statements on the purported subject of fraud may give rise to a strong inference of scienter." *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 973 (D. Ariz. 2024). Here, "[r]epeatedly during earnings calls and in interviews with analysts, [defendant] showed himself to be familiar with" the subject of the misstatements. *J:or Fonder*, 81 F.4th at 940. Defendants repeatedly touted their personal awareness of and access to information about Monolithic's quality issues and relationship with Nvidia, which furthers a strong inference of scienter. *See Quality Sys.*, 865 F.3d at 1145–46 (finding scienter where "executives themselves told investors they had real-time access to, and knowledge of, sales information"). Accordingly, Hsing and Blegen's own statements support a strong inference that they either knew the truth about the persistent problems with Monolithic's PMICs, and deliberately misled investors, or they were reckless with respect to the truth. *See Oracle*, 527 F. Supp. 3d at 1187 (strong inference of deliberate recklessness where defendant acknowledged understanding of sales practices); *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *19

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

(W.D. Wash. Apr. 19, 2019) ("scienter can be inferred where a corporate officer states that he or she knew about or was monitoring the subject of the misleading statements"). As in *Nvidia*, here, the Individual Defendants repeated statements on earnings calls in response to questions posed by analysts detailing their understanding of the underling issue support an inference of scienter. 81 F.4th at 940.

Hsing and Blegen's specific statements concerning the reliability issues with Monolithic's PMICs and the Company's relationship with Nvidia support the inference the Individual Defendants were both closely monitoring the subject of their misstatements and aware of the significance the information they withheld from investors. *See, e.g.*, ¶¶59-61, 63-65, 70. These facts support an inference of scienter. *See Oracle*, 380 F.3d at 1232 (9th Cir. 2004).

### d.   The Challenged Statements Concerned the Company's Core Operations

The core operations doctrine bolsters an inference of scienter because Monolithic's PMICs are its most essential product and its relationship with Nvidia was the key driver of the Company's growth. *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp.3d 580, 601-03 (N.D. Cal. 2019). In the Ninth Circuit, "allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances": (i) "along with other allegations," to "evaluat[e] all circumstances together," (ii) "independently," when the allegations "are particular and suggest that defendants had actual access to the disputed information," and (iii) "in a more bare form, without accompanying particularized allegations," when "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008). The Complaint alleges scienter under all three prongs.

First, weighed together with the other scienter allegations, the core operations doctrine creates a strong inference of scienter given Defendants' role, the importance of the information,

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                    21

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

and the nature of the problem (a design flaw). *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp.3d 580, 601-03 (N.D. Cal. 2019).

Second, the Complaint contains particularized allegations that Hsing and Blegen knew the truth concerning the problems with Monolithic's PMICs. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (core operations theory supported by "specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations") (citation omitted). Here, the Complaint quotes Hsing and Blegen's statements admitting their awareness of the problems with Monolithic's PMICS. ¶¶61-65.

Third, even standing alone, there is a reasonable inference "that at least some corporate officials knew" Monolithic still had problems with their product at the time Defendants claimed those problems were resolved. *In re Volkswagen*, 2017 WL 66281, at *14; (N.D. Cal. Jan. 4, 2017) (quoting *Glazer*, 549 F.3d at 744); *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1123 (C.D. Cal. 2012). Here, "the nature of the relevant fact[s]" was "of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014) overruled on other grounds by *City of Dearborn Heights v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017); *see Berson v. Applied Signal Tech.*, 527 F.3d 982, 987-88 (9th Cir. 2008); *Am. W. Holding*, 320 F.3d at 943 & n.21, such that scienter would be alleged even "without accompanying particularized allegations" of access to information. *Intuitive Surgical*, 759 F.3d at 1060 (quoting *S. Ferry*, 542 F.3d at 785). The importance of the Company's relationship with Nvidia and the nature of the problems with Monolithic's PMICs supports inference that it was at least reckless to assure investors all issues had been resolved when that was not the case.

In *Reese*, the Ninth Circuit found that the absurdity prong applies to long-standing facts "fundamental to operations of [an executive's] business over the tenure of [their] career[s]." *Reese*, 747 F.3d at 576. The Ninth Circuit also recently drew a strong inference of scienter from

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                    22

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

a "significant source" of revenue over just "five quarters" because "a CEO who does not know about such a source is "not likely to remain CEO for very long." *J:or Fonder*, 81 F.4th at 946 (core operations doctrine supported inference of scienter). Here, Monolithic's sales of PMICs to Nvidia were the key driver of its most important segment since 2022, ¶34, responsible for "approximately 17%" of the Company's total revenue in 2024, ¶5, and the problems with Monolithic's PMICs first arose in "late 2023." ¶6. It is absurd to suggest Hsing and Blegen were not aware of the facts concerning Monolithic's most important product and relationship.

### e. The Speed With Which the Truth Came Out Supports an Inference of Scienter

The close temporal proximity between Defendants' false statements and the subsequent disclosures of the truth supports an inference of scienter. *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *10–11 (N.D. Cal. Nov. 4, 2020) ("[T]he law is clear that close temporal proximity between an allegedly fraudulent statement or omission and a later disclosure may bolster an inference of scienter … [t]hat is because temporal proximity makes more plausible that intervening events did not cause the inconsistent statements.").

Here, just nine months separate Hsing's reassurances that the problems with Monolithic's PMICs had been resolved, ¶61, and the Edgewater Research Report confirming the problems were unresolved and responsible for Nvidia's lost confidence in Monolithic. *See* ¶85; ECF No. 48-5. And only six months passed from Blegen's claim that Monolithic was "integrated" with the "next generation" of Nvidia products to Hsing's admission that Nvidia had been onboarding Monolithic's competitors as PMIC suppliers throughout 2024. ¶¶70, 77. Particularly because the problems revealed by the downturn in Enterprise Data revenue and the Edgewater Research Report related to a fundamental "product failure" or "design issue," ECF No. 48-5, with Monolithic's key product, the temporal proximity constitutes circumstantial evidence of scienter. *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017) (five and a half months between allegedly false statement and corrective disclosure supported inference of scienter); *see*

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR      23

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

*also Roberti*, 2015 WL 1985562 at *11 (approximately six months separating allegedly misleading statement and corrective disclosure); *Fecht v. Price Co.*, 70 F.3d 1078, 1083–84 (9th Cir. 1995) (months between optimistic statement and corrective disclosure given more weight because of "the absence of any indication of an intervening catastrophic event").

In response, Defendants tout inapposite authority where shorter timespans were alleged, apparently failing to grasp that the significance of the temporal relationship between a defendant's statements and the corrective disclosure is influenced by the nature of the problems concealed by those statements. Indeed, Defendants' own exhibits confirm that the problems with Monolithic's power management integrated circuits could not be quickly remedied. That "product failure[s]" or "design issue[s]," ECF No. 48-5, identified as part of a multi-year product cycle for highly sophisticated technology, could be resolved in less than nine months is implausible—Defendants' characterization of the market for Monolithic's products as "dynamic" and "fast-evolving" is irrelevant. MTD 23. The Edgewater Report indicates that the issues driving away Nvidia were the same problems that first surfaced in 2023. ECF No. 48-5. Defendants miss the point, emphasizing that "Hopper and Blackwell are distinct NVIDIA GPU architectures"— but *both* relied on Monolithics PMICs. And the problems that became evident with Hopper took on more significance with Blackwell because the newer architecture was more demanding. ¶¶55-57, 85-90. In February 2024, Defendants claimed the problems with Monolithic's products had been resolved, ¶61, but just months later the Report revealed "there is an issue with [Monolithic's] PMIC performance that goes back to the original issue MPWR had with Hopper." ECF No. 48-5. The most plausible inference is that Defendants misled investors about a persistent problem. *Allaire*, 224 F. Supp. 2d at 330. Defendants' observation that temporal proximity, without more, does not support an inference of scienter is a red herring as "plaintiffs here do not simply rely on temporal proximity." *Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 790 F. Supp. 3d 763, 777–78 (N.D. Cal. 2025).

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR                    24

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

## C.  Plaintiff Adequately Alleges Control Person Liability

Because a § 10(b) violation is adequately pled, the Court should sustain Plaintiff's § 20(a) claims. *See In re Questcor Sec. Litig.*, 2013 WL 5486762, at *24 (C.D. Cal. Oct. 1, 2013).

### CONCLUSION

Plaintiff respectfully requests the Motion to Dismiss be denied.

DATED this 10th day of February, 2026

**TOUSLEY BRAIN STEPHENS PLLC**

By: _/s/ Kim D. Stephens, P.S._
    Kim D. Stephens, P.S., WSBA #11984
    Rebecca L. Solomon, WSBA #51520
    1200 Fifth Avenue, Suite 1700
    Seattle, Washington  98101
    Telephone:  206.682.5600/Fax: 206.682.2992
    kstephens@tousley.com
    rsolomon@tousley.com

**BLOCK & LEVITON LLP**

By:  _/s/ Jeffrey C. Block_
    Jeffrey C. Block (*pro hac vice* forthcoming)
    Jacob A. Walker (*pro hac vice* forthcoming)
    Brendan T. Jarboe (*pro hac vice* forthcoming)
    Zoe van Vlaanderen (*pro hac vice* forthcoming)
    260 Franklin Street, Suite 1860
    Boston, Massachusetts 02110
    Telephone: 617.398.5600
    jeff@blockleviton.com
    jake@blockleviton.com
    brendan@blockleviton.com
    zoe@blockleviton.com

***Attorneys for Mirko Dardi and Lead Counsel for the Class***

I certify that this memorandum contains 8,350 words, in compliance with the Local Civil Rules.

LEAD PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
2:25-cv-00220-JLR          25

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992