UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WATERFORD TOWNSHIP
GENERAL EMPLOYEES
RETIREMENT SYSTEM, et al.,

              Plaintiffs,

     v.

MONOLITHIC POWER SYSTEMS,
INC., et al.,

              Defendants.

CASE NO. C25-0220JLR

ORDER

## I.    INTRODUCTION

Before the court are Defendants'[1] motion to dismiss and request for judicial notice.  (MTD (Dkt. # 46); Reply (Dkt. # 55); Request (Dkt. # 47); Request Reply (Dkt. # 55); *see also* Am. Compl. (Dkt. # 39).)  Lead Plaintiff Mirko Dardi opposes the motion.

---

[1] Defendants are Michael Hsing and Bernie Blegen (together, the "Executive Defendants") and Monolithic Power Systems, Inc. ("Monolithic") (collectively, "Defendants").

ORDER - 1

(Resp. (Dkt. # 49).)  The court has considered the parties' submissions, the relevant portions of the record, and the governing law.  Being fully advised,[2] the court GRANTS in part and DENIES in part Defendants' motion.

## II.    BACKGROUND

Mr. Dardi brings this putative securities fraud class action on behalf of investors who purchased or otherwise acquired shares of Monolithic common stock between February 8, 2024, and November 11, 2024, inclusive (the "Proposed Class Period").  (*See* Am. Compl. ¶¶ 1, 163.)  Plaintiff alleges that, during the Proposed Class Period, two of Monolithic's executive officers, Chief Executive Officer Michael Hsing and Chief Financial Officer Bernie Blegen made "materially false and misleading" statements and "omitted material facts" about the quality and performance of Monolithic's power management integrated circuits ("PMICs").  (*Id*. ¶¶ 4, 26-27, 45, 58-75.)  PMICs are specialized chips that manage voltage regulation, current control, and thermal protection in power modules.  (*Id*. ¶ 45.)  Plaintiff further alleges that Defendants' conduct artificially inflated the price of Monolithic's common stock, and, when the true extent of the PMICs' performance issues came to light, the revelation caused a "precipitous decline in the market value of the Company's common stock," resulting in significant losses to the putative class.  (*Id*. ¶ 19.)[3]

---

[2] Neither party requested oral argument, and the court finds that oral argument would not assist it in deciding the motion.  (MTD; Resp); *see* Local Rules W.D. Wash. LCR 7(b)(4).

[3] The court takes judicial notice of Monolithic's stock price.  *See* Fed. R. Evid. 201(b)(2).  On February 8, 2024, at the start of the Proposed Class Period, Monolithic's stock price closed at $737.07 per share.  *Monolithic Power Systems, Inc. Common Stock (MPWR) Historical Quotes*, NASDAQ, https://www.nasdaq.com/market-

ORDER - 2

Below, the court sets forth the factual background as pleaded by Plaintiff before turning to the relevant procedural history.[4]

**A.      Monolithic and its Business**

Monolithic is a publicly traded company headquartered in Kirkland, Washington, which designs and manufactures specialized semiconductor devices.  (Am. Compl. ¶¶ 25, 30-31.)  Its integrated circuits, or chips, are essential for ensuring that electronic devices run efficiently, safely, and with minimal energy loss.  (*Id*. ¶ 31.)  Monolithic differentiates itself by using a "monolithic" design philosophy in which it integrates "an entire power system onto a single silicon chip" that is streamlined for size and efficiency.  (*Id*. ¶ 41.)

To sell its products, Monolithic uses a cadre of technical sales staff and application engineers to aid prospective customers with the design and development of the customers' own products.  (*Id*. ¶ 32.)  Once a customer selects a product design, Monolithic outsources the production of the chips to specialized third-party manufacturers called "foundries."  (*Id*.)  Monolithic credits this process for its ability to

---

activity/stocks/mpwr/historical?page=1&rows_per_page=100&timeline=y5 (last visited May 6, 2026).  On November 11, 2024, at the close of the Proposed Class Period, Monolithic's stock price closed at $647.31 per share.  *Id*.  On February 4, 2025, when this action commenced, Monolithic's stock price closed at $656.29 per share.  *Id*.  As of the date of this Order, the stock price is $1588.12.  *Id*.

[4] Defendants requested judicial notice of certain exhibits pursuant to Federal Rule of Evidence 201 and the incorporation doctrine.  (*See generally* Request.)  Plaintiff disputes only Exhibits 1-4.  (*See* Resp. at 6 n3.)  The court agrees with the parties that Defendants' Exhibits 5-21 are judicially noticeable for the reasons explained in Defendants' briefing, and therefore takes judicial notice of these exhibits.  (*See* Duffy Decl. (Dkt. # 48) ¶¶ 7-23, Exs. 5-21.)  The court addresses the disputed Exhibits 1-4 below.

"meet customers' exacting specifications for quality and performance and promotes future product sales." (*Id.*)

In an era of increased demand for artificial intelligence ("AI") applications and an influx of capital to construct data centers for the development of AI technologies, Monolithic thrived and experienced great financial success. (*Id.* ¶ 35.) Monolithic's most profitable business segment is its enterprise data segment, which sells PMICs that power AI technology and contributes 32.5% of Monolithic's revenue. (*Id.* ¶¶ 47-48.) Specifically, the enterprise data end market relates to "data-center [sic] and cloud infrastructure markets, in particular, power solutions for servers, storage, networking, and AI computing hardware." (*Id.* ¶ 48.) Enterprise data customers are primarily technology companies that engage Monolithic to design power management modules for use in graphic processing units ("GPUs") that run and operate AI data servers. (*Id.* ¶ 33.)

During the Proposed Class Period, Nvidia Corporation ("Nvidia") was Monolithic's most important enterprise data customer. (*Id.* ¶ 48.) Nvidia is the world's leading supplier of GPUs, "which are specialized electronic circuits built for parallel processing—performing many mathematical operations simultaneously." (*Id.* ¶ 49.) Nvidia's GPUs aid with AI acceleration, deep learning, and high-performance computing. (*Id.*) Monolithic did not sell directly to Nvidia. (*Id.* ¶ 54.) Rather, Nvidia purchased Monolithic's PMICs from a network of third-party distributors and value-added resellers or directly from contract manufacturers or board assemblers. (*Id.*) These retailers integrated Monolithic's PMICs into Nvidia's GPUs and other machinery. (*Id.*)

ORDER - 4

In 2022, Nvidia launched the Hopper GPU to construct the next wave of AI data centers. (*Id.* ¶ 34.) Monolithic supplied the PMICs for Nvidia's Hopper architecture – the H100 – which was designed for "large-scale computing applications and excelled in transformer-based AI models, large language models (LLMs), and scientific workloads." (*Id.* ¶ 50.) AI servers widely used the H100 through 2024. (*Id.*) As the sole supplier of the PMICs used in the H100, Monolithic experienced exponential growth in its enterprise data business as a result of increased customer demand for its AI power solutions. (*Id.* ¶¶ 35, 38; *id.* ¶ 38 (alleging that Monolithic's quarterly enterprise data revenue increased 290% year-over-year, from $48 million to $187 million).)

In 2024, Nvidia released its Blackwell architecture as the successor to the Hopper GPU. (*Id.* ¶ 55.) Blackwell delivers better performance and energy efficiency than Hopper. (*Id.* ¶ 56 ("Blackwell delivers 2.5x performance increase over Hopper while being 25x more energy efficient and six times faster than Hopper for large datasets.").) Expected to be widely available by the end of 2025, Blackwell was "designed for the most demanding computational workloads, including training large AI models, running complex simulations, and accelerating generative AI applications." (*Id.* ¶ 55.) Because Blackwell was expected to "render the Hopper obsolete," investors paid close attention to whether "Monolithic's PMICs would play as important a role in Blackwell as they did in the Hopper." (*Id.* ¶ 57.)

**B.    The Alleged Fraud**

At the start of the Proposed Class Period, Nvidia was Monolithic's largest and most important indirect customer. (*See, e.g.*, *id.* ¶ 40; *see also id.* ¶ 53 (alleging that "by

ORDER - 5

the end of 2024, Nvidia's purchases represented approximately 50% of Monolithic's [enterprise data] end market and 20% of its total sales").)  Monolithic represented to investors during the Proposed Class Period that the widespread adoption of its products was due to their purportedly superior performance.  (*Id*. ¶ 36.)  Monolithic claimed publicly that it maintained market dominance because its products could "solve" issues within customers' systems and because it was closely involved in the development of customers' next-generation products.  (*Id*.)

Monolithic similarly represented in SEC filings that its specialization, expertise, and product quality enabled it to deliver "reliable, compact, and monolithic solutions." (*Id*. ¶ 37.)  Unsurprisingly, Monolithic's strong market performance earned praise from industry analysts.  (*Id*. ¶ 39.)  For example, a Deutsche Bank analyst reported that Monolithic was a "[b]eacon on a hill" compared to peer companies that reported less impressive financial results.  (*Id*.)

Contrary to these representations, however, "Monolithic's power management solutions were suffering from significant performance and quality control issues, which, in turn, negatively impacted the GPUs they powered[,]" including those supplied by Nvidia.  (*Id*. ¶ 40.)  Mr. Dardi alleges that several of Monolithic's public statements during the Proposed Class Period were false or misleading or omitted material facts.  (*See generally* Am. Compl.)  Specifically, Mr. Dardi alleges that, at the time they made these statements, the Executive Defendants knew that the relationship between Monolithic and Nvidia was severely damaged and actively misrepresented that ongoing PMIC performance issues in the Monolithic products supplied to Nvidia were resolved.  (*Id*.

¶¶ 58-75.)  When reports of these issues came to light, Monolithic asserted that it had resolved any quality issues with the components it supplied to Nvidia.  (*Id.* ¶ 40.)  Mr. Dardi further alleges that, by misrepresenting the seriousness of the performance issues, the Executive Defendants exposed "Monolithic to material undisclosed risks of significant business, financial, and reputational harm and caus[ed] Monolithic to lose significant market share[.]"  (*Id.*)  Indeed, due to the PMIC performance issues, Nvidia lost confidence in Monolithic's products, cancelled half of its outstanding Monolithic orders, and turned to Monolithic's competitors as Nvidia's primary suppliers for its next-generation Blackwell.  (*Id.* ¶ 62.)

     1.  February 7, 2024 Statements

The Proposed Class Period begins on February 8, 2024—one day after Monolithic revealed the financial results for its fourth fiscal quarter and year ending December 31, 2023.  (*Id.* ¶ 58.)  On February 7, 2024, Monolithic announced that its total revenue for the quarter decreased by $6 million, from $460 million to $454 million.  (*Id.*) Additionally, Monolithic's enterprise data business, which encompasses indirect sales to Nvidia, increased to $129 million from $68 million in the prior year quarter.  (*Id.*)  On the same day, the Executive Defendants held a conference call with analysts to review the Monolithic's financial and operational results for the fourth quarter of 2023 ("4Q23 Earnings Call").  (*Id.* ¶ 59.)  During the 4Q23 Earnings Call, Nathaniel Quinn Bolton of Needham & Company asked the Executive Defendants about "new ramps with probably higher content[,]" i.e., the production of Blackwell and other next-generation systems having substantial power demands.  (*Id.* ¶ 60.)  Mr. Bolton also asked how a potential

ORDER - 7

increase in competition might affect "average dollar content per win[,]" referring to the revenue Monolithic earned for each system design that incorporated its PMICs.  (*Id.*)

Mr. Hsing replied:

> [A]t this time, we want to solve all the problems and *we believe we resolve all these issues during this fast ramp.*  And also the cost at this time is not really the issue.  *It's all about the throughput and to meet the customer demand.*

(*Id.* ¶ 61 (emphasis in complaint).)  "Fast ramp" refers to "the rapid scale up in production of PMICs for Nvidia's Hopper as AI GPU demand surged."  (*Id.* ¶ 61 n.1.)  Mr. Dardi alleges that the italicized parts of this statement were materially false and misleading and omitted material facts because (1) when Mr. Hsing made this statement, Monolithic knew of unresolved performance issues with Nvidia's Hopper server boards that Nvidia had traced back to Monolithic's PMICs, and (2) Mr. Hsing omitted from his statement that these performance issues had materially affected Monolithic's relationship with Nvidia.  (*Id.* ¶ 62.)

During the same earnings call, Richard Ewing Schafer of Oppenheimer & Co. asked the Executive Defendants about Monolithic's ability to meet Nvidia's demand for annual processor development as Nvidia and similar companies transitioned from a 2-year cadence on new processor development to an annual cadence.  (*Id.* ¶ 63.)  In response, Mr. Hsing stated,

> So far, in what we have, okay, and our customers can be very receptive to our solution.  So far, we pretty much have a majority of the volumes.  *And they keep requesting it and keep requesting we resolve all these issues,* related to their system issues, ours and issues from our side . . . So we start to win a lot of – a lot of shares.  And the same is in the servers and have a very similar trend.  And that's how we win the market.  And we always want

> to do – as we said in the past, we want to push in the technology.  We want to make sure we're the best.

(*Id*. ¶ 64 (emphasis in complaint).)

Mr. Dardi alleges that the italicized portion of this statement was also both materially false and misleading and omitted material facts.  (*Id*. ¶ 65.)  Specifically, when Mr. Hsing made the statement in February 2024, the relationship between Monolithic and Nvidia had already begun to deteriorate as a result of the performance and quality control issues with Monolithic's PMICs.  (*Id*.)  In late 2023, Nvidia had started to search for other PMIC suppliers.  (*Id*.)  This development eventually led Monolithic's enterprise data segment to slow down in the third quarter of 2024.  (*Id*.)

Later in the 4Q23 Earnings Call, Mr. Hsing commented on the PMICs' performance issues:

> Yes, okay.  We had some issues on the Stage 1.  We had some design wins and very small volumes in different systems, actually.  Now we don't have – *all these issues are resolved*.  That will significantly gain the content.  And in each AR systems.

(*Id*. ¶ 66 (emphasis in complaint).)  Mr. Dardi alleges that the italicized portion of this statement was also materially false and misleading and omitted material facts because, when Mr. Hsing made the statement, Monolithic had not yet resolved its quality control issues, "as evidenced by the fact that Monolithic's [enterprise data] revenue declined significantly in its 2024 third quarter because it received fewer orders for its PMICs for Nvidia's servers as Nvidia began to replace Monolithic with other suppliers."  (*Id*. ¶ 67.)

ORDER - 9

### 2. May 1, 2024 Statements

On May 1, 2024, Monolithic announced the financial results for its first fiscal quarter ending March 31, 2024 and reported a quarterly revenue increase of $7 million, from $451 million to $458 million in the prior year quarter. (*Id.* ¶ 69.) Monolithic also announced that its enterprise data segment revenues increased to $150 million from $47 million in the prior year quarter. (*Id.*) That same day, on a conference call with analysts, the Executive Defendants answered a question about Monolithic's relationship with Nvidia. (*Id.* ¶ 70.)

Mr. Blegen represented that Monolithic was

> *at the front of the design cycle, we're consulted, we're integrated, in fact, with the development of the next generation of products[.]*

(*Id.* (emphasis in complaint).) Mr. Blegen also claimed that Monolithic was still positioned to be a "*leader*" in the market for those products. (*Id.* (emphasis in complaint).)

Mr. Dardi alleges that this statement was also materially false and misleading when made. (*Id.* ¶ 71.) When Mr. Blegen made this statement, Monolithic was no longer a leading supplier of PMICs for Blackwell. (*Id.*) Indeed, Mr. Hsing later acknowledged in an October 30, 2024 statement that Monolithic's competitors were supplying Nvidia with PMICs in the first and second quarters of 2024 and that these competitors had increased sales attributed to Nvidia's Blackwell server. (*See id.* ¶ 71.)

ORDER - 10

3.  August 1, 2024 Statements

On August 1, 2024, Monolithic announced the financial results for its second fiscal quarter ending June 30, 2024 and reported a quarterly revenue increase to $507 million, up from $441 million in the prior year quarter.  (*Id*. ¶ 72.)  It also announced that its enterprise data segment revenues increased to $187 million from $48 million in the prior year quarter.  (*Id*.)  That same day, on a conference call with analysts, the Executive Defendants delivered prepared remarks emphasizing Monolithic's "record" revenue growth.  (*Id*. ¶ 73.)  Mr. Blegen stated

> Let me open by saying [Monolithic] reported yet another record quarter, with Q2 2024 revenue of $507.4 million, exceeding the high end of our guidance. *Our strong revenue growth was attributed to three factors: increased demand for AI power solutions, improving order trends in several of our end markets, and lastly, initial revenue ramps associated with design wins secured in past years.*

(*Id*. (emphasis in complaint).)  Mr. Dardi alleges that the italicized portion of this statement was materially false and misleading when made and omitted the material facts that the relationship between Monolithic and Nvidia had fractured and that Nvidia had secured new suppliers for PMICs for its Blackwell architecture.  (*Id*. ¶ 74.)

4.  October 30, 2024 Statements

On October 30, 2024, Monolithic announced the financial results for its third fiscal quarter ending September 30, 2024 and reported an unexpected quarterly enterprise data segment revenue decrease of $3 million, down to $184 million from $187 million in the prior quarter.  (*Id*. ¶ 76.)  Analysts reported that the decreased revenue produced by Monolithic's enterprise data segment was due to a decrease in Nvidia orders.  (*Id*. ¶ 81.)

ORDER - 11

That same day, on a conference call with analysts, Mr. Hsing represented that Monolithic maintained a dominant initial share of the AI market because it enabled high quality power solutions:

> Yes. I mean you probably – everybody knows that if you look at the transcript from the last year, we talked about the market is big and that the market is growing or the AI requirements is growing.  And so the customers initially will take the – *always take the best solutions to fulfill their needs* and the best solution and also the speed of the development service, as [Mr. Blegen] said earlier.  *And that's why we occupied a pretty large shares*, okay?  And last year, we said, okay, this market is too big and [Monolithic] will be always have the best solutions in these applications.  And we also talk about the market is bigger.  There will be a second or third or fourth supplier to join this segment.  *And this – and when will that happen, and we don't know, okay?  It happened in the last couple of quarters.*  And again, in next years, what we see – again, the market is growing very fast.

(*Id.* ¶ 77 (emphasis in complaint).)  Mr. Dardi alleges that the italicized portions of this statement were materially false and misleading when made and omitted material facts. (*Id.* ¶ 78.)  Specifically, he challenges Mr. Hsing's claims that Monolithic's products were the "best solutions" for customers to explain why Monolithic "occupied a pretty large [market] share" when, in fact, Monolithic's quality control issues had led it to lose Nvidia's business and allowed new competitors to take away its market share.  (*Id.*)

During this call, an analyst questioned Mr. Hsing about Monolithic's opportunity within AI accelerators in the next year. (*Id.*)  In response, Mr. Hsing described Monolithic's power solutions as the "*best*" and "*most power efficient*" and that he optimistically expected that the Company's enterprise data segment "*will grow*[.]"  (*Id.* ¶ 79 (emphasis complaint).)  Mr. Dardi asserts that, given the loss of Nvidia's business due to quality control issues, these comments too were materially false and misleading

ORDER - 12

and omitted material facts. (*Id*. ¶ 80 (alleging that Monolithic lost market share to competitors precisely because its products were not the "best").)

After Mr. Hsing made these statements, analysts reported that Monolithic's disappointing financial performance was the result of a decrease in Nvidia orders. (*Id*. ¶¶ 81-82.) One analyst wrote that Monolithic "had signaled a moderation to sequential growth[,] [but] the magnitude was much greater than investors [] had contemplated." (*Id*. ¶ 83.) The price of Monolithic common stock fell more than $160 per share from $919.81 per share on October 30, 2024 (the date Monolithic released its third-quarter results), to $759.30 per share on October 31, 2024. (*Id*. ¶ 84 (alleging that this is a decline of more than 17% on above-average trading volume of more than three million shares traded).) Despite this substantial decline, Mr. Dardi contends that "the price of Monolithic common stock remained artificially inflated as Defendants continued to make material misstatements and omissions and to conceal the full truth[.]" (*Id*.)

On November 11, 2024, Edgewater Research revealed that Nvidia had cancelled half of its outstanding Monolithic orders and intended to eliminate its use of Monolithic's PMICs in most variants of its next-generation Blackwell chips as a result of Monolithic's "performance issues." (*Id*. ¶ 85.) Edgewater Research further reported that Nvidia had "lost confidence" in Monolithic's products, selected Monolithic's competitors as its "primary suppliers," and submitted "rush orders" for components related its most-advanced Blackwell models. (*Id*.) On this news, the price of Monolithic common stock fell $114 per share from $761.30 per share on November 8, 2024, to $647.31 per share on November 11, 2024. (*Id*. ¶ 86 (alleging this is a decline of 15% on above-average trading

volume of more than four million shares traded).)  Despite Monolithic's attempts to refute the claims in the Edgewater Research report, the price of Monolithic common stock continued to fall.  (*Id.* ¶ 87.)  On November 20, 2024, it reached a low of $560 per share.  (*Id.*)

According to Mr. Dardi, later industry reporting confirmed that Monolithic's PMIC performance issues led to a decline in enterprise data revenue and an increase in the strength of its competitor's Nvidia-related business.  (*See id.* ¶¶ 88-92.)  For example, on November 17, 2024, John Vinh of KeyBanc wrote

> We believe [Monolithic] will lose significant market share on Blackwell with the ramp of GB200/B200, as Hopper PMIC overheating issues have persisted on Blackwell . . . we believe [Nvidia] has been experiencing overheating issues with [Monolithic's] PMIC in its testing and, as a result, will not have any share on GB200/B200.  These overheating issues appear to be related to the PMIC issues we had flagged on Hopper and likely worsened as the power requirements increased on Hopper at 700W to 1,000W on Blackwell . . . given that these issues had persisted on Hopper at 700W and were never completely resolved, we believe significantly uncertainty exists as to when [Monolithic] will be able to reenter [Nvidia's] supply chain.

(*Id.* ¶ 88.)

On May 5, 2025, Monolithic filed its 10-Q for the first quarter of fiscal year 2025 and reported that, due to lower sales of its PMICs, its "[r]evenue from the enterprise data market decreased $16.8 million, or 11.2%, from the same period in 2024."  (*Id.* ¶ 93.)

Mr. Dardi alleges that during the Proposed Class Period, (1) Defendant Hsing engaged in 11 transactions in Monolithic's stock, selling a total of 59,765 shares for a total of $44,211,500, (Am. Compl. ¶ 99; *see also* ¶¶ 100-117 (listing the transaction dates and trading volume) and (2) Defendant Blegen engaged in 14 transactions in

Monolithic's stock, selling a total of 28,007 shares for $21,878,412, (*id*. ¶ 122; *see also id*. ¶¶ 124-136 (listing the transaction dates and trading volume).).

**C.     Procedural History**

Former named plaintiff Waterford Township General Employees Retirement System filed the original putative class action complaint in this matter on February 4, 2025. (*See generally* Compl. (Dkt. # 1).) On August 25, 2025, the court appointed Mr. Dardi as lead plaintiff. (8/25/25 Order (Dkt. # 35).)

Mr. Dardi filed the amended complaint on November 12, 2025, asserting claims for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Exchange Act") and SEC Rule 10b-5, 17 C.F.R. 240.10b-5. (Am. Compl. ¶¶ 169-174.) Mr. Dardi alleges that the Executive Defendants, because of their positions at Monolithic, possessed the power and authority to control the content and form of Monolithic's annual and quarterly reports and public statements, including press releases, investor presentations and other materials provided to the market. (*Id*. ¶ 28.) He further alleges that the Executive Defendants authorized the publication of allegedly misleading documents, presentations, and materials and "had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected." (*Id*.) Finally, Mr. Dardi alleges that the Executive Defendants knew that material adverse facts had not been disclosed or were actively being concealed from the public and that, the positive representations they made were false and misleading. (*Id*.) Defendants timely moved to dismiss the amended complaint, and the motion is now ripe for decision. (*See generally* MTD.)

# III. ANALYSIS

The court first sets forth the relevant legal standard before addressing procedural matters and the merits of Defendants' motion.

## A.    Legal Standard

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"). The court must accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the plaintiff, but it need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit," or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Securities fraud claims must also meet the more "exacting" pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). "That is, the complaint must allege the 'who, what, when, where, and how' of the fraud." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or

omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).  The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id*. § 78u-4(b)(2)(A); *see id*. § 78u-4(b)(3)(A) (mandating dismissal on defendant's motion where the complaint fails to meet these requirements).

**B.     Preliminary Matters**

Mr. Dardi opposes Defendants' request for judicial notice and incorporation by reference of Exhibits 1-4 only to the extent Defendants use the materials to dispute Mr. Dardi's allegations.  (Resp. at 6 n.3.)  Exhibits 1-4 are the transcripts for Monolithic's fourth quarter 2023 earnings call on February 7, 2024 (Ex. 1); first quarter 2024 earnings call on May 1, 2024 (Ex. 2); second quarter 2024 earnings call on August 1, 2024 (Ex. 3); and third quarter 2024 earnings call on October 30, 2024 (Ex. 4).  (Duffy Decl. ¶¶ 3-6, Ex. 1-4 (Transcripts).)

On a motion to dismiss, the court may consider "documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice[.]" *United States. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Federal Rule of Evidence 201(b) similarly allows the court to take judicial notice of publicly available documents "introduced to 'indicate what was in the public realm at the time, not whether the contents of those [documents] were in fact true.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (citation omitted).

ORDER - 17

Here, Defendants "do not offer the transcripts in order to dispute [Mr. Dardi's] factual allegations, but rather to provide the [c]ourt the full context of the challenged statements[.]"  (Request Reply at 1; *id*. at 3 ("Defendants have not asked the [c]ourt to accept the truth of any contested factual assertions made during the earnings call.").)  Additionally, Mr. Dardi references the transcripts extensively in the amended complaint without challenging the authenticity of the transcripts.  (*See* Am. Compl. ¶¶ 58-75 (quoting the transcripts at issue).)  Accordingly, the court agrees with the parties that it may judicially notice the transcripts not for the truth of their contents, but for the narrow purpose of considering the representations made and information available to the market during the Proposed Class Period.

The court now turns to the merits of the parties' arguments.

**C.    Mr. Dardi's Section 10(b) Claims**

Section 10(b) of the 1934 Exchange Act makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  "Rule 10b-5 implements Section 10(b) by making it unlawful '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'"  *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) (quoting 17 C.F.R. § 240.10b-5(b)).  To state a claim for securities fraud under

Section 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission in connection with the purchase or sale of a security (i.e., falsity); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Id.* (citation omitted).

Here, the parties dispute only falsity and scienter. The court addresses each of these disputed elements in turn.

1.  Falsity

Section 10(b) and Rule 10b-5 require a plaintiff to show that the defendant made a statement that was false or misleading as to a material fact. *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). A statement is false or misleading if it directly contradicts what the defendant knew at the time or omits material information. *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022). Plaintiffs "may rely on either an affirmative misrepresentation theory or an omission theory." *Wochos v. Tesla*, Inc., 985 F.3d 1180, 1188 (9th Cir. 2021) (citing 17 C.F.R. § 240.10b-5(b)). "[A]n affirmative misrepresentation is an 'untrue statement of a material fact,' and a fraudulent omission is a failure to 'state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.'" *Id.* "Courts apply the objective standard of a 'reasonable investor' to determine whether a statement is misleading." *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 932 (N.D. Cal. 2022) (citing *In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993)). A "'statement is misleading if it would give a reasonable investor the impression of a state of affairs that

ORDER - 19

differs in a material way from the one that actually exists.'" *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)).

Certain types of statements are not actionable for securities fraud. Relevant here, Defendants argue that Mr. Dardi fails to establish falsity because the challenged statements are not false or misleading or are protected opinions or puffery. (*See* MTD at 8-15 (evaluating each allegedly false or misleading statement made during the Proposed Class Period).) In general, pure statements of honest opinion are not actionable. *Wochos*, 985 F.3d at 1189. There are three circumstances in which an opinion statement may be actionable such as where: (1) the speaker did not actually hold the stated belief; (2) the opinion contains an embedded statement of untrue fact; or (3) a reasonable investor would "understand an opinion statement to convey facts . . . about the speaker's basis for holding that view," but those facts are untrue. *Id.* (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015)). The third category captures opinions that are "misleading by omission[.]" *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017). "[F]or an opinion to be misleading by omission, (1) the 'statement [must] omit [ ] material facts about the [defendant's] inquiry into or knowledge concerning a statement of opinion,' and (2) 'those facts [must] conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017)).

ORDER - 20

"Puffery" statements also are not actionable. *Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098 (9th Cir. 2022). "Corporate 'puffing' involves 'expressing an opinion' that is not 'capable of objective verification.'" *Id*. at 1098-99 (quoting *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017)). "These 'vague statements of optimism like 'good,' 'well-regarded,' or other feel-good monikers, are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.'" *Id*. at 1099 (quoting *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014)). Puffery "statements rise to the level of materially misleading statements," and thus may be actionable, "only if they provide [a] 'concrete description of the past and present' that affirmatively create[s] a plausibly misleading impression of a 'state of affairs that differed in a material way from the one that actually existed.'" *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021) (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017).

With these principles in mind, the court now turns to the challenged statements, addressing them by the date on which they were made.

### a. February 7, 2024 Statements

On February 7, 2024 Mr. Hsing stated:

> [A]t this time, we want to solve all the problems and *we believe we resolve all these issues during this fast ramp.* And also the cost at this time is not really the issue. *It's all about the throughput and to meet the customer demand.*

(Am. Compl. ¶ 61 (emphasis in complaint); *see also id*. ¶¶ 64, 66 (identifying additional February 7, 2024 statements in which Mr. Hsing represented that Monolithic had resolved all performance issues with the PMICs that it supplied to Nvidia).) Defendants argue that Mr. Dardi's claim premised on Mr. Hsing's February 7, 2024 statements fails as a matter of law because these statements are "quintessential, nonactionable opinions." (MTD at 9.) The court disagrees. The statements contain an embedded, objectively verifiable fact because whether Monolithic had resolved the PMIC quality issues at the time Mr. Hsing made these statements can be proven true or false. (*See* Am. Compl. ¶¶ 61, 64, 66.) "Purported statements of opinion that contain untrue embedded facts are not opinions shielded from liability under the securities laws." *In re Juno Therapeutics, Inc.*, No. C16-1069RSM, 2017 WL 2574009, at *5 (W.D. Wash. June 14, 2017) (citing *Omnicare*, 575 U.S. at 185-86, 193) (internal quotation marks omitted). Thus, the court agrees with Mr. Dardi that the February 7, 2024 statements are actionable. (*See* Resp. at 9-10.)

> b. *May 1, 2024 Statements*

On May 1, 2024, Mr. Blegen represented that Monolithic was:

> *at the front of the design cycle, we're consulted, we're integrated, in fact, with the development of the next generation of products[.]*

(Am. Compl. ¶ 70 (emphasis in complaint).) Mr. Blegen also claimed that Monolithic was strategically positioned to be a "*leader*" in the market for the next-generation products. (*Id*. (emphasis in complaint).) Here, Defendants assert that Mr. Dardi's claim as to this statement fails because the amended complaint does not plead with particularity

that this statement was false when made and because this claim is "classic puffery[.]" (MTD at 12-13.)  The court again disagrees.  First, the court determines that the amended complaint satisfies Rule 9(b)'s heightened pleading standard for fraud.  *See* Fed. R. Civ. P. 9(b).  Mr. Dardi alleges that the Executive Defendants on several dates made affirmative statements or materially omitted information about the performance of PMICs supplied to Nvidia and the status of the business relationship between Nvidia and Monolithic.  (*See* Am. Compl. ¶¶ 58-75.)  Mr. Dardi specifically alleges that the May 1, 2024 statement is misleading because, contrary to Mr. Blegen's claims, Monolithic's products were not being integrated into Nvidia's Blackwell architecture and the Executive Defendants knew of this development at least a "couple of quarters" before Mr. Blegen made the statement.  (*See id.* ¶ 77 (alleging that Mr. Hsing acknowledged during the October 30, 2024 earnings call that Monolithic had learned "in the last couple of quarters" that Nvidia had started to source its PMICs from Monolithic's customers).)  Thus, viewing these allegations in a light most favorable to Mr. Dardi, it is reasonable to infer that Mr. Blegen knew that his statement was false when he made it on May 1, 2024.

Second, the court determines that the May 1, 2024 statement is not protected as puffery because this statement is capable of objective verification.  *Macomb Cnty. Employees' Ret. Sys.*, 39 F.4th at 1098-99.  Whether Nvidia had integrated Monolithic's PMICs into Blackwell can be proven true or false.  Consequently, the court rejects Defendants' argument that this statement is classic puffery.  Thus, taking the allegations in the amended complaint as true, the court agrees with Mr. Dardi that he has plausibly

ORDER - 23

alleged that Defendants "omitted material facts necessary to make [the May 1, 2024 statement] not misleading" and, as a result, the statement is actionable.  (Resp. at 11.)

### c.  *August 1, 2024 Statements*

On August 1, 2024, Mr. Blegen stated:

> Let me open by saying [Monolithic] reported yet another record quarter, with Q2 2024 revenue of $507.4 million, exceeding the high end of our guidance. *Our strong revenue growth was attributed to three factors: increased demand for AI power solutions, improving order trends in several of our end markets, and lastly, initial revenue ramps associated with design wins secured in past years.*

(Am. Compl. ¶ 73 (emphasis in complaint).)  Defendants argue that Mr. Dardi's claims premised on this statement are not actionable because Defendants were not subject to a duty to disclose the damaged state of the relationship between Monolithic and Nvidia to the public.  (MTD at 14 (citing *Fialkov v. Microsoft Corp.*, 72 F. Supp. 3d 1220, 1229 (W.D. Wash. 2014), *aff'd*, 692 F. App'x 491 (9th Cir. 2017).)  Specifically, Defendants assert that, because Mr. Blegen's August 1, 2024 remarks "did not speak to customer-specific share or future allocations" and, rather, describe past quarter revenues and historic success, "they could not trigger a duty to disclose any purported 'damage' to the [Nvidia] relationship that might impact future success."  (*Id.*)  Additionally, Defendants argue that Mr. Dardi's claim fails because he did not allege that the relationship between Monolithic and Nvidia had been damaged as of August 1, 2024. (*Id.*)  The court disagrees with Defendants.

The court determines that Mr. Blegen's August 1, 2024 statement is actionable because it would "give a reasonable investor the impression of a state of affairs that

ORDER - 24

differs in a material way from the one that actually exists." *In re Cutera*, 610 F.3d at 1109 (citation and internal quotation marks omitted).  As to the state of the relationship between Monolithic and Nvidia and Nvidia's demand for Monolithic's PMICs, the court agrees with Mr. Dardi that "[o]nce Defendants chose to speak on these subjects, they were 'bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.'" (Resp. at 10 (citing *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016)).)  In light of the circumstances under which he made the August 1, 2024 statement, Mr. Blegen omitted material facts necessary for the listener to fully understand the context of the positive information he shared at that time.  *See United States v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010) (stating that Rule 10b-5(b) "prohibits the telling of material half-truths, where the speaker omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading") (simplified and cleaned up).

Furthermore, Mr. Dardi grounds his assertion that Defendants misled investors by not disclosing a material risk in Monolithic's failure to disclose the ongoing PMIC quality control issues, rather than in its failure to disclose that the relationship between Monolithic and Nvidia had been damaged.  (*See* Resp. at 12.)  Specifically, he contends that regardless of whether Nvidia had begun searching for other PMIC suppliers, he "'need merely allege that defendants misled investors by omitting to disclose a material risk' that ongoing quality control issues could impact Monolithic's relationship with Nvidia." (*Id*. (citing *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1230 (N.D. Cal.

2009).))  Thus, the court concludes that Mr. Dardi has plausibly alleged that Mr. Blegen's August 1, 2024 statement is actionable.

>          d.  *October 30, 2024 Statements*

Finally, Mr. Dardi challenges remarks made during the 3Q24 earnings call.  (Am. Compl. ¶¶ 77-80.)  On October 30, 2024, Mr. Hsing stated:

> Yes.  I mean you probably – everybody knows that if you look at the transcript from the last year, we talked about the market is big and that the market is growing or the AI requirements is growing.  And so the customers initially will take the – *always take the best solutions to fulfill their needs* and the best solution and also the speed of the development service, as [Mr. Blegen] said earlier.  *And that's why we occupied a pretty large shares*, okay?  And last year, we said, okay, this market is too big and [Monolithic] will be always have the best solutions in these applications.  And we also talk about the market is bigger.  There will be a second or third or fourth supplier to join this segment.  *And this – and when will that happen, and we don't know, okay?  It happened in the last couple of quarters.*  And again, in next years, what we see – again, the market is growing very fast.

(Am. Compl. ¶ 77 (emphasis in complaint); *see id*. ¶ 79 (alleging that, on the same date, Mr. Hsing stated that Monolithic's PMICs were the "*best*" and "*most power efficient*" and that he expected that Monolithic's enterprise data business "*will grow*") (emphasis in complaint).)  Defendants assert that claims premised on this statement are not actionable because this statement is "classic, non-actionable opinions and corporate optimism."  (MTD at 15.)  In response, Mr. Dardi asserts that because these opinion statements "provide[d] specific details to investors about the status of specific products" and did not align with the information Mr. Hsing had in his possession at the time, they are actionable.  (Resp. at 12-13.)  Here, the court agrees with Defendants that Mr. Hsing's

ORDER - 26

statements referring to Monolithic's products as the "best" constitutes corporate puffery and therefore are not actionable.

First, the statements made by Mr. Hsing during the earnings call are subjective and thus "not capable of objective verification." *In re Arrowhead Pharms.*, No. CV 16-08505 PSG-PJW, 2017 WL 5635422, at *4 (C.D. Cal. Sept. 20, 2017) ("Puffing language includes vague statements of optimism like 'business couldn't be better' and 'industry-leading,' as well as words like 'strong,' 'robust,' 'well positioned,' 'solid,' and 'improved.'"). Second, the October 30, 2024 statements do not provide a "'concrete description of the past and present' that affirmatively create[s] a plausibly misleading impression of a 'state of affairs that differed in a material way from the one that actually existed.'" *Alphabet*, 1 F.4th at 700 (quoting *Quality Sys.*, 865 F.3d at 1144). Finally, the statements are protected opinions, and therefore are not actionable because (1) Mr. Dardi fails to allege that Mr. Hsing did not actually hold the stated beliefs; (2) the statement does not contain an embedded statement of untrue fact; and (3) the opinion was not misleading by omission. *See Wochos*, 985 F.3d at 1188-89 (citing *Omnicare*, 575 U.S. at 183-85, 188).) Even if these opinions reflected facts that later proved untrue, "an investor cannot state a claim by alleging only that an opinion was wrong[.]" *Omnicare*, 575 U.S. at 194. Thus, the court concludes that Mr. Hsing's October 30, 2024 statements referring to Monolithic's products as the "best solution" and using other similar language are not actionable.

Having determined that Mr. Dardi satisfies Section 10(b)'s requirement for falsity, the court now turns to the parties' arguments pertaining to scienter.

ORDER - 27

2. <u>Scienter</u>

Scienter "is a 'mental state embracing intent to deceive, manipulate, or defraud.'" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007)).  To adequately plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A). Specifically, defendants must have "made false or misleading statements either intentionally or with deliberate recklessness."  *Nguyen*, 962 F.3d at 414 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)) (internal quotation marks omitted).  "[D]eliberate recklessness represents 'an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 536 (9th Cir. 2024) (quoting *Zucco*, 552 F.3d at 991).  The scienter element is met "'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Nguyen*, 962 F.3d at 414 (quoting *Tellabs*, 551 U.S. at 324).

Although the court must perform the scienter inquiry "holistically," the Ninth Circuit has directed that "'it would be folly to simply skirt the major allegations.'" *Webb v. Solarcity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (quoting *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 704 (9th Cir. 2012)).  "Generally, we expect that a financial motive for securities fraud will be clear[.]"  *Prodanova v. H.C. Wainwright &*

*Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021).  "[F]or example, someone inside a company stands to gain a substantial profit by engaging in deceptive behavior, such as selling shares before the company discloses negative information."  *Id.*  "[I]f two possible inferences—one fraudulent and the other nonfraudulent—are equally compelling, a plaintiff has demonstrated a strong inference of scienter."  *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016).

Mr. Dardi alleges that the Executive Defendants acted with scienter because they "knew or recklessly disregarded that their public statements were materially false and misleading; knew that their statements would be disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of their statements in actions intended to manipulate the market price of Monolithic's common stock[.]"  (Am. Compl. ¶ 94.)  Specifically, Mr. Dardi asserts that a strong inference of scienter can be drawn from (1) the timing and amounts of the Executive Defendants' stock sales during the Proposed Class Period; (2) the Executive Defendants' misstatements regarding Monolithic's quality control issues; (3) the Executive Defendants' statements concerning Monolithic's core operations; and (4) the temporal proximity between the Executive Defendants' false statements and the revelation of the truth about the relationship between Monolithic and Nvidia.  (Resp. at 13-24.)

The court concludes that the timing and amounts of the Executive Defendants' stock transactions supports an inference of scienter.  The parties do not dispute that the Executive Defendants sold millions of dollars' worth of Monolithic stock after making public statements that Monolithic had resolved performance issues for PMICs supplied to

Nvidia, but before the Edgewater Report revealed that those performance issues persisted. (*See* MTD at 16-20; Resp. at 14-17.) Defendants, however, assert that the stock sales were not suspicious because they were executed "pursuant to Rule 10b5-1 trading plans or for routine tax withholdings." (MTD at 16.)

In the Ninth Circuit, unusual or suspicious "stock sales by corporate insiders may constitute circumstantial evidence of scienter." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999), *as amended* (Aug. 4, 1999) (citation omitted). Insider trading is only considered "suspicious" when it is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id*. (citing *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir. 1989)) (internal quotation marks omitted). Specifically, to determine whether stock sales are suspicious, courts consider "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id*. (citation omitted). Regardless of the percentage of shares sold, substantial sales support an inference of scienter. *See Nursing Home Pension Fund, Loc. 144 v. Oracles Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).

Here, the court agrees with Mr. Dardi that the Executive Defendants' individual stock sales are suspicious and thus support an inference of scienter. (Resp. at 14-17.) First, as to the amounts and percentages, the Executive Defendants sold a substantial amount of stock. Mr. Hsing sold 6% of his Monolithic holdings during the Proposed Class Period, generating more than $44 million. (Am. Compl. ¶¶ 99, 116-17.) Mr. Blegen sold 33% of his Monolithic holdings during the Proposed Class Period,

generating almost $22 million.  (*Id.* ¶¶ 122, 142-43.)  Second, Defendants do not contest that these stock sales occurred during the Proposed Class Period, including on February 8, 2024; March 1, 2024; May 1, 2024; and on November 8, 2024, prior to the release of the Edgewater Research Report.  (*Id.* ¶¶ 114, 140.)  Third, as to consistency, Mr. Dardi asserts, and the Executive Defendants do not contest, that (1) most of the Executive Defendants' trades during the Proposed Class Period were not made in connection with a tax obligation; and (2) the volume of trades during the Proposed Class Period greatly exceeded the volume of trades in the two years preceding the Proposed Class Period, when Executive Defendants "rarely, if ever, sold shares except to cover tax liabilities attendant to their acquisition of more stock."  (Resp. at 16 (citing Duffy Decl. ¶¶ 8-22, Ex. 6-20 (SEC Form 4 Records).)  On this basis, the court determines that Mr. Dardi has plausibly alleged that the Executive Defendants' individual stock sales are suspicious.

In so concluding, the court rejects Defendants' argument that such sales are not suspicious and thus do not support a strong inference of scienter because the Executive Defendants traded stock pursuant to 10b5-1 plans that they adopted six months before the Proposed Class Period.  (Reply at 7.)  Defendants rely in part on *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008) to support their argument.  (*Id.*)  In *Metzler*, the Ninth Circuit considered stock sales that the defendants completed before the relevant class period and in a manner consistent with the defendants' trading history, and affirmed a lower court ruling that the plaintiff failed to plead a strong inference of scienter as required by the PSLRA.  *Metzler*, 540 F.3d at 1067.  Here, in contrast, the Executive Defendants traded shares of Monolithic stock

ORDER - 31

during the Proposed Class Period and in a manner inconsistent with their recent prior trading history. (*See* Am. Compl. ¶¶ 95-144.) Furthermore, the court rejects Defendants' assertion that *Metzler* established a threshold requiring a defendant to sell at least 37% of his holdings to support scienter. (*See* Reply at 8 (so suggesting).) Five years after the decision in *Metzler*, the Ninth Circuit held that a defendant's stock sales need only be "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information" to support a conclusion that such sales are suspicious and an inference of scienter. *Oracle*, 380 F.3d at 1232 (internal quotation marks and citation omitted). Mr. Dardi's allegations meet this standard.

Here, Mr. Dardi has plausibly alleged a financial motive for securities fraud, namely that Executive Defendants stood to gain a substantial profit by engaging in deceptive behavior and sold personal shares before Monolithic disclosed negative information. (*See* Am. Compl. ¶¶ 95-144); *Prodanova*, 993 F.3d at 1108. Thus, the court concludes that Mr. Dardi has plausibly alleged that the Executive Defendants' individual trades are suspicious and support an inference of scienter. Because the court concludes that the Executive Defendants' individual stock sales support a strong inference of scienter, the court declines to address Mr. Dardi's remaining arguments regarding scienter.

**D.      Mr. Dardi's Section 20(a) Claims**

Section 20(a) of the Securities and Exchange Act governs the liability of controlling persons and persons who aid and abet violations of securities laws. Section 20(a) provides:

ORDER - 32

> Every person who, directly or indirectly, controls any person liable under any provision of [the Securities and Exchange Act] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a); *see also In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012). Mr. Dardi may establish control person liability by pleading: (1) a primary violation of securities laws and (2) that the defendants exercised actual power or control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (citation omitted). To show that a defendant is a controlling person, the court conducts a fact-based inquiry, "involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.* (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994)) (internal quotation marks omitted).

Defendants do not contest the merits of Mr. Dardi's Section 20(a) claims other than to argue that Mr. Dardi has not adequately pleaded a predicate offense. (*See* MTD at 25.) Accordingly, because Mr. Dardi has successfully pleaded a Section 10(b) violation, the court denies Defendants' motion to dismiss his Section 20(a) claims.

**E.    Leave to Amend**

Under Federal Rule of Civil Procedure 15(a), district courts are ordinarily to "freely give" leave to amend a claim subject to dismissal. Fed. R. Civ. P. 15(a)(2). Leave to amend is not required, however, where amendment would be futile, such as when the pleading could not possibly be cured by further factual allegations. *Foman v. Davis*, 371 U.S. 178,

ORDER - 33

182 (1962); *Ebner v. Fresh, Inc.*, 838 F.3d 958, 968 (9th Cir. 2016). Because the October 30, 2024 statements constitute corporate puffery, further amendment would be futile. Therefore, the court denies leave to amend Mr. Dardi's claims as to the October 30, 2024 statements.

## IV. CONCLUSION

As to Defendants' October 30, 2024 statements referring to Monolithic's products as the "best solution" and using other similar language, the court GRANTS the motion to dismiss (Dkt. # 46). The court DENIES Defendants' motion in all other respects.

Dated this  6th day of May, 2026.

_____
JAMES L. ROBART
United States District Judge

ORDER - 34