The Honorable James L. Robart

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WATERFORD TOWNSHIP GENERAL EMPLOYEES RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> MONOLITHIC POWER SYSTEMS, INC., MICHAEL HSING, and BERNIE BLEGEN, <br><br> Defendants. | Case No. 2:25-cv-00220-JLR <br><br> DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS <br><br> NOTE ON MOTION CALENDAR: August 31, 2026 |

DEFS' MOT. FOR J. ON
PLEADINGS
(2:25-CV-00220-JLR)

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................1

PROCEDURAL BACKGROUND ........................................................................3

LEGAL STANDARD ...........................................................................................4

ARGUMENT .........................................................................................................5

    A.    THE PLEADINGS ESTABLISH THAT EVERY CLASS PERIOD
    SALE WAS NONDISCRETIONARY ........................................................6

        1.    Hsing's Sales Were Nondiscretionary..............................................6

        2.    Blegen's Sales Were Nondiscretionary ............................................8

    B.    THE STOCK SALES DO NOT SUPPORT A STRONG INFERENCE
    OF SCIENTER ...........................................................................................10

        1.    The Sales Were Consistent With—and Indeed Less Than—Prior
        Trading ...........................................................................................10

        2.    The Timing of the Individual Defendants' Stock Sales Was Not
        Suspicious ......................................................................................14

        3.    The Amounts and Percentages Sold Were Not Suspicious ............15

    C.    PLAINTIFF'S OTHER SCIENTER THEORIES FAIL ...........................17

        1.    There Are No Particularized Facts Suggesting Knowledge of
        Falsity; Instead, the Complaint Offers Only Impermissible
        Fraud-by-Hindsight.........................................................................17

        2.    The "Core Operations" Doctrine Does Not Support a Strong
        Inference of Scienter......................................................................21

        3.    Temporal Proximity Does Not Support Scienter ...........................22

        4.    Holistic Review Confirms That Nonculpable Inferences
        Predominate ...................................................................................23

CONCLUSION....................................................................................................24

DEFS' MOT. FOR J. ON
PLEADINGS
(2:25-CV-00220-JLR)

- i -

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

## **TABLE OF AUTHORITIES**

**CASES**                                                                        **Page(s)**

*Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*,
    756 F. Supp. 3d 852 (S.D. Cal. 2024)...................................................................13

*Bolling v. Dendreon Corp.*,
    2014 WL 12042559 (W.D. Wash. Jan. 28, 2014).................................................12

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013),
    *aff'd*, 691 F. App'x 393 (9th Cir. 2017).................................................................18

*Fialkov v. Microsoft Corp.*,
    72 F. Supp. 3d 1220 (W.D. Wash. 2014)...............................................................24

*Fleming v. Pickard*,
    581 F.3d 922 (9th Cir. 2009) ................................................................................4

*Garbaccio v. Starbucks Corp.*,
    2026 WL 2035799 (W.D. Wash. July 15, 2026) ............................................4, 11

*In re Metawave Commc'ns Corp. Sec. Litig.*,
    298 F. Supp. 2d 1056 (W.D. Wash. 2003).............................................................23

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ...............................................................18, 20, 21

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ....................................................................... *passim*

*In re Skechers U.S.A., Inc. Sec. Litig.*,
    273 F. App'x 626 (9th Cir. 2008) ........................................................................16

*In re Twitter, Inc. Sec. Litig.*,
    506 F. Supp. 3d 867 (N.D. Cal. 2020), *aff'd sub nom.*
    *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022) ..............13

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) .................................................................11, 14, 15, 16

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
    259 F.R.D. 490 (W.D. Wash. 2009) .....................................................................16

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ................................................................................13

*Johnson v. Carpenters of W. Wash. Bd. of Trs.*,
    824 F. Supp. 3d 1103 (W.D. Wash. 2026)..............................................................4

DEFS' MOT. FOR J.  ON
PLEADINGS
(2:25-CV-00220-JLR)
- ii -

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

*Joyce v. Amazon.com, Inc.*,
  2025 WL 835054 (W.D. Wash. Mar. 17, 2025) ...............................................................11, 23

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ...................................................................... *passim*

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ...............................................................................10, 14

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ...................................................................5, 10, 16

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ...............................................................................14

*Rodriguez v. Gigamon Inc.*,
  325 F. Supp. 3d 1041 (N.D. Cal. 2018) ...................................................................13

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ...................................................................... *passim*

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ...............................................................................21, 22

*Stephens v. Maplebear Inc.*,
  2025 WL 1359125 (N.D. Cal. May 9, 2025) .......................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...............................................................................5, 10, 23, 24

*Threshold Enters. Ltd. v. Pressed Juicery, Inc.*,
  445 F. Supp. 3d 139 (N.D. Cal. 2020) ...................................................................4

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ...............................................................................5, 24

**STATUTES, REGULATIONS, AND RULES**

15 U.S.C. §78u-4(b)(2)(A)...............................................................................5

17 C.F.R. §240.10b5-1............................................................................... *passim*

Federal Rule of Civil Procedure 12(c) ...............................................................1, 4

DEFS' MOT. FOR J. ON
PLEADINGS
(2:25-CV-00220-JLR)

- iii-

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

## I.   INTRODUCTION

The now-complete pleading record establishes that every stock sale by the two individual defendants—Monolithic Power Systems, Inc.'s ("MPS") Chief Executive Officer Michael Hsing and now-retired Chief Financial Officer Bernie Blegen—during the putative class period was ***nondiscretionary***.  Every sale was executed either under a Rule 10b5-1 trading plan adopted six months before the putative class period began, or as a routine "sell-to-cover" transaction in which stock was sold automatically to satisfy tax withholding obligations.  No sale was timed to exploit inside information, and none departed from Hsing's and Blegen's long-established trading patterns.  On this record, MPS, Hsing, and Blegen (together, "Defendants") are entitled to judgment on the pleadings under Federal Rule of Civil Procedure 12(c) because the pleadings foreclose the strong inference of scienter that the Private Securities Litigation Reform Act ("PSLRA") demands.

When this Court denied in part Defendants' Motion to Dismiss (Dkt. #57), it had before it only Plaintiff's side of the story:  the allegations of the First Amended Complaint (Dkt. #39, the "Complaint"), which painted an incomplete and, as the full record now shows, misleading picture of Hsing's and Blegen's trading activity.  The Court found a strong inference of scienter based on three allegations:  the amount of stock sold, the timing of the sales during the putative class period, and their supposed inconsistency with prior trading history.  Dkt. #57 at 29-31.  The closed pleadings and the documents incorporated into the pleadings—Hsing's and Blegen's Rule 10b5-1 trading plans, SEC Forms 4, and multi-year trading histories—now preclude a scienter inference.

The complete pleading record establishes three dispositive points.  ***First***, both Hsing and Blegen adopted their Rule 10b5-1 trading plans in August 2023—months before the material nonpublic information Plaintiff alleges even existed.  The Complaint alleges that NVIDIA did not begin experiencing the failures it traced to MPS's power management integrated circuits ("PMICs") until "late 2023."  Dkt. #39 ¶¶6, 65.  Adoption of a trading plan before the

| | |
|---|---|
| DEFS' MOT. FOR J.  ON PLEADINGS (2:25-CV-00220-JLR) | **FENNEMORE CRAIG, P.C.** 999 Third Avenue, Suite 600 Seattle, Washington 98104 (206) 749-0500 |

- 1-

supposedly concealed facts came into existence cannot, as a matter of logic or law, reflect an intent to profit on that not-yet-existing inside information. The plans themselves directed a broker to execute sales automatically, at fixed intervals, with no involvement or discretion by either Hsing or Blegen. Nor were the 2023 plans a new development adopted in anticipation of bad news. Rather, both executives had maintained a succession of Rule 10b5-1 plans dating back to at least 2019, pursuant to which dozens of pre-planned, nondiscretionary trades had been executed.

*Second*, Hsing's and Blegen's trading activity during the putative class period was *less than*—not greater than—their historical trading levels. Hsing sold 59,765 shares across the nine months of the class period, less than he sold in 2020 (457,720 shares), 2021 (282,549 shares), and 2022 (118,990 shares). Likewise as to Blegen: his class period sales of 28,007 shares fell well below his totals in 2020 (44,910 shares) and 2021 (51,421 shares), and were about the same as in 2022 (22,662 shares). A supposed scheme to profit from illicit insider selling that results in *fewer* shares sold than before cannot give rise to a scienter inference.

*Third*, Hsing and Blegen kept selling even *after* the supposedly concealed information was disclosed. Dkt. #39 ¶¶110, 135-36. Anyone exploiting inside information would stop trading the moment that information became public. Hsing and Blegen did not—because they were not trading to profit on inside information. Their sales were dictated by pre-programmed plans indifferent to short-term price fluctuations, exactly as the sales had been for years.

What the Complaint omits speaks more loudly than what it alleges. Plaintiff offers no confidential witnesses. Plaintiff cites no internal MPS document to suggest that Defendants were not candid with investors—no emails, memoranda, reports, or communications of any kind. And Plaintiff identifies no particularized fact, from any source, showing that Defendants contemporaneously possessed information that contradicted their public statements. The PSLRA demands "strong" indicia of fraudulent intent—not speculation, hindsight, or the mere fact that executives sold stock under pre-existing trading plans or to comply with their tax obligations.

Plaintiff alleges none of the hallmarks of a strong scienter case, and the closed pleadings confirm it. Judgment on the pleadings is warranted as a matter of law.

## II.    PROCEDURAL BACKGROUND

Plaintiff filed the Complaint on November 12, 2025, alleging that Hsing and Blegen (the "individual defendants") made materially false and misleading statements about the quality and performance of MPS's PMICs during the proposed "Class Period" of February 8, 2024 to November 11, 2024. Dkt. #39 ¶¶84, 86.

Defendants moved to dismiss the Complaint. Dkt. #46. On May 6, 2026, this Court granted the motion in part and denied it in part. Dkt. #57. The Court dismissed claims based on Hsing's October 30, 2024 statements describing MPS products as the "best solution," finding them non-actionable opinions and corporate puffery. *Id.* at 26-27. By contrast, the Court denied the motion as to Hsing's February 7, 2024 statement that MPS had "resolved" certain PMIC performance issues, Blegen's May 1, 2024 statement that MPS was integrated into NVIDIA's next-generation product development, and Blegen's August 1, 2024 statement reporting MPS's record quarterly revenue. *Id.* at 21-26.

The Court found that a strong inference of scienter could be drawn from the Complaint's allegations about the "timing and amounts of the Executive Defendants' stock transactions" during the Class Period. *Id.* at 29. That finding rested on three sets of allegations: (1) "the Executive Defendants sold a substantial amount of stock" (*id.* at 30 (citing Dkt. #39 ¶¶99, 116-17, 122, 142-43)); (2) the sales "occurred during the Proposed Class Period" (*id.* at 31 (citing Dkt. #39 ¶¶144, 140)); and (3) "the volume of trades during the Proposed Class Period greatly exceeded the volume of trades in the two years preceding the Proposed Class Period" (*id.* at 31; *see also* Dkt. #39 ¶¶111, 138).

Defendants filed their Answer on June 17, 2026. Dkt. #65 (cited as "Ans."). The pleadings are now closed. The Answer—together with the Rule 10b5-1 trading plans, SEC forms, and multi-year trading records it incorporates—supplies the complete picture the

DEFS' MOT. FOR J. ON
PLEADINGS
(2:25-CV-00220-JLR)

- 3-

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

Complaint obscured, and it refutes every factual predicate underlying the Court's scienter finding.

### III.    LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Judgment on the pleadings is properly granted when no issue of material fact remains in dispute and the moving party is entitled to judgment as a matter of law. *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). Critically, a Rule 12(c) motion permits the Court to consider not only the complaint but also "the pleadings, documents attached to the pleadings, documents incorporated therein, or matters of judicial notice." *Johnson v. Carpenters of W. Wash. Bd. of Trs.*, 824 F. Supp. 3d 1103, 1108 (W.D. Wash. 2026). Documents attached to an answer are properly considered "where (i) the documents are central to the claims and (ii) where the authenticity of the documents is not disputed." *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 147 (N.D. Cal. 2020). That is what distinguishes this motion from the earlier motion to dismiss—and explains why the result must be different.

*Garbaccio v. Starbucks Corp.*, 2026 WL 2035799 (W.D. Wash. July 15, 2026), illustrates the point. There, the court granted in part and denied in part the defendants' Rule 12(b)(6) motion to dismiss a securities class action, concluding that the complaint adequately pleaded falsity and scienter as to several challenged statements. *Id.* at *1. After the pleadings closed, the defendants moved under Rule 12(c) for judgment on the remaining claims. The court granted that motion notwithstanding its earlier ruling, dismissing every remaining claim for failure to adequately plead scienter. *Id.* at *2. The court explained that where the record has been meaningfully developed since the earlier ruling, a different outcome on the same claims may be required. *Id.* at *3. That is the situation here. The closed pleadings—including the Answer and its incorporated Rule 10b5-1 trading plans, SEC Forms 4, and multi-year trading histories— provide a fuller record that was unavailable at the Rule 12(b)(6) stage, and that record compels a

different conclusion.

The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference" of scienter.  15 U.S.C. §78u-4(b)(2)(A).  That "strong inference" "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  The Court "must compare the malicious and innocent inferences cognizable from" the pleading record, and "only allow the complaint to survive" if "the malicious inference is at least as compelling as any opposing innocent inference."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).

To support a scienter inference through insider trading, stock sales must be "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999).  Three factors guide that inquiry: (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.  *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).  As demonstrated below, all factors weigh against the scienter inference.

## IV.    ARGUMENT

The closed pleadings do not merely cast doubt on the Complaint's theory of scienter—they completely refute it.  The pleadings establish that *every single* stock sale made on behalf of Hsing and Blegen during the Class Period was a nondiscretionary transaction under either (1) a Rule 10b5-1 trading plan adopted roughly six months before the Class Period began, or (2) MPS's equity incentive plan, effected to satisfy tax withholding obligations triggered by the vesting of restricted stock units.  Ans. ¶¶9, 98-99, 121-22.  All of the relevant Rule 10b5-1 plans, grant agreements, and Forms 4 are now part of the record, and they establish the nondiscretionary nature of every Class Period and pre-Class Period sale.  This record permits only one conclusion:  the individual defendants' Class Period sales were consistent with—and in

DEFS' MOT. FOR J.  ON
PLEADINGS
(2:25-CV-00220-JLR)

- 5-

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

most respects *lower than*—their established, pre-Class Period trading patterns.  The absence of any other indicia of scienter confirms what the trading data shows:  there is no strong inference of fraudulent intent.  The motion should be granted, and judgment entered for Defendants.

**A.      The Pleadings Establish That Every Class Period Sale Was Nondiscretionary.**

**1.      Hsing's Sales Were Nondiscretionary.**

*Class Period Sales***.**  During the Class Period, a broker executed on Hsing's behalf trades disposing of 59,765 shares for approximately $44.2 million in proceeds.  Dkt. #39 ¶99; Ans. ¶99; Ans. Ex. A at 102-24; Appendix 1, Table 5.[1]  That headline figure conceals an important fact: not one of those trades was made with any involvement or discretion by Hsing.  All were nondiscretionary trades; each was either a routine sale to cover tax withholding obligations under MPS's equity incentive plan (a "sell-to-cover" transaction) or a sale executed under a pre-established Rule 10b5-1 plan adopted in 2023.  The sell-to-cover transactions disposed of 20,830 shares for approximately $16.2 million.  Ans. ¶¶98-100, 104, 107-08, 110; *see also* Ans. Ex. A at 102, 110, 117, 119, 123; Appendix 1, Table 5.  These transactions were effected under MPS's equity incentive plan to satisfy tax withholding obligations triggered by the vesting of restricted stock units.[2]

The other Class Period transactions—disposing of 38,935 shares for approximately $28 million—were executed by a broker under the Rule 10b5-1 trading plan established in August 2023.  Ans. ¶¶98-99, 101-03, 105-06, 109, 115; Ans. Ex. A at 104-09, 112-16, 121; Ans. Ex. E at 11-12; Appendix 1, Table 5.  That written plan imposed a mandatory 120-day cooling-off period (*see* 17 CFR §240.10b5-1(c)(1)(ii)(B)), and instructed the broker to sell a specified number of

[1] Attached as Appendices 1 and 2 to this motion are tables summarizing the individual defendants' pre-Class Period and Class Period trades, as set forth in the Forms 4 attached as Exhibits A and F to Defendants' Answer, and the Rule 10b5-1 plans attached as Exhibits B, C, D, E, G, H, I, and J.

[2] It is well-settled "sell-to-cover transaction[s]" cannot give rise to liability for insider trading when executed pursuant to a "plan [that] authorizes an agent to sell only such securities as are necessary to satisfy tax withholding obligations arising exclusively from the vesting of a compensatory award, such as restricted stock or stock appreciation rights, and the insider does not otherwise exercise control over the timing of such sale."  17 C.F.R. §240.10b5-1(c)(1)(ii)(D)(3).

DEFS' MOT. FOR J.  ON
PLEADINGS
(2:25-CV-00220-JLR)

- 6-

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

shares (8,000) at specified prices on specified dates, with no involvement by Hsing. *See* Ans. Ex. E at 10-11. The broker executed that instruction on six dates during the Class Period (March 1, April 1, May 1, June 3, July 1, and August 9, 2024), selling at whatever prices the market happened to offer on those dates.[3] Ans. ¶¶101-103, 105-106, 109, 115; Ans. Ex. A at 104-09, 112-16, 121; Appendix 1, Table 5.[4]

Hsing's 2023 Rule 10b5-1 trading plan was not a new instrument adopted in anticipation of bad news, and the Complaint does not allege that it was. It was at least the fourth in a succession of such pre-established trading plans: Hsing adopted such plans in 2019, 2020, and 2021, each governing the orderly, nondiscretionary disposition of MPS stock through a broker at pre-determined fixed quantities and at specified minimum prices. Ans. ¶9; Ans. Exs. B-D. Under the 2020 plan, for example, the broker executed pre-planned trades totaling approximately $69.4 million. *See* Appendix 1, Tables 1-2; Ans. Ex. A at 8-15, 17-22, 27-28, 34-35; Ans. Ex. C at 11-13. The 2023 plan was simply the latest in a longstanding practice.

***Pre-Class Period Sales.*** Compared to Hsing's pre-Class Period trading history, his Class Period sales were unremarkable—indeed, they were a *reduction* from prior levels. In 2020, a broker executed on Hsing's behalf trades disposing of 457,720 shares for approximately $97.2 million, including 239,587 shares under Hsing's Rule 10b5-1 plan. *See* Appendix 1, Table 1; Ans. Ex. A at 2-21. In 2021, 282,549 of Hsing's shares were sold for approximately $106.5 million, including 127,434 shares under Hsing's Rule 10b5-1 plan. *See* Appendix 1, Table 2; Ans. Ex. A at 25-57. In 2022, 118,990 shares were sold for approximately $49.9 million. *See* Appendix 1, Table 3; Ans. Ex. A at 58-70. From 2023 through the start of the Class Period, 218,788 shares were sold for approximately $112.9 million—proceeds more than 150% greater

---

[3] Like sell-to-cover transactions, it is well-settled that sales pursuant to 10b5-1 plans cannot give rise to liability for trading on material nonpublic information. 17 C.F.R. §240.10b5-1(c)(1)(i) (describing elements of 10b5-1 plans).

[4] The broker sold fewer than 8,000 shares in July and August 2024 because holding restrictions prevented the sale of some shares identified in Hsing's 2023 plan. Ans. ¶¶106, 109; Ans. Ex. A at 115, 121; Ans. Ex. E at 30, 67.

than those of the entire Class Period—including 16,000 shares under his Rule 10b5-1 plan. *See* Appendix 1, Table 4; Ans. Ex. A at 71-100.

The numbers speak for themselves. Hsing sold *fewer* shares for *less* proceeds during the Class Period than in *each* of the four preceding years:

| Time Period Of Sales | Number of Different Sale Dates | Total Number of Shares Sold | Shares Sold Under Sell-to-Cover | Shares Sold Under 10b5-1 Plan | Total Proceeds from All Sales |
|---|---|---|---|---|---|
| 2020 | 19 | 457,720 | 236,133 | 239,587 | $97,220,493 |
| 2021 | 15 | 282,549 | 155,115 | 127,434 | $106,548,934 |
| 2022 | 14 | 118,990 | 118,990 | 0 | $49,909,724 |
| 2023 through start of Class Period | 19 | 218,788 | 202,788 | 16,000 | $112,930,209 |
| Class Period | 11 | 59,765 | 20,830 | 38,935 | $44,211,560 |

### 2. Blegen's Sales Were Nondiscretionary.

*Class Period Sales*. Blegen's trading history tells the same story. During the Class Period, a broker executed on Blegen's behalf trades disposing of 28,007 shares for approximately $21.9 million. Dkt. #39 ¶122; Ans. ¶122; Ans. Ex. F at 120-48; Appendix 2, Table 5. Not one of those trades was made with any involvement or discretion by Blegen. Every one of those nondiscretionary trades was either a sell-to-cover transaction or a sale under his pre-established Rule 10b5-1 plan adopted in 2023.

Sell-to-cover transactions disposed of 5,507 shares for $4.3 million. Ans. ¶¶121-23, 127, 130, 132, 136; Ans. Ex. F at 120, 128, 135, 139, 148; *see also* 17 C.F.R. §240.10b5-1(c)(1)(ii)(D)(3). The other trades—disposing of 22,500 shares for $17.6 million—were executed by a broker under a Rule 10b5-1 trading plan that was pre-established in August 2023. Ans. ¶¶121-22, 124-26, 128-29, 131, 133-35, 141; Ans. Ex. F at 122-27, 130-34, 137, 141-47; Ans. Ex. J at 11-13. That written plan included a 120-day cooling-off period and instructed the

DEFS' MOT. FOR J. ON PLEADINGS
(2:25-CV-00220-JLR)

- 8-

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

broker to sell a specified number of shares (2,500) at specified prices on specified dates.  Ans. ¶141; Ans. Ex. J at 12-13; *see also* 17 C.F.R. §240.10b5-1(c)(1)(i) .  The broker executed that instruction like clockwork, selling 2,500 shares on the first business day of every month in 2024.  Ans. ¶¶124-26, 128-29, 131, 133-35, 141; Ans. Ex. F at 122-27, 130-34, 137, 141-47.

Like Hsing, Blegen's 2023 Rule 10b5-1 plan was not his first Rule 10b5-1 arrangement but at least his fourth.  Blegen adopted such pre-established trading plans in 2019, 2020, and 2021, each governing the orderly, nondiscretionary disposition of MPS stock through a broker at pre-determined fixed quantities and at specified minimum prices.  Ans. ¶¶9, 139; Ans. Exs. G-I.  Under the 2020 plan, for example, the broker executed trades selling 20,442 shares.  *See* Appendix 2, Tables 1-2; Ans. Ex. F at 10, 12-13, 15, 18-19, 21, 23-25, 27, 32-33; Ans. Ex. H at 11-12.  The pattern was consistent:  fixed quantities, minimum price thresholds, and no discretion for Blegen—the same framework that governed his Class Period trades.

***Pre-Class Period Sales***.  Blegen's Class Period trading was not merely consistent with his prior history—it was a continuation of that history, at roughly the same pace.  In 2020, a broker executed on Blegen's behalf trades disposing of 44,910 shares for approximately $10.2 million, including 15,189 shares under Blegen's Rule 10b5-1 plan.  *See* Appendix 2, Table 1; Ans. Ex. F at 2-15, 17-25.  In 2021, 51,421 of Blegen's shares were sold for approximately $20.9 million, including 25,188 shares under Blegen's Rule 10b5-1 plan.  *See* Appendix 2, Table 2; Ans. Ex. F at 26-28, 31-38, 40-66.  In 2022, 22,662 shares were sold for approximately $9.5 million, including 3,436 shares under Blegen's Rule 10b5-1 plan.  *See* Appendix 2, Table 3; Ans. Ex. F at 67-69, 71-83.  From 2023 through the start of the Class Period, 68,404 shares were sold for approximately $37.1 million—*more* shares than he sold during the entire Class Period.  *See* Appendix 2, Table 4; Ans. Ex. F at 84-119.

As with Hsing, nothing about Blegen's Class Period sales was extraordinary compared to prior years:

DEFS' MOT. FOR J.  ON
PLEADINGS
(2:25-CV-00220-JLR)
- 9-
**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

| Time Period Of Sales | Number of Different Sale Dates | Total Number of Shares Sold | Shares Sold Under Sell-to-Cover | Shares Sold Under 10b5-1 Plan | Total Proceeds from All Sales |
|---|---|---|---|---|---|
| 2020 | 24 | 44,910 | 29,721 | 15,189 | $10,237,574 |
| 2021 | 24 | 51,421 | 26,233 | 25,188 | $20,904,798 |
| 2022 | 16 | 22,662 | 19,226 | 3,436 | $9,540,587 |
| 2023 through start of Class Period | 21 | 68,404 | 55,904 | 7,500 | $37,125,958 |
| Class Period | 14 | 28,007 | 5,507 | 22,500 | $21,878,412 |

**B.    The Stock Sales Do Not Support a Strong Inference of Scienter.**

With the limited record before it at the motion-to-dismiss stage, the Court identified three allegations as supporting a scienter finding:  (1) the "amounts and percentages" of stock sold; (2) the "timing" of the sales during the Class Period; and (3) their "inconsistency with prior trading."  Dkt. #57 at 30-32.  The closed pleadings and the documents they incorporate strip each allegation of whatever force it once had.  Under the holistic analysis required under *Tellabs*, the Court must—now with the benefit of a complete record—take into account the fact that all of Hsing and Blegen's sales were either sell-to-cover or under 10b5-1 plans, and that their Class Period sales were less than their pre-Class Period sales.  On the fuller record now before the Court, one conclusion emerges:  these nondiscretionary stock sales do not give rise to the requisite strong and cogent inference of scienter.

**1.    The Sales Were Consistent With—and Indeed Less Than—Prior Trading.**

The closed pleadings and their incorporated documents establish that the individual defendants' Class Period sales were not "dramatically out of line" with their prior trading practices.  *Silicon Graphics*, 183 F.3d at 986.  The Ninth Circuit has found insider sales "unusual and suspicious" where defendants engaged in a "sudden flurry of massive insider trading . . . after an extended period of inactivity."  *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939-40 (9th Cir. 2003); *see also Oracle*, 380 F.3d at 1229

(CEO's sale of $900 million in stock was suspicious because it was the first time he had sold stock in five years).  A dramatic spike in selling during the class period can support scienter if it suggests sales "at times calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986.  This case is the opposite.  Hsing and Blegen were not dormant traders who suddenly sprang into action with a "flurry" of Class Period sales.  They were consistent, long-time sellers who simply continued nondiscretionary sales as they had always done—only less of it.  The trading data demonstrates that fewer shares were sold as compared to prior years.

Stock sales that are "largely consistent with the prior trading history" do not support scienter.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008).  Nor must an executive sell the exact same quantity before and during the class period.  Even doubling the stock sale rate "yields a much lower increase in selling activity than cases when courts have found this factor supports a finding of scienter." *Joyce v. Amazon.com, Inc.*, 2025 WL 835054, at *8 (W.D. Wash. Mar. 17, 2025); *see also In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1095 (9th Cir. 2002) (sale of 61,000 shares for $1.6 million during the class period not suspicious where the same officer sold 10,000 shares for $400,000 the preceding year).  Here, the individual defendants did not increase, far less double, their trading—they reduced it.

In partially denying the motion to dismiss, the Court credited the Complaint's allegation that "the volume of trades during the Proposed Class Period greatly exceeded the volume of trades in the two years preceding the Proposed Class Period." Dkt. #57 at 31.  That conclusion— drawn when the Court had only Plaintiff's one-sided allegations before it—cannot survive the closed pleadings.  The incorporated and judicially noticeable facts tell a starkly different story: the individual defendants did not increase their Class Period selling, they *reduced* it.  The prior finding of suspicious inconsistency with historical trading is no longer tenable, and the now-complete record supplies exactly the kind of fuller, previously unavailable factual basis that warrants a different outcome.  *Cf. Garbaccio*, 2026 WL 2035799, at *4-5 (granting judgment on

DEFS' MOT. FOR J.  ON
PLEADINGS
(2:25-CV-00220-JLR)

- 11-

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

the pleadings notwithstanding an earlier order denying dismissal in part, where the Rule 12(c) motion presented a fuller record on scienter).

Nor can the prior finding be salvaged on the theory that Defendants "rarely, if ever, sold shares except to cover tax liabilities" before the Class Period. Dkt. #57 at 31. That characterization, drawn solely from the Complaint's allegations, is contradicted by the closed pleadings. Far from "rarely, if ever" selling shares outside of tax-related transactions, both individual defendants maintained Rule 10b5-1 trading plans under which significant pre-planned stock sales were executed in the years before the Class Period. *See, e.g.*, Ans. Exs. B-D, G-I. Hsing had numerous plan-based trades in 2020, 2021, and 2023. Appendix 1, Tables 1-2; Ans. Ex. A at 8-15, 17-22, 27-28, 34-35; Ans. Ex. C at 11-13. Blegen likewise had numerous plan-based trades in 2020, 2021, 2022, and 2023. Ans. ¶¶9, 139; Ans. Ex. F at 10-74; Ans. Ex. H at 11-12; Ans. Ex. I at 11-12; Appendix 2, Tables 1-2. In no sense did the individual defendants "rarely, if ever" sell stock outside of tax obligations—the record now conclusively refutes that characterization.

The timeline of plan adoption confirms what the trading data shows: plan-based trading was a longstanding practice, not a Class Period innovation. Hsing adopted plans in 2019, 2020, 2021, and 2023. Ans. Exs. B-E. Blegen likewise adopted plans in 2019, 2020, 2021, and 2023. Ans. Exs. G-J. Each plan specified similar nondiscretionary terms (a fixed quantity of shares, a minimum price, and designated sell dates), leaving no discretion to either executive. Ans. ¶9; Ans. Ex. B at 11-12; Ans. Ex. C at 11-15; Ans. Ex. D at 11-13; Ans. Ex. E at 11-13; Ans. Ex. G at 11-13; Ans. Ex. H at 11-13; Ans. Ex. I at 11-12; Ans. Ex. J at 11-13.

These facts are dispositive. This Court itself has held that stock sales do not permit an inference of scienter where they "were largely non-discretionary pursuant to a Rule 10b5-1 trading plan" and "were consistent with Defendants' prior trading history." *Bolling v. Dendreon Corp.*, 2014 WL 12042559, at *13 (W.D. Wash. Jan. 28, 2014). The Ninth Circuit and courts throughout this Circuit likewise consistently recognize that "[s]ales according to pre-determined

DEFS' MOT. FOR J. ON PLEADINGS
(2:25-CV-00220-JLR)

- 12-

plans may 'rebut an inference of scienter.'" *Metzler*, 540 F.3d at 1067 n.11 (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 (9th Cir. 1994), which concluded that sales "pursuant to a predetermined plan" "conclusively rebut an inference of scienter"); *see also In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020) ("[A]utomatic sales made pursuant to Rule 10b5-1 plans do not support a strong inference of scienter."), *aff'd sub nom. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022); *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1056 (N.D. Cal. 2018) (same).

Courts decline to credit Rule 10b5-1 plans only where the plans were "entered into *after* [the defendants] were in possession" of material nonpublic information. *Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*, 756 F. Supp. 3d 852, 876-77 (S.D. Cal. 2024). Plaintiff's own allegations foreclose that theory here. According to the Complaint, NVIDIA did not begin to experience failures in its Hopper server boards "that were ultimately traced back to [MPS]'s PMICs" until "*late* 2023." Dkt. #39 ¶6 (emphasis added); *see id.* ¶65 (same). The individual defendants adopted their Rule 10b5-1 plans in August 2023—months *before* Plaintiff alleges the material nonpublic information even existed, and six months before the Class Period began. Ans. ¶¶98, 121. A trading plan adopted before the supposed material nonpublic information existed cannot, as a matter of logic or law, support an inference that trades under the plan were motivated by fraud.

The same logic applies to the sell-to-cover transactions. As noted, a significant portion of the Class Period sales were routine, nondiscretionary sell-to-cover transactions triggered by the vesting of restricted stock units. Ans. ¶¶98-99, 121-22; Appendix 1, Table 5; Appendix 2, Table 5. These sales are no more suspect than the Rule 10b5-1 transactions: they were automatic dispositions triggered by a vesting event, in amounts dictated by applicable tax rates, without the involvement of either executive.

Courts consistently recognize that "[s]ales to satisfy tax obligations are not indicative of scienter." *Stephens v. Maplebear Inc.*, 2025 WL 1359125, at *8 (N.D. Cal. May 9, 2025). As

DEFS' MOT. FOR J. ON
PLEADINGS
(2:25-CV-00220-JLR)

- 13-

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

the Ninth Circuit has explained, "credible and wholly innocent explanations for stock sales"—including "the need to free cash to meet matured tax liabilities"—do not give rise to an inference of fraudulent intent. *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996). Tellingly, the Complaint does not even attempt to argue that the tax-driven sales contribute to an inference of scienter, nor could it. It simply lumps all the Class Period sales together, offering no theory for how a mandatory sell-to-cover transaction could reflect fraudulent intent. Now, with the pleading record closed, there remains no theory for how nondiscretionary plan-based trades could support a scienter inference.

### 2. The Timing of the Individual Defendants' Stock Sales Was Not Suspicious.

The timing of the individual defendants' sales does not merely fail to support an inference of scienter—it affirmatively negates one. In its prior order, this Court observed that "these stock sales occurred during the Proposed Class Period." Dkt. #57 at 31. But mere temporal overlap between stock sales and a class period has never sufficed to establish suspicious timing, and for good reason. Senior executives are compensated largely in stock, so corporate insiders sell stock regularly. Any class period will likely coincide with trading activity, and the law does not treat that coincidence as evidence of fraud. "It is not inherently alarming or unusual that an insider might sell" stock during an alleged class period. *In re Vantive*, 283 F.3d at 1094. "Context is important, especially for assessing the weight to attach to the timing of the sales." *Id.* at 1092. That is why the legal standard requires more: to support scienter, a sale must be "dramatically out of line with prior trading practices *at times calculated to maximize the personal benefit from undisclosed inside information*." *Silicon Graphics*, 183 F.3d at 986 (emphasis added).

Stock sales may be suspicious when numerous executives engage in concentrated trading at the stock's peak price, shortly before a corrective disclosure. *Am. W. Holding*, 320 F.3d at 939. The converse is equally true: sales are not suspicious when insiders sell below the highest

available price—that is, when they "miss the boat." *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001); *see also In re Vantive*, 283 F.3d at 1095 (sales before the stock's peak suggest they were not "calculated to maximize the personal benefit from undisclosed inside information").

The individual defendants' trading fits the latter pattern, not the former. Plaintiff alleges that MPS's share price reached a Class Period high of $919.81 before falling to $647.31 on November 11, 2024, when Edgewater released its report. Dkt. #39 ¶¶11, 84, 153. If the individual defendants had possessed material nonpublic information and intended to profit from it, one would expect them to have concentrated their sales around that peak price. They did the opposite: they sold on a regular cadence dictated by tax obligations and their pre-established Rule 10b5-1 plans, including plan-based trades at prices far below the peak. *See, e.g.*, Ans. ¶102 (Hsing sold 8,000 shares at $677.44); *id.* ¶103 (same at $661.86); *id.* ¶105 (same at $731.08); *id.* ¶125 (Blegen sold 2,500 shares at $677.40); *id.* ¶126 (same at $663.29); *id.* ¶128 (same at $731.77). "When insiders miss the boat this dramatically, their sales do not support an inference" of scienter. *Ronconi*, 253 F.3d at 435 ("[S]elling stock for $54, when the price subsequently rises to $74 and then sinks to $49, does not support an inference of knowing falsehood."); *see also id.* (no scienter inference where an insider sold 98% of her holdings "at prices ranging from $57 to $64," below the peak of $74).

Indeed, the individual defendants kept selling even *after* the supposed "truth" began to emerge on October 30, 2024. Dkt. #39 ¶76; Ans. ¶¶110, 135-37. That fact, too, is inconsistent with scienter. An insider seeking to profit from undisclosed adverse nonpublic information would stop selling once that information became public. The individual defendants did no such thing, because they were not trading to profit on inside information. The sales were nondiscretionary and consistent with prior practice.

### 3.    The Amounts and Percentages Sold Were Not Suspicious.

The amount of stock the individual defendants sold during the Class Period was typical of their trading history and cannot support a strong inference of scienter.

DEFS' MOT. FOR J. ON
PLEADINGS
(2:25-CV-00220-JLR)

- 15-

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

Hsing sold just 6% of his holdings during the Class Period, through sell-to-cover transactions and sales under his Rule 10b5-1 plan.  Dkt. #39 ¶117.  Blegen, who was approaching retirement, sold 33% of his stock during the Class Period, through the same two channels.[5]  *Id.* ¶143.  Neither figure supports a scienter inference.[6]  *See Ronconi*, 253 F.3d at 436 (sales of 69% and 17% of stock did not give rise to scienter inference; sale of 98% of holdings gave rise to only a "weak" inference); *Metzler*, 540 F.3d at 1067 (sales of 100% and 37% of stock holdings did not give rise to a scienter inference); *In re Skechers U.S.A., Inc. Sec. Litig.*, 273 F. App'x 626, 628 (9th Cir. 2008) (same; sale of 42% of holdings); *Silicon Graphics*, 183 F.3d at 987 (same; sales of 43.6% and 75.3% of holdings); *In re Vantive*, 283 F.3d at 1094-95 (same; sales of 13% and 26% of holdings).

In denying Defendants' motion to dismiss, the Court cited *Oracle* for the proposition that sales at this level can still be suspicious if "'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'"  Dkt. #57 at 32 (quoting *Oracle*, 380 F.3d at 1232).  But in *Oracle*, the company's CEO sold $900 million of stock in a single week after not selling any stock for the prior five years.  380 F.3d at 1232.  That is nothing like the situation here.  As shown above, neither individual defendant's Class Period sales were dramatically out of line with prior trading practices.  Their trades were squarely within established norms—and in fact, there was reduced sales activity, not more, than in prior periods—and, moreover, not a single sale was discretionary.

---

[5] Blegen was 66 years old at the start of the Class Period.  *See* MPS Form 10-K at 10 (filed Feb. 29, 2024); *see also In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 495 (W.D. Wash. 2009) (taking judicial notice of "SEC filings").

[6] Even if 33% were enough to support a strong inference of scienter—and it is not—the fact that Hsing sold just 6% of his stock based on the same supposed inside information undermines any notion that the individual defendants sold their shares to profit from that information.  *See Ronconi*, 253 F.3d at 436 (sale of 100% of holdings during class period did not give rise to scienter where other defendants sold 37% and 0% because "[o]ne insider's well timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made"); *see also Metzler*, 540 F.3d at 1067 ("We typically require larger sales amounts—and corroborative sales by other defendants—to allow insider trading to support scienter.").

DEFS' MOT. FOR J.  ON PLEADINGS
(2:25-CV-00220-JLR)

- 16-

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

**C.      Plaintiff's Other Scienter Theories Fail.**

Because the Court found that the stock sales alone supported a strong inference of scienter, it did not reach Plaintiff's remaining arguments when it denied the motion to dismiss. Dkt. #57 at 32.  But those allegations still contribute nothing to a scienter inference—even more so now that the Plaintiff's stock sale theory has been debunked.  *See* Dkt. #57 at 28 ("Generally, we expect that a financial motive for securities fraud will be clear[.]") (citation omitted).  As shown below, each additional scienter allegation rests on the kind of speculative, hindsight-driven reasoning the PSLRA forecloses:  Plaintiff cites no internal document, no confidential witness, and no contemporaneous fact showing that Defendants knew information contradicting their public statements.  Each allegation, whether considered individually or holistically, fails to give rise to the requisite strong inference of scienter.

**1.      There Are No Particularized Facts Suggesting Knowledge of Falsity; Instead, the Complaint Offers Only Impermissible Fraud-by-Hindsight.**

Plaintiff's first alternative scienter theory, which covers all three statements that survived the motion to dismiss, namely Hsing's February 7, 2024 remarks and Blegen's May 1 and August 1, 2024 remarks, rests on a research note Edgewater published on November 11, 2024. Dkt. #39 ¶85.  Working backward from that note, Plaintiff demands that the Court infer that Defendants already knew, between three and nine months earlier, that MPS's relationship with NVIDIA was "damaged" and that the PMIC quality issues described as "resolved" were not. Dkt. #39 ¶145.  That is pure fraud by hindsight, and the same defect infects the scienter theory as to the three statements.  The Complaint identifies no particularized fact showing that any individual defendant knew that he was relaying false or misleading information or that he recklessly disregarded the truth of such information.  Instead, the Complaint parrots post-hoc speculation of a third party based on unspecified rumors and hearsay.

DEFS' MOT. FOR J.  ON
PLEADINGS
(2:25-CV-00220-JLR)

- 17-

The PSLRA does not permit a plaintiff to manufacture scienter through hindsight. Rather, Plaintiff must identify "specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi*, 253 F.3d at 432. "Without evidence of contemporaneous falsity, an allegation of a misleading representation, which entirely rests on later contradictory statements, constitutes an impermissible attempt to plead fraud by hindsight." *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1109 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017); *accord Ronconi*, 253 F.3d at 430 n.12 ("Fraud by hindsight is not actionable.") (citation omitted). Third-party commentary "written in hindsight" likewise "do[es] not contribute to an inference of scienter." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1060 (9th Cir. 2014). Plaintiff's theory runs headlong into these settled principles.

Start with Hsing's February 7, 2024 statement that MPS had "resolve[d] all these issues" affecting its Stage 1 PMICs for NVIDIA's Hopper platform. Dkt. #39 ¶¶61, 64, 66. The Complaint alleges no contemporaneous fact—no internal test report, root-cause analysis, qualification failure, customer communication, or confidential witness—showing that Hsing knew, or even suspected, that those specific Stage 1 issues were unresolved in February 2024. The Complaint's only asserted support is the Edgewater report. But that report—published nine months later—did not even address the same product. It concerned NVIDIA's next-generation Blackwell platform, whereas Hsing's February remarks addressed Stage 1 issues tied to the prior-generation Hopper platform. Dkt. #48-5 at 2. The PSLRA does not permit the Court to ignore that factual pleading gap and infer scienter despite it.

The same defect dooms Plaintiff's theory as applied to the May 1 and August 1, 2024 statements. In holding the May 1 statement actionable, the Court inferred Blegen knew his integration statement was false because Hsing later stated, on the October 30, 2024 earnings call, that MPS had learned "in the last couple of quarters" that NVIDIA had begun sourcing PMICs from other suppliers. Dkt. #57 at 23 (quoting Dkt. #39 ¶77). But that inference cannot survive

scrutiny of MPS's own contemporaneous disclosures, which flatly contradict the premise that Hsing's October 30 remark revealed anything new.  Months *before* Blegen's May 1 statement, MPS had already told the market to expect exactly what Hsing later described.  On February 7, 2024, Blegen told analysts, in response to a question about the outlook for the Enterprise Data segment, that "we also believe that competition within the supply chain will continue," and that MPS expected its "pretty high percentage of market share" "to decrease as we introduce second and third suppliers."  Dkt. #48-1 at 8.  Hsing struck the same note moments later, telling investors that MPS anticipated "more—our competitor joining," that "other AI players will enter the market," and that "as you see the second half or sometime next year, you will see a lot of other players to be qualified."  Dkt. #48-1 at 9.

Hsing's October 30 remark, in other words, was not a revelation at all.  Instead, it was the fulfillment of a prediction MPS had been publicly making since February.  Measured against that backdrop, any inference of scienter collapses:  a statement that merely confirms a previously disclosed expectation cannot, as a matter of logic, demonstrate that an earlier, consistent statement was knowingly false.  Nor does the substance of Hsing's remark supply the missing element.  NVIDIA's decision to qualify additional PMIC suppliers did not mean MPS ceased to be "integrated" with NVIDIA at all; rather, NVIDIA continued to use MPS's PMICs alongside those other suppliers.  Dkt. #39 ¶13.  Because Hsing's October 30 statement neither said anything MPS had not already told investors to expect nor established that MPS had been excised from NVIDIA's supply chain, it supplies no basis—let alone the particularized basis the PSLRA demands—for concluding that Blegen knowingly misrepresented MPS's integration with NVIDIA when he spoke on May 1.

Likewise, an awareness that NVIDIA was assessing additional suppliers for Blackwell says nothing about whether Blegen knew, on August 1, that the "record" quarter he described was the product of a relationship already in decline.  A generalized sense of competitive pressure, unmoored from any specific particularized fact about what was false and when, is not a

"specific contemporaneous statement[] or condition[]" demonstrating scienter. *Metzler*, 540 F.3d at 1066. As with the February 7 statement, Plaintiff identifies no confidential witness, no internal document, and no communication—with NVIDIA, another customer, or anyone else— establishing that, as of May 1 or August 1, 2024, Defendants knew MPS's relationship with NVIDIA had been damaged or that quality issues persisted. Once again, the Complaint's only asserted proof is the Edgewater report, which was published six and three months after those statements, respectively.

The Edgewater note cannot bear the weight Plaintiff assigns it. On its face, the report does not purport to describe what Hsing, Blegen, or anyone else at MPS knew as of the dates of any of the challenged statements. It is not sourced to MPS or NVIDIA. It instead compiles rumors and anonymous "industry feedback," hedged throughout with qualifiers like "we hear," "it sounds like," and "feedback suggests"—and it candidly acknowledges that "[t]he root cause of MPWR's PMIC issue remains unclear." Dkt. #48-5 at 1. A report whose own authors concede uncertainty about causation, and which nowhere claims to reflect any Defendant's knowledge, is not the "particularized fact" from which a court may draw a strong inference that Hsing or Blegen sought to mislead investors months earlier. *See Metzler*, 540 F.3d at 1068 (requiring "at least" "some additional allegation of specific information conveyed to management and related to the fraud"). Courts have repeatedly held that unsourced, after-the-fact analyst commentary of this exact kind "do[es] not contribute to an inference of scienter." *NVIDIA*, 768 F.3d at 1060. At most, the Edgewater report reflects a conclusion drawn by one analyst, based on unidentified and unverified third-party sources, as of November 2024—not what Defendants knew in February, May, or August 2024.

In short, whether measured against the February, May, or August statements, Plaintiff's Edgewater-based theory suffers from the same incurable defect: it rests entirely on inference drawn from a single, later, hedged, and unsourced report, not on any particularized contemporaneous fact showing what the individual defendants actually knew when they spoke.

That is the definition of fraud by hindsight, and it cannot give rise to a strong inference of scienter under the PSLRA as a matter of law.

### 2. The "Core Operations" Doctrine Does Not Support a Strong Inference of Scienter.

Plaintiff also invokes the "core operations" doctrine, which permits a scienter inference only in the "exceedingly rare" case where there are no particularized allegations that the defendants actually knew the disputed information but where a fact is so central to a company's business that it would be literally "absurd" to suggest that executives lacked knowledge of it. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86, 785 n.3 (9th Cir. 2008).[7]  Plaintiff argues that because MPS's Enterprise Data segment—which included indirect PMIC sales to NVIDIA—accounted for roughly one-third of MPS's total revenues during the Class Period, and because NVIDIA was that segment's most important indirect customer, it would be absurd for the individual defendants not to have known of NVIDIA's purported dissatisfaction and its decision to source PMICs elsewhere.  Dkt. #39 ¶¶146-49.  That is not enough to invoke the doctrine, which courts reserve for facts so company-defining that a defendant's ignorance would strain credulity—not the kind of indirect and evolving business dynamics alleged here.  *See NVIDIA*, 768 F.3d at 1063-64 (no scienter even where the allegations concerned a company's "flagship product" and "two largest customers").

No particularized facts support the theory that it would have been "absurd" for the individual defendants to lack knowledge that MPS's relationship with NVIDIA was in "danger" at the time of the challenged statements.  (Indeed, as discussed above, the Complaint alleges no particularized facts that the matters described in the Edgewater report even existed when the challenged statements were made.)  MPS did not sell directly to NVIDIA, as Plaintiff concedes.

---

[7] Scienter may also be inferred under the core operations doctrine where particularized allegations suggest defendants had actual access to information contradicting their statements. *S. Ferry LP No. 2*, 542 F.3d at 786.  The Complaint never alleges, however, that the individual defendants had actual access to information demonstrating that their statements were false when made.

DEFS' MOT. FOR J.  ON PLEADINGS
(2:25-CV-00220-JLR)

- 21-

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

Dkt. #39 ¶54. Third-party assemblers and manufacturers instead integrated MPS components into products later incorporated into NVIDIA's platforms. *Id.* ¶55. In such a multi-level supply chain, the ultimate customer's purchasing decisions are iterative, confidential, and often not communicated to upstream suppliers like MPS. The Complaint identifies no communication from NVIDIA to MPS, no communication from a third-party assembler or manufacturer, no internal MPS documents or analysis, and no industry report pre-dating November 2024 indicating that NVIDIA had decided to reallocate its PMIC business or that the relationship was in "danger." That silence confirms that Plaintiff's theory rests on speculation, which by definition cannot give rise to the requisite scienter inference. *See Silicon Graphics*, 183 F.3d at 985 ("It is not enough for [the plaintiff] to state facts giving rise to a mere speculative inference of deliberate recklessness, or even a reasonable inference of deliberate recklessness.").

The weakness of Plaintiff's theory is underscored by a threshold question Plaintiff never answers: what information were Defendants supposed to have known, and when? If Plaintiff suggests that Defendants must have known that quality issues persisted with Stage 1 PMICs for NVIDIA's Hopper platform after February 2024, the Complaint did not allege that NVIDIA ever raised concerns about Stage 1 products after that date, nor did it allege a single communication with or about NVIDIA, nor any customer complaint or qualification failure from that period. It alleges no facts about any known, ongoing issue before Edgewater's report—published nine months later—and that report concerned a different NVIDIA platform (Blackwell) with different power specifications. Dkt. #39 ¶¶55, 57, 85. Given the dearth of particularized facts, the core operations doctrine here fails in its most "bare form." *S. Ferry LP No. 2*, 542 F.3d at 785-86.

### 3.   Temporal Proximity Does Not Support Scienter.

Plaintiff points to the temporal proximity between the challenged statements and the supposedly "corrective" disclosure. Specifically, Plaintiff argues that the roughly nine-month gap between Hsing's February 2024 statement that PMIC quality issues had been "resolved" and the November 2024 Edgewater report is short enough to support an inference that Defendants

DEFS' MOT. FOR J. ON
PLEADINGS
(2:25-CV-00220-JLR)                    - 22-                    **FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

sought to deceive MPS investors.  Dkt. #39 ¶¶150-51.  But courts consistently hold otherwise: "temporal proximity between allegedly false statements and a corrective disclosure, without more, cannot support a finding of scienter."  *Joyce*, 2025 WL 835054, at *14.  Courts within the Ninth Circuit have found periods far shorter than nine months insufficient.  *See, e.g.*, *Ronconi*, 253 F.3d at 437 (rejecting a five-week gap); *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1081 (W.D. Wash. 2003) (rejecting a three-week gap).  A nine-month interval is not "short" under any recognized standard, least of all in an industry as dynamic as this one.

The Complaint itself describes a fast-moving transition from supplying PMICs for one GPU platform (NVIDIA's Hopper) to developing new products for a materially different and more demanding platform (NVIDIA's Blackwell).  Dkt. #39 ¶¶55, 57.  In that environment, nine months is a lifetime.  The most cogent inference—the one the PSLRA requires the Court to weigh against Plaintiff's fraud theory—is straightforward and nonculpable:  engineering challenges genuinely resolved in February 2024 on one platform gave way to new and different challenges by November 2024 on a different platform with different power specifications.  That is not fraud.  It is the ordinary evolution of complex technology.

### 4. Holistic Review Confirms that Nonculpable Inferences Predominate.

Considered holistically, as *Tellabs* requires, the most cogent inference from the pleading record is that Defendants spoke and acted in good faith.  551 U.S. at 322-24.  The Complaint is devoid of the hallmarks of a strong scienter case:  no confidential witnesses, no financial restatement, no internal documents, and no communications establishing that Defendants contemporaneously possessed information contradicting their public statements.  The challenged statements themselves—addressing the resolution of quality issues on one product platform and expressing optimism about future design cycles—are the kind of forward-looking business commentary that executives routinely make in good faith.  The individual defendants' stock trading was nondiscretionary and consistent with years of prior practice.  And the principal basis for Plaintiff's claim that Defendants "must have known" the truth at the time of the challenged

DEFS' MOT. FOR J.  ON
PLEADINGS
(2:25-CV-00220-JLR)

- 23-

statements is a third-party research note that was issued nine months ***after*** the earliest challenged statement, was based on rumor and feedback from unidentified (and thus potentially unreliable) sources, was couched in tentative terms, and addressed a ***different*** product platform than the one Defendants discussed. Dkt. #39 ¶85. That is far more consistent with evolving competitive dynamics than with a concealed reality. *See Tellabs*, 551 U.S. at 322-24; *Fialkov v. Microsoft Corp.*, 72 F. Supp. 3d 1220, 1233 (W.D. Wash. 2014). The pleading record thus establishes that the nonculpable inference is far more compelling than Plaintiff's unsupported theory of fraud. *See Tellabs*, 551 U.S. at 324.[8]

## V.   CONCLUSION

For these reasons, Defendants respectfully request that the Court grant their Motion for Judgment on the Pleadings and enter judgment in Defendants' favor.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[8] Given the failure of the Complaint to plead a strong inference of scienter for the Section 10(b) claim, the Section 20(a) claim also necessarily fails and Defendants are therefore entitled to judgment on that claim as well. *Zucco Partners*, 552 F.3d at 990.

DEFS' MOT. FOR J. ON
PLEADINGS
(2:25-CV-00220-JLR)

- 24-

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

Dated: August 3, 2026

FENNEMORE CRAIG P.C.


*s/ Stephen C. Willey*
Stephen C. Willey, WSBA #24499
999 Third Avenue, Suite 600
Seattle, Washington 98104
206.749.0500 (phone)
swilley@fennemorelaw.com

JONES DAY

Geoffrey J. Ritts (*pro hac vice*)
Jacob J. Thackston (*pro hac vice*)
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
216.586.3939 (phone)
gjritts@jonesday.com
jthackston@jonesday.com

Marjorie P. Duffy (*pro hac vice*)
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio 43215
614.469.3939 (phone)
mpduffy@jonesday.com

Abigael C. Bosch (*pro hac vice*)
250 Vesey Street
New York, New York 10281
212.326.3939 (phone)
abosch@jonesday.com

*Attorneys for Defendants Monolithic Power Systems, Inc., Michael Hsing, and Bernie Blegen*

*I certify that this memorandum contains 8355 words, in compliance with the Local Civil Rules.*

DEFS' MOT. FOR J. ON
PLEADINGS
(2:25-CV-00220-JLR)                              - 25-

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

# Appendix 1

**Appendix 1**
**Chart of Hsing Stock Sales**

**Table 1: Michael Hsing – 2020 Trades[1]**

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| Jan. 7, 2020 | 65,813 | $176.99 | $11,648,243 | Sell-to-Cover | — | Ex. A at 2 |
| Jan. 8, 2020 | 16,475 | $176.49 | $2,907,673 | 10b5-1 Plan | Feb. 25, 2019 | Ex. A at 2; Ex. B at 12 |
| Feb. 3, 2020 | 9,561 | $173.89 | $1,662,562 | Sell-to-Cover | — | Ex. A at 4 |
| Feb. 6, 2020 | 70,886 | $183.75 | $13,025,303 | Sell-to-Cover | — | Ex. A at 5–6 |
| Feb. 10, 2020 | 7,957 | $181.07 | $1,440,774 | Sell-to-Cover | — | Ex. A at 7 |
| Mar. 31, 2020 | 23,258 | $170.00 | $3,953,860 | 10b5-1 Plan | Feb. 27, 2020 | Ex. A at 8; Ex. C at 12 |
| Apr. 1, 2020 | 11,150 | $162.58 | $1,812,767 | Sell-to-Cover | — | Ex. A at 8 |
| Apr. 6, 2020 | 17,742 | $170.00 | $3,016,140 | 10b5-1 Plan | Feb. 27, 2020 | Ex. A at 10; Ex. C at 12 |
| Apr. 7, 2020 | 95,979 | $170.00 | $16,316,430 | 10b5-1 Plan | Feb. 27, 2020 | Ex. A at 10; Ex. C at 12 |
| May 8, 2020 | 16,619 | $208.67 | $3,467,887 | Sell-to-Cover | — | Ex. A at 12 |
| May 11, 2020 | 17,348 | $209.96 | $3,642,386 | 10b5-1 Plan | Feb. 27, 2020 | Ex. A at 12; Ex. C at 12 |
| Jul. 1, 2020 | 10,960 | $235.16 | $2,577,354 | Sell-to-Cover | — | Ex. A at 14 |
| Jul. 6, 2020 | 16,540 | $241.38 | $3,992,425 | 10b5-1 Plan | Feb. 27, 2020 | Ex. A at 14; Ex. C at 13 |

---

[1] The trading data presented in the tables is derived from Forms 4 filed with the Securities and Exchange Commission, as well as the addenda to Mr. Hsing's Rule 10b5-1 trading plans discussed herein, all of which attached to Defendants' Answer as **Exhibits A–E**. Total approximate values are reported as stated in the Forms 4 and, where transactions were executed at multiple prices, reflect aggregate reported proceeds rather than a single price-times-quantity calculation. Price-per-share figures denoted with "~" or "avg." indicate that the transaction was executed in multiple lots at varying prices, and the figure shown represents the approximate average or range. Percentages are rounded to the nearest tenth of a percent.

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| Aug. 10, 2020 | 16,057 | $274.40 | $4,406,041 | Sell-to-Cover | — | Ex. A at 17 |
| Aug. 11, 2020 | 17,909 | $271.43 | $4,861,039 | 10b5-1 Plan | Feb. 27, 2020 | Ex. A at 17; Ex. C at 13 |
| Oct. 1, 2020 | 10,960 | $280.50 | $3,074,280 | Sell-to-Cover | — | Ex. A at 19 |
| Oct. 2, 2020 | 16,540 | $274.07 | $4,533,118 | 10b5-1 Plan | Feb. 27, 2020 | Ex. A at 19; Ex. C at 13 |
| Nov. 9, 2020 | 16,170 | $333.51 | $5,392,857 | Sell-to-Cover | — | Ex. A at 21 |
| Nov. 10, 2020 | 17,796 | $308.46 | $5,489,354 | 10b5-1 Plan | Feb. 27, 2020 | Ex. A at 21; Ex. C at 13 |
| **Total: 19 Trade Dates** | **475,720** | | **$97,220,493** | | | |
| *Sell-to-Cover: 10 trade dates \| 236,133 shares \| $48,508,068 (49.9%)* <br> *10b5-1 Plan: 9 trade dates \| 239,587 shares \| $48,723,425 (50.1%)* | | | | | | |

2

**Table 2: Michael Hsing – 2021 Trades**

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| Jan. 4, 2021 | 10,960 | $368.26 | $4,036,130 | Sell-to-Cover | — | Ex. A at 25 |
| Jan. 5, 2021 | 44,784 | $367.29 | $16,448,819 | 10b5-1 Plan | Feb. 27, 2020 | Ex. A at 27–28; Ex. C at 13–14 |
| Feb. 5, 2021 | 52,729 | $366.34 | $19,316,742 | Sell-to-Cover | — | Ex. A at 32 |
| Feb. 9, 2021 | 14,899 | $372.89 | $5,555,688 | Sell-to-Cover | — | Ex. A at 32 |
| Feb. 10, 2021 | 19,067 | $375.33 | $7,156,466 | 10b5-1 Plan | Feb. 27, 2020 | Ex. A at 34–35; Ex. C at 14 |
| Mar. 30, 2021 | 63,583 | $339.06 | $21,558,452 | 10b5-1 Plan | Feb. 26, 2021 | Ex. A at 36–37; Ex. D at 11 |
| Apr. 1, 2021 | 10,960 | $364.78 | $3,997,989 | Sell-to-Cover | — | Ex. A at 38 |
| May 10, 2021 | 8,479 | $326.40 | $2,767,546 | Sell-to-Cover | — | Ex. A at 42 |
| May 12, 2021 | 6,723 | $311.82 | $2,096,366 | Sell-to-Cover | — | Ex. A at 44 |
| Jul. 1, 2021 | 10,960 | $370.45 | $4,060,132 | Sell-to-Cover | — | Ex. A at 46 |
| Aug. 9, 2021 | 7,926 | $459.12 | $3,638,985 | Sell-to-Cover | — | Ex. A at 48 |
| Aug. 12, 2021 | 6,373 | $457.10 | $2,913,098 | Sell-to-Cover | — | Ex. A at 50 |
| Oct. 1, 2021 | 11,020 | $476.16 | $5,247,283 | Sell-to-Cover | — | Ex. A at 52 |
| Nov. 8, 2021 | 7,813 | $548.27 | $4,283,634 | Sell-to-Cover | — | Ex. A at 54 |
| Nov. 12, 2021 | 6,273 | $553.42 | $3,471,604 | Sell-to-Cover | — | Ex. A at 56 |

3

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| **Total: 15 Trade Dates** | **282,549** | | **$106,548,934** | | | |
| *Sell-to-Cover: 12 trade dates \| 155,115 shares \| $61,385,197 (57.6%)*<br>*10b5-1 Plan: 3 trade dates \| 127,434 shares \| $45,163,737 (42.4%)* | | | | | | |

4

**Table 3: Michael Hsing – 2022 Trades**

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| Jan. 3, 2022 | 10,960 | $490.87 | $5,379,935 | Sell-to-Cover | — | Ex. A at 58 |
| Feb. 7, 2022 | 29,638 | $399.28 | $11,833,860 | Sell-to-Cover | — | Ex. A at 60 |
| Feb. 8, 2022 | 7,663 | $401.12 | $3,073,783 | Sell-to-Cover | — | Ex. A at 60 |
| Feb. 14, 2022 | 6,421 | $429.60 | $2,758,461 | Sell-to-Cover | — | Ex. A at 61 |
| Apr. 1, 2022 | 11,250 | $467.23 | $5,256,337 | Sell-to-Cover | — | Ex. A at 62 |
| May 4, 2022 | 3,807 | $453.15 | $1,725,154 | Sell-to-Cover | — | Ex. A at 63 |
| May 12, 2022 | 6,481 | $388.10 | $2,515,276 | Sell-to-Cover | — | Ex. A at 64 |
| Jul. 1, 2022 | 11,495 | ~$361.57 (avg.) | $4,156,247 | Sell-to-Cover | — | Ex. A at 65 |
| Aug. 4, 2022 | 3,798 | $522.39 | $1,984,037 | Sell-to-Cover | — | Ex. A at 66 |
| Aug. 12, 2022 | 6,306 | $525.95 | $3,316,641 | Sell-to-Cover | — | Ex. A at 67 |
| Oct. 3, 2022 | 10,960 | $372.60 | $4,083,696 | Sell-to-Cover | — | Ex. A at 68 |
| Nov. 4, 2022 | 3,790 | $343.98 | $1,303,684 | Sell-to-Cover | — | Ex. A at 69 |
| Nov. 14, 2022 | 5,347 | $390.33 | $2,087,095 | Sell-to-Cover | — | Ex. A at 70 |
| Nov. 15, 2022 | 1,074 | $405.51 | $435,518 | Sell-to-Cover | — | Ex. A at 70 |
| **Total: 14 Trade Dates** | **118,990** | | **$49,909,724** | | | |
| *Sell-to-Cover: 14 trade dates (100%), 118,990 shares (100%), $49,909,724 (100%).* <br> *10b5-1 Plan: 0 trades (0%), 0 shares (0%), $0 (0%).* | | | | | | |

5

**Table 4: Michael Hsing – 2023 and Pre-Class Period 2024 Trades**

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| Jan. 3, 2023 | 14,888 | $344.96 | $5,135,764 | Sell-to-Cover | — | Ex. A at 71 |
| Feb. 6, 2023 | 3,691 | $446.88 | $1,649,434 | Sell-to-Cover | — | Ex. A at 72 |
| Feb. 8, 2023 | 22,483 | $462.41 | $10,396,364 | Sell-to-Cover | — | Ex. A at 73 |
| Feb. 13, 2023 | 6,333 | $492.31 | $3,117,799 | Sell-to-Cover | — | Ex. A at 74 |
| Apr. 3, 2023 | 11,100 | ~$487.99 (avg.) | $5,416,689 | Sell-to-Cover | — | Ex. A at 75 |
| May 3, 2023 | 11,242 | $463.55 | $5,211,229 | Sell-to-Cover | — | Ex. A at 77 |
| May 4, 2023 | 3,825 | $459.60 | $1,757,970 | Sell-to-Cover | — | Ex. A at 79 |
| May 9, 2023 | 2,785 | $409.78 | $1,141,237 | Sell-to-Cover | — | Ex. A at 80 |
| Jul. 3, 2023 | 10,960 | $537.79 | $5,894,178 | Sell-to-Cover | — | Ex. A at 81 |
| Jul. 21, 2023 | 28,845 | $534.23 | $15,409,864 | Sell-to-Cover | — | Ex. A at 82 |
| Aug. 4, 2023 | 3,815 | $526.54 | $2,008,750 | Sell-to-Cover | — | Ex. A at 84 |
| Aug. 8, 2023 | 2,836 | $530.26 | $1,503,817 | Sell-to-Cover | — | Ex. A at 86 |
| Oct. 2, 2023 | 10,960 | $458.30 | $5,022,968 | Sell-to-Cover | — | Ex. A at 88 |
| Nov. 6, 2023 | 3,790 | $492.92 | $1,868,167 | Sell-to-Cover | — | Ex. A at 90 |
| Nov. 8, 2023 | 2,790 | $490.39 | $1,368,188 | Sell-to-Cover | — | Ex. A at 92 |
| Jan. 4, 2024 | 58,654 | $583.14 | $34,203,494 | Sell-to-Cover | — | Ex. A at 94 |
| Jan. 5, 2024 | 8,000 | ~$572.28 (avg.) | $4,578,223 | 10b5-1 Plan | Aug. 23, 2023 | Ex. A at 96–97; Ex. E at 11 |
| Feb. 1, 2024 | 8,000 | $602.01 | $4,816,043 | 10b5-1 Plan | Aug. 23, 2023 | Ex. A at 98–99; Ex. E at 11 |
| Feb. 5, 2024 | 3,791 | $641.00 | $2,430,031 | Sell-to-Cover | — | Ex. A at 100 |

6

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| **Total: 19 Trade Dates** | **218,788** | | **$112,930,209** | | | |
| *Sell-to-Cover: 17 trade dates (89.5%), 202,788 shares (92.7%), $103,535,943 (91.7%).* *10b5-1 Plan: 2 trade dates (10.5%), 16,000 shares (7.3%), $9,394,266 (8.3%).* | | | | | | |

**Table 5: Michael Hsing – Class Period Trades (February 8 – November 11, 2024)**

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| Feb. 8, 2024 | 2,790 | $680.00 | $1,897,200 | Sell-to-Cover | — | Ex. A at 102 |
| Mar. 1, 2024 | 8,000 | ~$726.08 (avg.) | $5,808,620 | 10b5-1 Plan | Aug. 23, 2023 | Ex. A at 104–05; Ex. E at 12 |
| Apr. 1, 2024 | 8,000 | ~$677.44 (avg.) | $5,419,521 | 10b5-1 Plan | Aug. 23, 2023 | Ex. A at 106–07; Ex. E at 12 |
| May 1, 2024 | 8,000 | ~$661.86 (avg.) | $5,294,840 | 10b5-1 Plan | Aug. 23, 2023 | Ex. A at 108–09; Ex. E at 12 |
| May 8, 2024 | 2,824 | $690.00 | $1,948,560 | Sell-to-Cover | — | Ex. A at 110 |
| Jun. 3, 2024 | 8,000 | ~$731.08 (avg.) | $5,848,606 | 10b5-1 Plan | Aug. 23, 2023 | Ex. A at 112–14; Ex. E at 12 |
| Jul. 1, 2024 | 2,672 | ~$804.57 (avg.) | $2,149,816 | 10b5-1 Plan | Aug. 23, 2023 | Ex. A at 115–16; Ex. E at 12 |
| Jul. 22, 2024 | 9,614 | $831.58 | $7,994,810 | Sell-to-Cover | — | Ex. A at 117 |
| Aug. 8, 2024 | 2,790 | $778.39 | $2,171,708 | Sell-to-Cover | — | Ex. A at 119 |
| Aug. 9, 2024 | 4,263 | ~$827.18 (avg.) | $3,526,277 | 10b5-1 Plan | Aug. 23, 2023 | Ex. A at 121–22; Ex. E at 12 |
| Nov. 8, 2024 | 2,812 | $765.15 | $2,151,602 | Sell-to-Cover | — | Ex. A at 123 |
| **Total: 11 Trade Dates** | **59,765** | | **$44,211,560** | | | |
| *Sell-to-Cover: 5 trade dates (45.5%), 20,830 shares (34.9%), $16,163,880 (36.6%). 10b5-1 Plan: 6 trade dates (54.5%), 38,935 shares (65.1%), $28,047,680 (63.4%).* | | | | | | |

8

# Appendix 2

**Appendix 2**
**Chart of Blegen Stock Sales**

**Table 1: Bernie Blegen – 2020 Trades**[1]

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| Jan. 7, 2020 | 915 | $176.99 | $161,946 | Sell-to-Cover | — | Ex. F at 2 |
| Jan. 21, 2020 | 819 | $181.12 | $148,337 | Sell-to-Cover | — | Ex. F at 3 |
| Jan. 21, 2020 | 965 | $181.12 | $174,781 | 10b5-1 Plan | Aug. 8, 2019 | Ex. F at 3; Ex. G at 12 |
| Feb. 6, 2020 | 12,096 | $183.75 | $2,222,667 | Sell-to-Cover | — | Ex. F at 4 |
| Feb. 10, 2020 | 1,611 | $181.07 | $291,710 | Sell-to-Cover | — | Ex. F at 6 |
| Feb. 18, 2020 | 49 | $187.81 | $9,203 | Sell-to-Cover | — | Ex. F at 7 |
| Mar. 24, 2020 | 1,408 | $160.00 | $225,280 | 10b5-1 Plan | Feb. 14, 2020 | Ex. F at 8; Ex. H at 11 |
| Apr. 1, 2020 | 920 | $162.58 | $149,574 | Sell-to-Cover | — | Ex. F at 9 |
| Apr. 20, 2020 | 1,039 | $182.45 | $189,566 | Sell-to-Cover | — | Ex. F at 10 |
| Apr. 20, 2020 | 1,408 | $183.50 | $258,368 | 10b5-1 Plan | Feb. 14, 2020 | Ex. F at 10; Ex. H at 11 |
| May 8, 2020 | 3,177 | $208.67 | $662,937 | Sell-to-Cover | — | Ex. F at 11 |
| May 19, 2020 | 1,408 | $204.91 | $288,513 | 10b5-1 Plan | Feb. 14, 2020 | Ex. F at 12; Ex. H at 11 |
| Jun. 19, 2020 | 1,408 | $224.13 | $315,575 | 10b5-1 Plan | Feb. 14, 2020 | Ex. F at 13; Ex. H at 11 |

---

[1] The trading data presented in the tables is derived from Forms 4 filed with the Securities and Exchange Commission, as well as the addenda to Mr. Blegen's Rule 10b5-1 trading plans discussed herein, all of which attached to Defendants' Answer as **Exhibits F–J**. Total approximate values are reported as stated in the Forms 4 and, where transactions were executed at multiple prices, reflect aggregate reported proceeds rather than a single price-times-quantity calculation. Price-per-share figures denoted with "~" or "avg." indicate that the transaction was executed in multiple lots at varying prices, and the figure shown represents the approximate average or range. Percentages are rounded to the nearest tenth of a percent.

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| Jul. 1, 2020 | 905 | $235.16 | $212,820 | Sell-to-Cover | — | Ex. F at 14 |
| Jul. 20, 2020 | 1,408 | $249.34 | $351,071 | 10b5-1 Plan | Feb. 14, 2020 | Ex. F at 15; Ex. H at 11 |
| Jul. 20, 2020 | 1,000 | $249.34 | $249,340 | Sell-to-Cover | — | Ex. F at 15 |
| Aug. 10, 2020 | 3,116 | $274.40 | $855,036 | Sell-to-Cover | — | Ex. F at 17 |
| Aug. 19, 2020 | 1,404 | $277.23 | $389,231 | 10b5-1 Plan | Feb. 14, 2020 | Ex. F at 18; Ex H at 11 |
| Sep. 18, 2020 | 1,408 | $252.80 | $355,949 | 10b5-1 Plan | Feb. 14, 2020 | Ex. F at 19; Ex H at 11–12 |
| Oct. 1, 2020 | 905 | $280.50 | $253,853 | Sell-to-Cover | — | Ex. F at 20 |
| Oct. 19, 2020 | 1,534 | $315.49 | $483,962 | 10b5-1 Plan | Feb. 14, 2020 | Ex. F at 21; Ex. H at 12 |
| Nov. 9, 2020 | 3,169 | $333.51 | $1,056,904 | Sell-to-Cover | — | Ex. F at 22 |
| Nov. 19, 2020 | 1,420 | $309.57 | $439,589 | 10b5-1 Plan | Feb. 14, 2020 | Ex. F at 23; Ex. H at 12 |
| Dec. 21, 2020 | 1,418 | $346.52 | $491,362 | 10b5-1 Plan | Feb. 14, 2020 | Ex. F at 24–25; Ex. H at 12 |
| **Total: 24 Trade Dates** | **44,910** | | **$10,237,574** | | | |
| *Sell-to-Cover: 13 trade dates \| 29,721 shares \| $6,463,893 (63.1%)* <br> *10b5-1 Plan: 11 trade dates \| 15,189 shares \| $3,773,681 (36.9%)* | | | | | | |

2

**Table 2: Bernie Blegen – 2021 Trades**

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| Jan. 4, 2021 | 905 | $368.26 | $333,275 | Sell-to-Cover | — | Ex. F at 26 |
| Jan. 20, 2021 | 1,919 | $397.01 | $761,862 | 10b5-1 Plan | Feb. 14, 2020 | Ex. F at 27–28; Ex. H at 12 |
| Feb. 5, 2021 | 11,010 | $366.34 | $4,033,403 | Sell-to-Cover | — | Ex. F at 31 |
| Feb. 9, 2021 | 2,922 | $372.89 | $1,089,585 | Sell-to-Cover | — | Ex. F at 31 |
| Feb. 19, 2021 | 4,299 | $386.99 | $1,663,670 | 10b5-1 Plan | Feb. 14, 2020 | Ex. F at 32–33; Ex. H at 12 |
| Mar. 22, 2021 | 1,897 | $350.48 | $664,861 | 10b5-1 Plan | Feb. 18, 2021 | Ex. F at 34–35; Ex. I at 12 |
| Apr. 1, 2021 | 905 | $364.78 | $330,126 | Sell-to-Cover | — | Ex. F at 36 |
| Apr. 20, 2021 | 1,897 | $364.86 | $692,139 | 10b5-1 Plan | Feb. 18, 2021 | Ex. F at 37–38; Ex. I at 12 |
| May 10, 2021 | 1,562 | $326.40 | $509,837 | Sell-to-Cover | — | Ex. F at 40 |
| May 12, 2021 | 1,437 | $311.82 | $448,085 | Sell-to-Cover | — | Ex. F at 41 |
| May 20, 2021 | 1,897 | $330.00 | $626,010 | 10b5-1 Plan | Feb. 18, 2021 | Ex. F at 42; Ex. I at 12 |
| Jun. 21, 2021 | 1,897 | $353.17 | $669,963 | 10b5-1 Plan | Feb. 18, 2021 | Ex. F at 43; Ex. I at 12 |
| Jul. 1, 2021 | 905 | $370.45 | $335,257 | Sell-to-Cover | — | Ex. F at 44 |
| Jul. 20, 2021 | 1,897 | $382.77 | $726,115 | 10b5-1 Plan | Feb. 18, 2021 | Ex. F at 45; Ex. I at 12 |
| Aug. 9, 2021 | 1,474 | $459.12 | $676,743 | Sell-to-Cover | — | Ex. F at 46 |
| Aug. 12, 2021 | 1,379 | $457.10 | $630,341 | Sell-to-Cover | — | Ex. F at 48 |

3

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| Aug. 20, 2021 | 1,897 | $469.24 | $890,148 | 10b5-1 Plan | Feb. 18, 2021 | Ex. F at 50; Ex. I at 12 |
| Sep. 20, 2021 | 1,897 | $482.99 | $916,232 | 10b5-1 Plan | Feb. 18, 2021 | Ex. F at 52–53; Ex. I at 12 |
| Oct. 1, 2021 | 910 | $476.16 | $433,306 | Sell-to-Cover | — | Ex. F at 54 |
| Oct. 20, 2021 | 1,897 | $496.59 | $942,031 | 10b5-1 Plan | Feb. 18, 2021 | Ex. F at 56; Ex. I at 12 |
| Nov. 8, 2021 | 1,460 | $548.27 | $800,474 | Sell-to-Cover | — | Ex. F at 58 |
| Nov. 12, 2021 | 1,364 | $553.42 | $754,865 | Sell-to-Cover | — | Ex. F at 60 |
| Nov. 22, 2021 | 1,897 | $567.54 | $1,076,628 | 10b5-1 Plan | Feb. 18, 2021 | Ex. F at 62–64; Ex. I at 12 |
| Dec. 20, 2021 | 1,897 | $474.35 | $899,842 | 10b5-1 Plan | Feb. 18, 2021 | Ex. F at 65; Ex. I at 12 |
| **Total: 24 Trade Dates** | **51,421** | | **$20,904,798** | | | |
| *Sell-to-Cover: 12 trade dates \| 26,233 shares \| $10,375,297 (49.6%)* *10b5-1 Plan: 12 trade dates \| 25,188 shares \| $10,529,501 (50.4%)* | | | | | | |

4

**Table 3: Bernie Blegen – 2022 Trades**

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| Jan. 3, 2022 | 905 | $490.87 | $444,237 | Sell-to-Cover | — | Ex. F at 67 |
| Jan. 20, 2022 | 1,897 | ~$414.46 (avg.) | $786,222 | 10b5-1 Plan | Feb. 18, 2021 | Ex. F at 68–69; Ex. I at 12 |
| Feb. 7, 2022 | 6,336 | $399.28 | $2,529,838 | Sell-to-Cover | — | Ex. F at 71 |
| Feb. 8, 2022 | 1,117 | $401.12 | $448,051 | Sell-to-Cover | — | Ex. F at 71 |
| Feb. 14, 2022 | 1,387 | $429.60 | $595,855 | Sell-to-Cover | — | Ex. F at 72 |
| Feb. 22, 2022 | 1,539 | ~$452.11 (avg.) | $695,795 | 10b5-1 Plan | Feb. 18, 2021 | Ex. F at 73–74; Ex. I at 12 |
| Apr. 1, 2022 | 930 | $467.22 | $434,515 | Sell-to-Cover | — | Ex. F at 75 |
| May 4, 2022 | 850 | $453.16 | $385,182 | Sell-to-Cover | — | Ex. F at 76 |
| May 12, 2022 | 1,395 | $388.10 | $541,400 | Sell-to-Cover | — | Ex. F at 77 |
| Jul. 1, 2022 | 950 | $361.58 | $343,501 | Sell-to-Cover | — | Ex. F at 78 |
| Aug. 4, 2022 | 848 | $522.38 | $442,978 | Sell-to-Cover | — | Ex. F at 79 |
| Aug. 12, 2022 | 1,369 | $525.95 | $720,026 | Sell-to-Cover | — | Ex. F at 80 |
| Oct. 3, 2022 | 905 | $372.60 | $337,203 | Sell-to-Cover | — | Ex. F at 81 |
| Nov. 4, 2022 | 847 | $343.98 | $291,351 | Sell-to-Cover | — | Ex. F at 82 |
| Nov. 14, 2022 | 1,196 | $390.33 | $466,835 | Sell-to-Cover | — | Ex. F at 83 |
| Nov. 15, 2022 | 191 | $406.27 | $77,598 | Sell-to-Cover | — | Ex. F at 83 |
| **Total: 16 Trade Dates** | **22,662** | | **$9,540,587** | | | |
| *Sell-to-Cover: 14 trade dates (87.5%), 19,226 shares (84.8%), $8,058,569 (84.5%).* *10b5-1 Plan: 2 trade dates (12.5%), 3,436 shares (15.2%), $1,482,016 (15.5%).* | | | | | | |

5

**Table 4: Bernie Blegen – 2023 and Pre-Class Period 2024 Trades**

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| Jan. 3, 2023 | 1,884 | $344.96 | $649,905 | Sell-to-Cover | — | Ex. F at 84 |
| Feb. 6, 2023 | 608 | $446.87 | $271,697 | Sell-to-Cover | — | Ex. F at 85 |
| Feb. 8, 2023 | 5,684 | $462.41 | $2,628,338 | Sell-to-Cover | — | Ex. F at 87 |
| Feb. 13, 2023 | 1,373 | $492.31 | $675,942 | Sell-to-Cover | — | Ex. F at 88 |
| Feb. 16, 2023 | 5,000 | ~$521.13 (avg.) | $2,605,651 | Open Market | — | Ex. F at 89 |
| Apr. 3, 2023 | 920 | ~$487.99 (avg.) | $448,951 | Sell-to-Cover | — | Ex. F at 91 |
| May 3, 2023 | 2,870 | $463.55 | $1,330,389 | Sell-to-Cover | — | Ex. F at 93 |
| May 4, 2023 | 854 | $459.60 | $392,498 | Sell-to-Cover | — | Ex. F at 95 |
| May 9, 2023 | 711 | $409.78 | $291,354 | Sell-to-Cover | — | Ex. F at 96 |
| Jul. 3, 2023 | 905 | $537.79 | $486,700 | Sell-to-Cover | — | Ex. F at 97 |
| Jul. 21, 2023 | 7,575 | $534.23 | $4,046,792 | Sell-to-Cover | — | Ex. F at 98 |
| Aug. 4, 2023 | 852 | $526.52 | $448,595 | Sell-to-Cover | — | Ex. F at 100 |
| Aug. 8, 2023 | 724 | $530.28 | $383,923 | Sell-to-Cover | — | Ex. F at 102 |
| Oct. 2, 2023 | 905 | $458.30 | $414,762 | Sell-to-Cover | — | Ex. F at 104 |
| Nov. 6, 2023 | 847 | $492.92 | $417,503 | Sell-to-Cover | — | Ex. F at 106 |
| Nov. 8, 2023 | 712 | $490.39 | $349,158 | Sell-to-Cover | — | Ex. F at 108 |
| Dec. 18, 2023 | 2,500 | ~$631.36 (avg.) | $1,578,398 | 10b5-1 Plan | Aug. 18, 2023 | Ex. F at 110–11; Ex. J at 12 |
| Jan. 2, 2024 | 2,500 | ~$615.71 (avg.) | $1,539,272 | 10b5-1 Plan | Aug. 18, 2023 | Ex. F at 112–13; Ex. J at 12 |
| Jan. 4, 2024 | 27,613 | $583.14 | $16,102,245 | Sell-to-Cover | — | Ex. F at 114 |

6

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| Feb. 1, 2024 | 2,500 | ~$603.26 (avg.) | $1,508,138 | 10b5-1 Plan | Aug. 18, 2023 | Ex. F at 116–17; Ex. J at 12 |
| Feb. 5, 2024 | 867 | $641.00 | $555,747 | Sell-to-Cover | — | Ex. F at 118 |
| **Total: 21 Trade Dates** | **68,404** | | **$37,125,958** | | | |
| *Sell-to-Cover: 17 trade dates (81.0%), 55,904 shares (81.7%), $29,894,499 (80.5%). 10b5-1 Plan: 3 trade dates (14.3%), 7,500 shares (11.0%), $4,625,808 (12.5%). Open Market: 1 trade date (4.8%), 5,000 shares (7.3%), $2,605,651 (7.0%)* | | | | | | |

7

**Table 5: Bernie Blegen – Class Period Trades (February 8 – November 11, 2024)**

| Trade Date | No. of Shares Sold | Price Per Share | Total Approximate Value | Transaction Type | 10b5-1 Plan Date | Answer Citation |
|---|---|---|---|---|---|---|
| Feb. 8, 2024 | 728 | $680.00 | $495,040 | Sell-to-Cover | — | Ex. F at 120 |
| Mar. 1, 2024 | 2,500 | ~$725.76 (avg.) | $1,814,388 | 10b5-1 Plan | Aug. 18, 2023 | Ex. F at 122–23; Ex. J at 12 |
| Apr. 1, 2024 | 2,500 | ~$677.40 (avg.) | $1,693,493 | 10b5-1 Plan | Aug. 18, 2023 | Ex. F at 124–25; Ex. J at 12 |
| May 1, 2024 | 2,500 | ~$663.29 (avg.) | $1,658,215 | 10b5-1 Plan | Aug. 18, 2023 | Ex. F at 126–27; Ex. J at 12 |
| May 8, 2024 | 737 | $689.98 | $508,515 | Sell-to-Cover | — | Ex. F at 128 |
| Jun. 3, 2024 | 2,500 | ~$731.77 (avg.) | $1,829,437 | 10b5-1 Plan | Aug. 18, 2023 | Ex. F at 130–31; Ex. J at 12 |
| Jul. 1, 2024 | 2,500 | ~$804.19 (avg.) | $2,010,485 | 10b5-1 Plan | Aug. 18, 2023 | Ex. F at 133–34; Ex. J at 12 |
| Jul. 22, 2024 | 2,580 | $831.58 | $2,145,476 | Sell-to-Cover | — | Ex. F at 135 |
| Aug. 1, 2024 | 2,500 | ~$852.51 (avg.) | $2,131,264 | 10b5-1 Plan | Aug. 18, 2023 | Ex. F at 137–38; Ex. J at 12 |
| Aug. 8, 2024 | 728 | $778.39 | $566,668 | Sell-to-Cover | — | Ex. F at 139 |
| Sep. 3, 2024 | 2,500 | ~$904.20 (avg.) | $2,260,506 | 10b5-1 Plan | Aug. 18, 2023 | Ex. F at 141–42; Ex. J at 12 |
| Oct. 1, 2024 | 2,500 | ~$908.36 (avg.) | $2,270,900 | 10b5-1 Plan | Aug. 18, 2023 | Ex. F at 144–45; Ex. J at 12 |
| Nov. 1, 2024 | 2,500 | ~$772.96 (avg.) | $1,932,405 | 10b5-1 Plan | Aug. 18, 2023 | Ex. F at 146–47; Ex. J at 12 |
| Nov. 8, 2024 | 734 | $765.15 | $561,620 | Sell-to-Cover | — | Ex. F at 148 |
| **Total: 14 Trade Dates** | **28,007** | | **$21,878,412** | | | |
| *Sell-to-Cover: 5 trade dates (35.7%), 5,507 shares (19.7%), $4,277,319 (19.5%).* *10b5-1 Plan: 9 trade dates (64.3%), 22,500 shares (80.3%), $17,601,093 (80.5%).* | | | | | | |

8

**CERTIFICATE OF SERVICE**

I hereby declare under penalty of perjury under the laws of the United States of America that, on this date, the foregoing document was filed electronically with the Court and thus served simultaneously upon all counsel of record.

Executed on August 3, 2026.

*s/ Amanda Saeteurn*
Amanda Saeteurn

CERTIFICATE OF SERVICE
(2:25-CV-00220-JLR)

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500